**Jane DOE I, et al., Plaintiffs,**

v.

**Liu QI, et al., Defendants.**

**Plaintiff A, et al., Plaintiffs,**

v.

**Xia Deren, et al., Defendants.**

**Nos. C 02–0672 CW, C 02–0695 CW.**

United States District Court,
N.D. California.

Dec. 8, 2004.

Matthew Eisenbrandt, Tania Rose, Law Offices of Michael Sorgen, San Francisco, CA, Terri Marsh, Washington, DC, Michael S. Sorgen, Law Offices of Michael Sorgen, San Francisco, CA, for Plaintiff.

Alison N. Barkoff, Alexander Kenneth Haas, Washington, DC, for Defendant.

Joseph Remcho, Thomas A. Willis, Remcho Johansen & Purcell, San Leandro, CA, for Amicus.

Karen Parker, San Francisco, CA, Morton Sklar, Washington, DC, for Intervenor.

## ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

WILKEN, District Judge.

Plaintiffs in these two related cases are Falun Gong practitioners who claim that acts of Defendants, local government officials of the People's Republic of China, violated the Alien Tort Claims Act (ATCA) and the Torture Victims Protection Act (TVPA). After Defendants failed to file a responsive pleading,the Clerk entered default. Plaintiffs filed a motion for default judgment in both cases. The Court referred the motions to Magistrate Judge Chen, who issued a Report and Recommendation.

Upon the Court's request, the United States Department of State filed a statement of interest in each case, expressing its concerns with the Report and addressing Plaintiffs' objections to the Report. The United States asked the Court to stay this case pending the Supreme Court's forthcoming ruling in *Sosa v. Alvarez-Machain,* —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d. 718 (2004), and the Court did so. Then it ordered supplemental briefing from the parties and requested a further statement of interest from the United States in light of *Sosa.* The Court then referred the matter back to Magistrate Judge Chen for an amended report in the light of *Sosa.* Plaintiffs filed objections to the Amended Report. Having reviewed the Magistrate Judge's Amended Report and all of the papers filed by the parties and the United States, the Court finds the Report correct, well-reasoned and thorough. The Report adequately considers and properly rejects the arguments advanced by Plaintiffs in their objections. In addition, the Report properly addresses the concerns expressed by the United States.

Thus, the Court OVERRULES Plaintiffs' objections and adopts the Amended Report in its entirety. The Court DENIES Plaintiffs' motion for *de novo* determination of this matter. Judgment shall enter accordingly.

IT IS SO ORDERED.

## AMENDED REPORT AND RECOMMENDATION RE: PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT

**(Docket No. 18, 19) (Docket No. 18)**

CHEN, United States Magistrate Judge.

### TABLE OF CONTENTS

I. GENERAL BACKGROUND............................................1266
 A. Jane Doe I, et al. v. Liu Qi ....................................1266
 B. Plaintiff A, et al. v. Xia Deren ................................1268
 C. Response by the U.S. State Department and the PRC ...........1270

II. CRITERIA FOR DEFAULT JUDGMENT..............................1271

III. SERVICE OF PROCESS ...........................................1274

IV. THE ALIEN TORT CLAIMS ACT AND TORTURE VICTIM
 PROTECTION ACT ..............................................1276

V. THE FOREIGN SOVEREIGN IMMUNITY ACT.........................1279
 A. Application of FSIA to Individual Officials .....................1281
 B. Whether Scope of Authority is Measured by International or Foreign
 Sovereign's Law ............................................1283

 C. Whether Defendants Acted Within the Scope of Their Authority Under
 Chinese Law ............................................................1285
 D. FSIA Sovereign Immunity Not Applicable to Defendants Liu and Xia....1287

 VI. ACT OF STATE DOCTRINE ...........................................1288
 A. Background on the Act of State Doctrine ..............................1288
 B. Whether Defendants' Conduct Constituted Acts of State .................1292
 C. The Sabbatino Analysis ..............................................1295
 1. Degree of International Consensus ...............................1296
 2. Implications for Foreign Relations ...............................1296
 3. Continued Existence of the Accused Government .....................1303
 4. Whether the Foreign State Was Acting in the Public Interest .........1306
 5. Summary ......................................................1306

 VII. ANALYSIS OF PLAINTIFF'S HUMAN RIGHTS CLAIMS.................1306
 A. The Torture Claims (TVPA)..........................................1312
 B. Standing for Plaintiff B .............................................1313
 C. Legal Sufficiency of the Plaintiffs' Claims of Torture ....................1313
 1. Color of Law or Authority ......................................1314
 2. Acts Rising to the Level of Torture ..............................1314
 a. Subjected to Torture While Under the Actor's Custody or
 Physical Control .........................................1314
 b. Severe Pain or Suffering .................................1314
 c. Requisite Intent .........................................1318
 3. Exhaustion of Local Remedies and Statutes of Limitations ............1319
 D. Cruel, Inhuman or Degrading Treatment (ATCA).......................1320
 E. Arbitrary Detention (ATCA) .........................................1325
 1. Doe v. Liu.....................................................1326
 2. Plaintiff A v. Xia ..............................................1327
 3. Conclusion ....................................................1328

VIII. COMMANDER RESPONSIBILITY .....................................1328

 IX. CONCLUSION & RECOMMENDATION ...............................1334

Before this Court is a joint motion by the Plaintiffs of two related lawsuits asserting claims under the Alien Tort Claims Act and Torture Victim Protection Act. The Plaintiffs are practitioners and supporters of Falun Gong, a spiritual movement in the People's Republic of China (hereinafter referred to as "China" or "PRC"). The Plaintiffs in these two cases have moved for entry of default judgment against two Defendants—local governmental officials of China accused of violating their human rights. Plaintiffs' joint motion was heard on October 30, 2002. Extensive post-hearing briefs were submitted by the parties. On June 11, 2003, this Court issued a Report and Recommendation recommending that this motion be **GRANTED IN PART** and that default

judgment for declaratory relief entered as to certain claims and **DENIED IN PART** as to the remaining claims which should be dismissed.

The Plaintiffs filed objections with District Judge Wilken. During the pendency of the proceedings before Judge Wilken, the Supreme Court decided *Sosa v. Alvarez–Machain*, —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Judge Wilken ordered further briefing in light of *Sosa.* She then referred the matter back to this Court for an amended Report and Recommendation addressing *Sosa.*

For the reasons stated herein, the Court concludes that its initial Report and Recommendation is entirely consistent with the Supreme Court's decision in *Sosa.* As

stated in its previous Report and Recommendation, the Court finds that Plaintiffs' claims under the Alien Tort Claims Act and Torture Victim Protection Act are not barred by sovereign immunity under the Foreign Sovereign Immunity Act because the alleged conduct cognizable in this suit were not validly authorized under Chinese law. However, justiciability concerns embodied in the act of state doctrine counsel against remedies other than declaratory relief. Those concerns are driven primarily by the potential impact these suits may have on foreign relations and the fact that the suits are brought against sitting officials and challenge current governmental policies. The Court also finds that as to the Plaintiffs' specific substantive claims, the Court should enter default judgment against Defendants for declaratory relief on certain claims. In particular, the Court recommends entry of judgment declaring that certain Plaintiffs were subject to torture, cruel, inhuman and degrading treatment, and arbitrary detention in violation of the Alien Tort Claims Act and Torture Victim Protection Act. The Court finds that it would not be appropriate to adjudicate the claims relating to broad systemic conduct of the government. Other claims have not been established on the merits. The Court recommends the remaining claims be dismissed.

## I. GENERAL BACKGROUND

Falun Gong is a spiritual practice that blends aspects of Taoism, Buddhism and the meditation techniques of qigong (a traditional martial art) with the teachings of Li Hongzhi, who was forced to leave China under threat of arrest in 1998. *Liu* Compl. ¶ 1. Falun Gong has followers in China and internationally. *Id.*

In July 1999, Chinese President Jiang Zemin and other high ranking officials issued statements declaring Falun Gong to be an illegal organization and orders initiating a widespread governmental crackdown against Falun Gong and its practitioners. *Liu* Compl. ¶ 30. In October 1999, the People's Congress, the Chinese national legislature, passed a series of laws outlawing "cults," defined to include Falun Gong. *Id.* As a result, according to the Plaintiffs, over 100,000 practitioners have been subjected to some form of "punishment," including arrest and detention in prison facilities, labor camps, and mental hospitals, brutal beatings, starvation, and other forms of torture, including electric shock and nerve-damaging drugs. *Liu* Compl. ¶ 31; *Xia* Compl. ¶ 19. Plaintiffs allege many have died while in the custody of law enforcement or prison personnel. *Id.*[1]

The instant suits seek both an award of damages and equitable relief.

## A. Jane Doe I, et al. v. Liu Qi

Between February 1999, before the governmental crackdown began in mid–1999,

---

1. The two actions before this Court are not unique. Other suits have been brought by Falun Gong supporters in the United States in an attempt to hold individual officials of the PRC accountable for alleged human rights violations directed against the Falun Gong movement in China. *See* Jacques DeLisle, *Human Rights, Civil Wrongs and Foreign Relations: A "Sinical" Look at the Use of U.S. Litigation to Address Human Rights Abuses Abroad*, 52 DePaul L.Rev. 473, 474–76 (2002). Since July, 2001, Falun Gong supporters have brought at least five actions, including the two here. An action was brought in New York against Zhao Zhifei, the head of the Hubei Provincial Public Security Bureau. *Id.* at 474. Another was brought in Chicago against Zhou Youkang, the Chinese Communist Party Secretary for Sichuan Province. *Id.* at 475. A third suit was filed in Hawaii against Ding Guangen, a Chinese Communist Party Politburo member and national deputy chief of the Party Propaganda Department. *Id.* at 476.

and early 2003, Defendant Liu Qi (hereinafter referred to as "Liu") served as the mayor of Beijing. *Liu* Compl. ¶ 32. Beijing has been a focal point for the repression and persecution of the Falun Gong. *Id.* As the mayor of Beijing, Liu had authority to formulate all provincial policies and lead the executive branches of the city government, including the Public Security Bureau of Beijing. *Id.* ¶ 35. The police and other security forces operate under the Public Security Bureau of Beijing. *Id.*

In May 2000, Jane Doe I, a citizen of the PRC, went to Beijing's Tiananmen Square to protest the PRC's persecution, arrest, and torture of Falun Gong practitioners. *Liu* Compl. ¶ 13. Jane Doe I was arrested during the protest and held without charge. *Id.* For twenty days, she was not allowed to see family members or a lawyer and was beaten and interrogated regularly. *Id.* On at least one occasion she was tortured with electric shocks by needles placed in her body. *Id.* ¶ 14. When she lost the ability to eat, she was force-fed via a tube placed in her nose, which caused her to cough up blood. *Id.* ¶ 15. After her release, Jane Doe I was subject to constant surveillance, arrests and interrogation. She subsequently fled China and presently resides in the United States. *Id.* ¶ 16.

In May 2000, Jane Doe II, a citizen of the PRC, was arrested and beaten so severely that she temporarily lost her hearing at a protest in Tiananmen Square.[2] *Liu* Compl. ¶ 18. She was held without charge for approximately twenty-seven days, during which she was interrogated, regularly beaten to the point of uncon-

sciousness, stripped of her clothing, and force-fed via a tube placed in her nose. *Id.* ¶¶ 18–24. Suffering further persecution after her release, Jane Doe II fled China and received political asylum in the United States. *Id.* ¶ 25.

On November 20, 2001, the following individuals who have joined as plaintiffs herein were arrested in Tiananmen Square during a demonstration in support of the Falun Gong:

1. Helen Petit, a citizen of France, was physically and sexually assaulted by officers during her arrest and interrogation. *Liu* Compl. ¶ 26. Petit was never advised of any charges and was not allowed to contact her embassy or consult with a lawyer. *Id.* After being detained for 24 hours or more, Petit was deported back to France. *Id.*

2. Martin Larsson, a citizen of Sweden and a university student in the United States, was interrogated by officers and physically assaulted by four guards when he refused to sign a statement written in Chinese and to allow them to take pictures of him. *Liu* Compl. ¶ 27. Larsson was never advised of any charges against him and was not allowed to contact his embassy or consult with a lawyer. *Id.* Larsson was deported to Sweden the following day. *Id.*

3. Leeshai Lemish, a citizen of both Israel and the United States and a university student in the United States, was interrogated and beaten during his 27 hour detention and not allowed to sleep, after which he was placed on a flight to Vancouver. *Liu* Compl. ¶ 28. Lemish was never

---

**2.** Jane Doe II had also previously been arrested in July 1999, when she went to Beijing to appeal to the People's Republic of China on behalf of arrested Falun Gong practitioners. She was not told of the charges against her and was refused contact with her family or an attorney. She was searched and her Falun Gong books confiscated. She was taken to a stadium with thousands of other practitioners where guards attempted to force them to renounce their spiritual beliefs. Jane Doe II was returned to her home town in handcuffs and detained for three days, without any charges being filed. *Liu* Compl. ¶¶ 17–24.

advised of any charges against him and was not allowed to contact his embassy or consult with a lawyer. *Id.*

4. Roland Odar, a citizen of Sweden, was beaten during his arrest and interrogation, and deported the following day to Sweden. *Liu* Compl. ¶ 29. He was never advised of any charges against him and was not allowed to contact his embassy or consult with a lawyer.

On February 7, 2002, Jane Doe I, Jane Doe II, Helene Petit, Martin Larsson, Leeshai Lemish and Roland Odar (hereinafter referred to as the "*Liu* Plaintiffs") filed suit against Defendant Liu for torts committed in violation of international and domestic law including the Torture Victim Protection Act (hereinafter referred to as the "TVPA"), 28 U.S.C. § 1350 note § 1 (2002). The *Liu* Plaintiffs allege this Court has jurisdiction over this action based on the Alien Tort Claims Act (hereinafter referred to as the "ATCA"), 28 U.S.C. §§ 1331, 1350 (2002). The *Liu* Plaintiffs also allege that Defendant Liu planned, instigated, ordered, authorized, or incited police and other security forces to commit the abuses suffered by the *Liu* Plaintiffs, and had command or superior responsibility over, controlled, or aided and abetted such forces in their commission of these abuses. *Liu* Compl. ¶ 2. Thus, Liu knew or reasonably should have known that Beijing police and other security forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong practitioners, and breached his duty, under both international and Chinese law, to investigate, prevent and punish human rights violations committed by members of the police and other security forces under his authority. *Id.* ¶¶ 33–34.

The *Liu* Complaint alleges the following claims under the TVPA and/or the ATCA: (1) torture of Plaintiffs Jane Doe I and Jane Doe II particularly; (2) cruel, inhuman or degrading treatment; (3) arbitrary detention; (4) crimes against humanity; and (5) interference with freedom of religion and belief. *Liu* Compl. ¶¶ 39–72. Plaintiffs seek compensatory, punitive and exemplary damages, reasonable attorneys' fees and costs of suit, and other and further relief as the court may deem just and proper. *Id.* ¶ 72.

Defendant Liu was personally served with the summons and complaint, and supplemental documents by a process server on February 7, 2002 at the San Francisco International Airport (discussed *infra* Part III).

On March 8, 2002, the *Liu* Plaintiffs filed a motion for entry of default. On March 12, 2002, the Clerk of this Court entered Liu's default. On March 14, 2002, Judge Claudia Wilken ordered the *Liu* Plaintiffs to file a motion for default judgment within 30 days, and which upon filing of the motion, was to be referred to a Magistrate Judge for a report and recommendation. On April 11, 2002, the *Liu* Plaintiffs filed this motion for judgment by default.

## B. *Plaintiff A, et al. v. Xia Deren*

Defendant Xia Deren (hereinafter referred to as "Xia") presently serves as Deputy Provincial Governor of the Liao Ning Province. According to the *Xia* Plaintiffs, this province is known to be one of the most repressive and abusive jurisdictions in China with regard to the arrest and treatment of Falun Gong practitioners. *Xia* Compl. ¶ 20. Since President Jiang Zemin's banning order of July 1999, at least 27 Falun Gong practitioners have allegedly died from torture inflicted in labor camps and detention centers in Liao Ning Province. *Id.* Masanjia Labor Camp, located in the capital of Liao Ning Province, Shenyang City, is purported to be

one of the most notorious prison labor camps in the country and is used to incarcerate and torture Falun Gong practitioners. *Id.*

From January 1998 through November 2000, Defendant Xia served as Deputy Mayor of Da Lian City, Liao Ning Province, and then as Deputy Mayor of General Affairs and Member of the Da Lian City Council from November 2000 through May 2001. *Xia* Compl. ¶ 14. In May of 2001, he assumed responsibility as Deputy Provincial Governor for Liao Ning Province. *Id.* While serving as Deputy Mayor, Deputy Mayor of General Affairs and Member of the Da Lian City Council, Xia exercised general supervisory authority over municipal affairs, including the operation of the law enforcement and correctional systems. *Id.* ¶ 15. Xia also served on the general governance body that oversees and directs policy-making and the carrying out of government policies and functions for the affected jurisdiction. Thus, Defendant Xia played a major policy-making and supervisory role in the policies and practices that were carried out in Da Lian City during that period. *Id.* In his present role as Deputy Provincial Governor of Liao Ning Province, Xia manages and supervises the News and Publications Bureau and all operations related to the control of the media, governmental communications, and distribution of government publications and notices. *Id.* ¶ 16. Defendant Xia also plays a key part in the general governance body that exercises general jurisdiction, supervision and authority over governmental policies and practices for the Province as whole, including law enforcement and prison management questions, and policies and practices associated with the governmentally mandated crack-down and persecution of the Falun Gong spiritual movement and its practitioners. *Id.* ¶ 17.

Plaintiff A,[3] a 53 year old female, was a citizen and resident of Da Lian City in Liao Ning Province during the period that Xia served as Deputy Mayor of Da Lian City. She was arrested and detained for long periods on two occasions in 1999 and 2000. While in detention, she was subjected to torture, such as being denied food and water, being required to remain standing and handcuffed against the backs of other prisoners for prolonged periods of time, being denied sleep, being denied use of toilet facilities, and being forced to watch the torture of others, including another Falun Gong practitioner who was placed on a rusty torture device called Di Lao. *Xia* Compl. ¶¶ 9, 25.

Plaintiff B, a former resident of Liao Ning Province, brings this complaint on behalf of herself and her parent, who still resides in Liao Ning Province and is currently incarcerated in Masanjia Labor Camp. *Xia* Compl. ¶ 10. Plaintiff B's Parent was arrested and detained twice, first in 2000 when the parent was detained for an extended period, and again in 2001. *Id.* At the labor camp, Plaintiff B's Parent has been subjected to physical abuse, torture and highly degrading treatment and punishment, including arbitrary, long-term detention and deprivation of liberty and security of the person. *Id.*

In 1999, Plaintiff C, a 39 year old male and former resident of Liao Ning Province, was arrested, detained for a number of days, and brutally beaten by the police with chains and an electric baton when he went to Beijing to support Falun Gong practitioners and protest their repression. *Xia* Compl. ¶ 11. In April 2000, he was

---

**3.** Plaintiffs filed under fictitious names to protect themselves and family members living in the PRC from governmental reprisals. *Xia* Compl. ¶ 8. The Court permitted the Plaintiffs to file confidential affidavits.

arrested a second time in Liao Ning Province and while in detention, beaten and tortured repeatedly. On one occasion when he refused to answer questions, he was beaten to unconsciousness, with blood coming from his mouth and nose, and his foot badly mangled. *Id.* ¶¶ 11, 27. On other occasions, he was hung from water pipes for three days, handcuffed to other prisoners, and not allowed to sleep. *Id.*

On February 8, 2002, Plaintiffs A, B, and C (hereinafter referred to as the "*Xia* Plaintiffs") filed suit against Defendant Xia for torts committed in violation of international and domestic law under the ATCA and the TVPA. 28 U.S.C. § 1350. The *Xia* Plaintiffs allege that Defendant Xia's actions led to the abuses inflicted upon them. They allege that Defendant Xia together with other officials, acted in their official capacity and under color of law, to persecute, punish and intimidate Falun Gong practitioners in violation of international and domestic laws. *Xia* Compl. ¶ 28. The suit is styled as a class action but Plaintiffs have never moved to certify the class.

Defendant Xia was also personally served with the summons, complaint, and supplemental documents by a process server on February 8, 2002 at the Fremont Hilton Hotel in Newark, California (discussed *infra* Part III).

The *Xia* Complaint alleges, *inter alia*, the following claims under the TVPA and/or the ATCA: (1) torture; (2) genocide; (3) violation of one's right to life; (4) arbitrary arrest and imprisonment; and (5) violation of one's right to freedom of thought, conscience and religion. *Xia* Compl. ¶¶ 29–35. The *Xia* Plaintiffs seek compensatory, punitive and exemplary damages; a declaratory judgment confirming the unlawful nature of the pattern and practice of gross violations of human rights that have taken place, injunctive relief prohibiting further unlawful action, reasonable

attorneys' fees and costs for this litigation, and other and further relief as the court may deem just and proper. *Id.* ¶ 36. Defendant Xia was served but did not enter an appearance.

On June 18, 2002, the *Xia* Plaintiffs filed a motion for entry of default. On June 26, 2002, the Clerk of this Court entered Xia's default. Having been notified of a related case, the *Liu* case, on June 28, 2002, the case was reassigned from Judge Larson to Judge Wilken for all further proceedings.

On August 1, 2002, Judge Wilken ordered the *Xia* Plaintiffs to file a motion for default judgment within 30 days, and upon filing of the motion for default judgment, referred the case to this Court for a report and recommendation. Since the *Xia* case was related to the *Liu* case, both cases were referred to this Court for consolidated hearing.

On August 5, 2002, this Court ordered a joint briefing schedule and joint hearing date on the Plaintiffs' motions for default judgment.

### C. *Response by the U.S. State Department and the PRC*

On September 27, 2002, at the invitation of this Court, the United States submitted a Statement of Interest and a statement made by the People's Republic of China in response to Plaintiffs' motions for default judgment against Defendants Liu and Xia.

In its Statement of Interest, the United States State Department (hereinafter referred to as "State Department") urged against adjudication of the instant suits. In its letter, the Department expresses the view that:

> In our judgment, adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong] movement, including the cases before Magistrate

Chen, is not the best way for the United States to advance the cause for human rights in China. . . .

. . . The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy. . . . Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

. . . [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of September 25, 2002, at 7–8 (emphasis in original).

In its letter transmitted to the Court, the PRC contends, *inter alia,* that the Falun Gong practitioners' lawsuits against Chinese public officials are "unwarranted," as the officials' treatment of Falun Gong practitioners at large is consistent with China's domestic and international legal obligations. Translation of Statement of the Government of the People's Republic of China on "Falun Gong" Unwarranted Lawsuits, September 2002, ¶¶ 1–2 (hereinafter "Translation of China's Statements"). The PRC contends that Falun Gong followers have perpetrated crimes that have brought "extremely grave damages to the Chinese society and people." *Id.* ¶ 1. The PRC argues that Falun Gong in particular was banned after the PRC concluded that it was a "cult" and an "unregistered and illegal organization." *Id.* ¶ 2. The PRC

accuses Falun Gong's founder, Li Hongzhi, and certain practitioners of committing activities that pose a "serious threat to public security." *Id.* ¶ 1.

Furthermore, the PRC contends that the plaintiffs' claims are not justiciable. *Id.* ¶ 3. The PRC posits that none of the exceptions under the Foreign Sovereign Immunity Act ("FSIA") applies to grant the Court jurisdiction over the claims. *Id.* In addition, the PRC contends both that outlawing the Falun Gong and punishing individuals for illegal activities related to the Falun Gong are supported by the Chinese Constitution and laws and thus, constitute acts of state. *Id.* As such, no foreign courts can question them. *Id.* Moreover, adjudication of the "false and unwarranted lawsuits [is] detrimental to China–US relations." *Id.* The PRC specifically accuses Falun Gong organizations based in the United States of "frame-ups" in which they sue Chinese officials who visit the United States in an effort "to obstruct the normal exchanges and cooperation and poison the friendly relations and cooperation between two countries." *Id.* ¶ 4. The PRC concludes with a reiteration of the detrimental effects of adjudication on the common interests of the two nations. *Id.*

## II. CRITERIA FOR DEFAULT JUDGMENT

■ Federal Rule of Civil Procedure 55(b)(2) permits a court, following a defendant's default, to enter a final judgment in a case. However, entry of a default judgment is not a matter of right. Its entry is entirely within the court's discretion and may be refused where the court determines no justifiable claim has been alleged or that a default judgment is inappropriate for other reasons. *See Draper v. Coombs,* 792 F.2d 915, 924 (9th Cir.1986); *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980).

Where, as here, a default has been entered, the factual allegations of each complaint together with other competent evidence submitted by the moving party are normally taken as true. *See TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir.1987); *Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir.1978). However, this Court must still review the facts to insure that the Plaintiffs have properly stated claims for relief. *See Cripps v. Life Ins. Co. of N. Am.,* 980 F.2d 1261, 1267 (9th Cir.1992) ("necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default"); *Apple Computer Inc. v. Micro Team,* 2000 WL 1897354, at *3 n. 5 (N.D.Cal.2000) ("Entry of default judgment is not mandatory upon Plaintiff's request, and the court has discretion to require some proof of the facts that must be established in order to determine liability.") (citing 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2688 (3rd ed.1998)).

In *Eitel v. McCool,* 782 F.2d 1470 (9th Cir.1986), the Ninth Circuit enumerated seven factors that a court may consider in determining whether to grant default judgment: (1) the merits of the plaintiff's substantive claim; (2) the sufficiency of the complaint; (3) the sum of money at stake in the action; (4) the possibility of prejudice to the plaintiff; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits. *Id.* at 1471–72; *see also Pepsico, Inc. v. Cal. Sec. Cans,* 238 F.Supp.2d 1172, 1174 (C.D.Cal. 2002).

The consolidated actions now before this Court are hardly the kind of a garden variety cases in which default judgments are sought. *Cf. e.g., Bd. of Trs. of Sheet Metal Workers v. Gen. Facilities, Inc.,* 2003 WL 1790837 (N.D.Cal.2003) (default judgment in ERISA action against distressed employer to recover unpaid contributions to employee benefit funds) *with* Hon. John M. Walker, Jr., *Domestic Adjudication of International Human Rights Violations Under The Alien Tort Statute,* 41 St. Louis U. L.J. 539, 539 (1997) ("It is safe to say that, quantitatively, international human rights law is not a major, or even a minor, component of the business of federal courts: it is a minuscule part of what we do."). Plaintiffs bring claims under ACTA and TVPA for human rights violations allegedly committed in China and sanctioned by the PRC including, *inter alia,* torture, genocide, crimes against humanity, religious persecution, and arbitrary arrest and imprisonment. The cases implicate important and consequential issues of sovereign immunity and could impact foreign relations and diplomacy.

Accordingly, the nature and gravity of the *Liu* and *Xia* cases mandate the factors that inform the Court's discretion in ruling on a motion to enter default judgment, particularly the merits and justiciability of Plaintiffs' substantive claims, be closely scrutinized. *See Eitel,* 782 F.2d at 1472 (There was no abuse of discretion to deny default judgment where "the district court could have had serious reservations about the merits of Eitel's substantive claim, based upon the pleadings."); *Aldabe,* 616 F.2d at 1092–93 ("Given the lack of merit in appellant's substantive claims, we cannot say that the district court abused its discretion in declining to enter a default judgment in favor of appellant."); *In re Kubick,* 171 B.R. 658, 662 (9th Cir. BAP1994) ("The court, prior to the entry of a default judgment, has an independent duty to determine the sufficiency of a claim, as stated in Rule 55(b)(2) ..."); *Lewis v. Lynn,* 236 F.3d 766, 767 (5th Cir.2001) (in constitutional action against

prison officials, district court did not abuse its discretion in denying default judgment when plaintiff had no meritorious claim).

Given the unusual circumstances and the potential implications of these cases, the Court, in ruling upon Plaintiffs' motion for entry of default judgment, must proceed with great caution. As will be evident, the Court accords greatest weight to the factors that address the merits of the Plaintiffs' substantive claims and the sufficiency of the complaint and evidence supporting their claims. The merits analysis encompasses important immunity and justiciability issues central to this case. That analysis dictates that some but not all claims pertaining to individual Plaintiffs are justiciable and sustainable, but that relief should be limited to declaratory relief. Because justiciability concerns preclude damages and injunctive relief, the *Eitel* factors regarding the sum of money at stake and possible prejudice to the Plaintiffs are irrelevant. Furthermore, as explained below, Plaintiffs' broad claims which involve systemic, class-based allegations and which squarely challenge official PRC policy are inappropriate for adjudication by default in view of the merits, the unreliability of the default process in this context, the disputability of facts material to these broader claims, and the strong policy favoring decision on the merits. Finally, although, as discussed below, personal service was effected on Defendants Liu and Xia, and thus personal jurisdiction was obtained under *Burnham v. Superior Court*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990), there is no evidence that either Defendant has had substantial contact with the United States. Both were served during brief visits to the United States. While human rights suits under the ATCA and TVPA may lie against individuals served while visiting the United States (*see e.g. Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir.1995)), Defendants' situation

stands in contrast to that of former officials and dictators who have taken residence in the United States. *See e.g. In re: Estate of Ferdinand Marcos, Human Rights Litig.* ("*Hilao II* "), 25 F.3d 1467 (9th Cir.1994); *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980). Thus, while their failure to appear and defend is not entirely excusable, it is less culpable in these circumstances.

■ Finally, it should be noted that default judgments against foreign nations are generally disfavored. *See* Restatement (Third) of Foreign Relations Law § 459 cmt c (1987) ("Default judgments are disfavored, particularly in suits against foreign states.") (hereinafter referred to as "Restatement"). *Cf.* 28 U.S.C. § 1608(e) (1994) (default judgment shall not be entered against a foreign state unless claimant establishes right to relief by "evidence satisfactory to the court."). Courts have gone to considerable lengths to allow default judgments against foreign states to be set aside. *See Jackson v. People's Republic of China,* 794 F.2d 1490, 1494–96 (11th Cir.1986) (in action by banks against the PRC for payment of bearer bonds issued by Imperial Chinese Government in 1911, district court properly set aside default judgment for lack of subject matter jurisdiction and where State Department informed the court that permitting the PRC to have its day in court will significantly further United States foreign policy interests); *see also First Fid. Bank v. Gov't of Ant. & Barb.,* 877 F.2d 189, 196 (2d Cir.1989) (reversing district court's denial of motion to set aside default judgment where there were factual issues as to whether U.N. ambassador had apparent authority to obtain loan and waive governments sovereign immunity); *Carl Marks & Co., Inc. v. USSR,* 841 F.2d 26, 27 (2d Cir.1988) (per curiam) (in action against the Soviet Union to recover on debt instru-

ments issued by the Russian Imperial Government in 1916, district court properly vacated default judgments for lack of jurisdiction). While the suits at bar are nominally brought against two government officials in the PRC, as discussed below, the suits require the Court to assess the legality of practices and policies that allegedly have been sanctioned by the PRC government.

The above factors inform the Court's cautious approach in assessing Plaintiffs' motions for entry of default judgment.

## III. *SERVICE OF PROCESS*

Before addressing the merits, the Court must first turn to the question of personal jurisdiction in the *Liu* case.

■ The Court granted the San Francisco Chinese Chamber of Commerce ("SFCCC") leave to file an *amicus curiae* brief which raised the question of whether service was properly effected on Defendant Liu. The SFCCC submitted a declaration of San Francisco Police Officer Higgins suggesting that Defendant Liu had not in fact been properly served with process. SFCCC *Amicus Curiae* Brief, at 2. Plaintiffs contend that the SFCCC lacks standing to raise the objection. The Court, however, permitted the filing of the brief because it has *sua sponte* power to examine whether service on Defendants was proper given its jurisdictional implications. Moreover, the interests of judicial economy weigh in favor of determining at the outset whether service of process was proper, based on all available information. *Cf. Zhou v. Peng*, 2002 WL 1835608 (S.D.N.Y.2002) (after alleged victims of human rights abuses at Tiananmen Square attempted service on Premier of the PRC, the U.S. State Department submitted a statement of interest arguing that service was inadequate, requiring additional briefing and a separate ruling on this issue).

■ In response to the SFCCC's brief, the *Liu* Plaintiffs submitted declarations and a video clip of the event at the San Francisco International Airport where Defendant Liu is alleged to have been served. From the evidence, it appears that the process server stood about an arms-length away from Defendant Liu as he entered a screening area at the San Francisco airport; the process server held out a copy of the Summons, Complaint and other court papers to the Defendant and said, "Mr. Liu Qi, these are legal documents from the U.S. District Court of California. It's serious." Leining Decl. ¶¶ 4–5 and Video Clip 2. When Mayor Liu turned away without accepting the papers, the server stated, "You can accept them or you do not have to, but you have been formally served by the U.S. District Court of Northern California." Leining Decl. ¶ 6; Video Clip 3. The server then offered the documents to members of Mayor Liu's entourage, but they were not accepted. Leining Decl. ¶ 8. Since default has already been entered, competent evidence submitted by the Plaintiffs regarding service of process must be taken as true at least where there is no contradictory evidence. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir.1987).

The declaration of San Francisco Police Officer Higgins submitted by the SFCCC is not inconsistent with this evidence. Officer Higgins acknowledged that he was at the back of the group escorting Defendant Liu while Liu was at the front of the group; at the time Higgins heard yelling, his back was turned to the Mayor. Leining Decl. ¶ 7. It appears that the attempted service occurred before Officer Higgins turned his attention to the matter. *Id.* ¶¶ 5–7. Evidently, Officer Higgins was not in a position to view the events that constituted service of process and the fact

that he did not see actual service is not inconsistent with the evidence of service submitted by Plaintiffs.

The SFCCC argues that *Weiss v. Glemp*, 792 F.Supp. 215 (S.D.N.Y.1992), in which the court found that a Catholic Cardinal from Poland visiting Albany, New York was not personally served with a defamation suit, is dispositive to the instant case. However, in *Weiss*, the court found that all the process server said to the defendant was "You want this for the . . ." before the priest accompanying the Cardinal said "No, no, no" and deflected the papers. *Id.* at 222. Based upon facts found by the court, the *Weiss* court held:

> The Court concludes the attempted service was not effected "in a way reasonably calculated to apprise" Cardinal Glemp, or the persons accompanying him, that service of process was being attempted. The papers proffered by Mrs. Frisch could just as well have been a petition, a leaflet, a protest, or another non-legal document. Because the evidence does not show Cardinal Glemp

attempted to evade service, the cases cited by Plaintiff involving defendants determined to evade process are not applicable here.

*Id.* at 225 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

In contrast to *Weiss*, the evidence here establishes that the process server did in fact apprise Defendant Liu that service of process was being effectuated. As noted, the video clip establishes that the server stated, "You can accept them or you do not have to, but you have been formally served by the U.S. District Court of Northern California." Video Clip 3.[4] The Court finds that Plaintiffs' efforts to serve Mayor Liu were "reasonably calculated, under all the circumstances, to apprise [the] interested parties of the pendency of the action." *Mullane*, 339 U.S. at 314, 70 S.Ct. 652.[5]

The Court finds that *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir.1995), rather than *Weiss*, is on point. In *Kadic*, a process

---

4. The Plaintiffs presented evidence that Defendant Liu speaks fluent English. Eisenbrandt Decl. ¶ 2. Mayor Liu's English fluency has been well-publicized as part of Beijing's campaign to host the 2008 Olympic Games. *See e.g. Olympic Bidding Success Spurs English Language Fever in China*, People's Daily Online, July 29, 2001, *available at* http://english.peopledaily.com.cn/ 200107/29/ eng20010729_76042.html ("On July 13, tens of millions of Chinese viewers were surprised to see 69-year-old Vice-Premier Li Languing, and Liu Qi, mayor of Beijing, speaking in fluent English to the crucial IOC meeting in Moscow, which was broadcast live on China's national TV."); *see also An Interview with Li Honghai from Beijing Citizen Speak English Committee*, Beijing Radio Station, *available at* http:// english.21dnn.com/ 35/2002-4- 10/52@195794.htm (quoting the head of this committee, "Leaders of the Municipal Government like Mayor Liu Qi, Vice Mayors Lin Wenyi and Zhang Mao, set an example of learning English for the public.").

5. The fact that Defendant Liu did not take possession of the court papers is of no import. Where a defendant attempts to avoid service *e.g.* by refusing to take the papers, it is sufficient if the server is in close proximity to the defendant, clearly communicates intent to serve court documents, and makes reasonable efforts to leave the papers with the defendant. *See Errion v. Connell* 236 F.2d 447, 457 (9th Cir.1956) (service sufficient when sheriff pitched the papers through a hole in defendant's screen door after she spoke with him and ducked behind a door to avoid service); *Novak v. World Bank*, 703 F.2d 1305, 1310 n. 14 (D.C.Cir.1983) (district court erred when it dismissed *sua sponte* for failure to effect service in case where U.S. Marshall refused to serve World Bank: "When a person refuses to accept service, service may be effected by leaving the papers at a location, such as on a table or on the floor, near that person."); *see also* 4A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1095 (2d ed.1987).

server approached Radovan Karadzic in a Manhattan hotel lobby, called Karadzic's name, and announced the purpose of serving the court papers. The server came within two to six feet of Karadzic and attempted to hand him the documents, but was intercepted by security officers, at which point the papers fell to the ground. *Id.* The Second Circuit remanded the service issue to the district court with guidance that Fed.R.Civ.P. 4(e)(2)[6] specifically authorizes personal service that comports with the requirements of due process. *Id.* at 247 (citing *Burnham v. Super. Ct. of Cal.,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)). The district court, in *Doe v. Karadzic,* 1996 WL 194298 (S.D.N.Y. Apr 22, 1996), found that service was proper. *Id.* at *2.

The key question is whether a party receives sufficient notice of the complaint and action against them. *United Food & Commercial Workers Union v. Alpha Beta Co.,* 736 F.2d 1371, 1382 (9th Cir.1984); *Chan v. Soc'y Expeditions, Inc.* 39 F.3d 1398, 1404 (9th Cir.1994); *Cf. Rio Props., Inc. v. Rio Intern. Interlink,* 284 F.3d 1007 (9th Cir.2002) (permitting email as means of alternative service on foreign Internet corporation). In this case, the due process requirements Fed.R.Civ.P. 4(e)(2) have been satisfied because the efforts of Plaintiffs' process server were "reasonably certain to inform those affected" of the action. *Mullane,* 339 U.S. at 315, 70 S.Ct. 652; *see also Henderson v. United States,* 517 U.S. 654, 672, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) ("core function" of service is to apprise defendant of an action "in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections.").[7]

## IV. THE ALIEN TORT CLAIMS ACT AND TORTURE VICTIM PROTECTION ACT

The Plaintiffs in both actions bring their claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note 2(a)(1). The ATCA provides that the United States district courts "shall have original jurisdiction of any civil

---

**6.** While service of process is herein analyzed under Rule 4(e)(2), the Court notes that Rule 4 also allows for personal service "pursuant to the law of the state in which the district court is located." Fed.R.Civ.P. 4(e)(1). On this point, Cal.Civ.Proc.Code § 413.10 *et seq.* is similarly flexible when a defendant attempts to avoid personal service. *See e.g., Khourie, Crew & Jaeger v. Sabek,* 220 Cal. App.3d 1009, 269 Cal.Rptr. 687, 689 (1990) ("It is established that a defendant will not be permitted to defeat service by rendering physical service impossible."); *Trujillo v. Trujillo,* 71 Cal.App.2d 257, 162 P.2d 640, 641–42 (1945) (service was sufficient when server clearly communicated the nature of the documents, at which point defendant jumped in his car, drove away and caused the documents to be dislodged from his windshield wiper); *In re Ball,* 2 Cal.App.2d 578, 38 P.2d 411, 412 (1934) ("We take it that when men are within easy speaking distance of each other and facts occur that would convince a reasonable man that personal service of a legal document is being attempted, service cannot be avoided by denying service and moving away without consenting to take the document in hand.").

**7.** Regarding Defendant Xia, Charles Li of San Carlos California declared under penalty of perjury that he personally served the defendant with the summons and complaint on February 8, 2002 at the Fremont Hilton Hotel at 39900 Balentine Drive in Newark, California. Summons. Mr. Li declared that he gave the copies to the defendant in person, and that an aide then grabbed them and dropped the papers to the floor. *Id.* The undisputed facts establish that service on Defendant Xia was in a manner affording "the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson,* 517 U.S. at 672, 116 S.Ct. 1638; *see also Karadzic,* 1996 WL 194298 at *2.

action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* § 1350. Though created under the Judiciary Act of 1789, the ATCA was little used until the last two decades. Kathryn L. Pryor, *Does The Torture Victim Protection Act Signal the Imminent Demise of the Alien Tort Claims Act?*, 29 Va. J. Int'l. L. 969, 974, 978 (1989).

In 1980, the Second Circuit held the ATCA conferred jurisdiction and provided a cause of action for an alien attempting to sue a foreign national for the tort of torture committed outside the United States in violation of the law of nations. *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir. 1980). In *Filartiga*, Dr. Joel Filartiga and his daughter Dolly, both citizens of Paraguay living in the United States, brought an action against Americo Pena–Irala, the former Inspector General of Police of Paraguay, for allegedly torturing Dolly's brother to death in retaliation for Dr. Filartiga's political activities in Paraguay. *Id.* at 878. The Second Circuit held that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties." *Id.* In so doing, the court concluded that the law of nations is not a static body of law, but one that "has evolved and exists among the nations of the world today." *Id.* at 881. The court looked to contemporary sources of customary international law, determined by the Supreme Court to include the practices of other countries, treaties, judicial opinions and the works of scholars. *Id.* at 880 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820)).

██ Consistent with *Filartiga*, the Ninth Circuit likewise held that the ATCA provides both federal jurisdiction and a substantive right of action for a "violation of the law of nations." *In re Estate of Ferdinand Marcos, Human Rights Litig. ("Hilao II")*, 25 F.3d 1467, 1475 (9th Cir. 1994) (internal quotation marks omitted). The international law, allegedly violated, need not provide a specific right to sue. *Id.; Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir.2002). The court has held that what is required, in addition to the claim being brought by an alien for a tort, is that the cause of action be based on "violations of specific, universal and obligatory international human rights standards which 'confer [ ] fundamental human rights standards upon all people vis-a-vis their own governments.'" *Hilao II*, 25 F.3d at 1475, *Papa*, 281 F.3d at 1013; (citing *Filartiga*, 630 F.2d at 885–87). *See also Martinez v. Los Angeles*, 141 F.3d 1373, 1383 (9th Cir.1998) (applicable norm of international law must be "specific, universal, and obligatory," quoting *Hilao II* ). Conduct which violates *jus cogens*—norms of international law that are so fundamental and universally recognized that they are binding on nations even if they do not agree to them—constitutes a violation of the "law of nations." *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 714–15 (9th Cir.1992).

To the extent the function of the ATCA was ambiguous, any such ambiguity has been removed by the Supreme Court's decision in *Sosa v. Alvarez–Machain*, —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). In *Sosa*, the Court held that the ATCA (also referred to as the "ATS" in *Sosa* ) enacted by the First Congress "was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." 124 S.Ct. at 2755. Although the ATCA is jurisdictional and does not itself create a cause of action, the Court found that Congress intended the ATCA to furnish jurisdiction of the courts over com-

mon law claims "for a relatively modest set of actions alleging violations of the law of nations." *Id.* at 2759. In particular, Congress intended the federal courts to have jurisdiction in cases involving offenses against ambassadors, violations of safe conduct, and piracy. *Id.* The Court found that although the jurisdictional grant of the ATCA was focused on these torts in violation of the law of nations, Congress did not intend to limit the courts' recognition of other common law claims. However, for a number of reasons that argue for judicial caution in this area, the Court held that

> courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

*Id.* at 2761–62.

Thus, under the ATCA, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when" the ATCA was enacted. *Id.* at 2766. The Court cited with approval as cases consistent with this standard *Filartiga, supra,* 630 F.2d at 890 (torturer has become an enemy of all mankind), *Tel–Oren, supra,* 726 F.2d at 781 (Edwards, J., concurring) (ATCA reaches a handful of heinous actions—each of which violates definable universal and obligatory norms), and *In re Estate of Marcos Human Rights Litigation, supra,* 25 F.3d at 1475 (action violations must be of a norm that is specific, universal, and obligatory).

Applying that standard to the facts of the case, the Court found that the plaintiff in *Sosa* failed to state a cognizable claim under the ATCA. The Plaintiff contended he was arrested arbitrarily and in violation of international law when the DEA approved his abduction in Mexico by Mexican nationals who transported him across the border to the United States to stand trial. As characterized by the Supreme Court, the plaintiff's claim was that his arrest was arbitrary and forbidden by international law because no applicable domestic law authorized it. *Id.* at 2768. The Court rejected the notion that such a broad definition of an "arbitrary" arrest (prohibiting any officially sanctioned detention not positively authorized under the domestic law of some government) has the status of a "binding customary norm." *Id.* at 2768. Although the Court acknowledged that some policies of prolonged arbitrary detention would suffice to state a claim, it concluded that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.* at 2769. The question of whether a claim under the ATCA lies thus turns on whether the specific facts (not the general characterization of the claim) violates international norms that are "specific, universal and obligatory." *Id.* at 2766, *quoting, In re Estate of Marcos Human Rights Litigation, supra,* 25 F.3d at 1475.

Plaintiffs also bring claims under the Torture Victims Protection Act of 1991 ("TVPA") which provides a cause of action for the recourse specific tort of torture. Congress passed the TVPA in response to *Filartiga* and *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984).[8] 28 U.S.C. § 1350, H.R.Rep. No. 102–367(I),

---

8. In *Tel–Oren,* Judge Bork questioned *Filartiga's* holding that the ATCA permits suits for violations of the law of nations. In his concurring opinion, Judge Bork opined that

1992 U.S.C.C.A.N. 84; S.Rep. No. 102–249(II). The TVPA makes clear that a cause of action lies for victims of torture and extrajudicial killings. The TVPA provides in relevant part that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture shall, in a civil action, be liable for damages to that individual." 28 U.S.C. § 1350 note 2(a)(1). The purpose of the statute, as stated by both the House and Senate reports, is to unambiguously provide a federal cause of action against the perpetrators of such abuse, as well as to extend a civil remedy to U.S. citizens who may have been tortured abroad. H.R.Rep. No. 102–367, at 3–5; S.Rep. No. 102–249, at 4–5. The legislation carries out the intent of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment opened for signature February 4, 1985, *available at* http://193.194.138.190/html/menu3/b/h_cat39.htm (hereinafter referred to as "CAT"), ratified by the U.S. Senate on October 27, 1990, by ensuring that "torturers and death squads will no longer have a safe haven in the United States." S.Rep. No. 102–249, at 4.

Before reaching the substantive claims advanced by the Plaintiffs, the Court must address the threshold questions of whether the suit is barred under the Foreign Sovereign Immunity Act and is justiciable under the act of state doctrine.

## V. THE FOREIGN SOVEREIGN IMMUNITY ACT

■ Congress enacted the Foreign Sovereign Immunity Act (hereinafter referred to as the "FSIA"), 28 U.S.C. § 1605 (2002), to guide the U.S. courts in determining when parties can maintain a lawsuit against a foreign state or its entities and agents and to prescribe the circumstances under which a foreign state would lose its sovereign immunity. The FSIA expressly governs the sovereign immunity of foreign governments. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("We think that the text and structure of FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."); *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 304 (9th Cir.1997) ("The FSIA is the sole basis for subject matter jurisdiction over suits involving foreign states and their agencies and instrumentalities."). The question presented in the instant cases is whether the FSIA sovereign immunity applies to the individual Defendants. Because the issue is jurisdictional and has important implications for foreign relations, the Court addresses the question *sua sponte*.[9]

Prior to the enactment of the FSIA, when faced with foreign governments' requests for sovereign immunity, the State Department adhered to the policy announced in the "Tate Letter," a 1952 letter from the State Department's Legal Advisor to the Justice Department that put other nations on notice that the U.S. would follow the restrictive theory of sovereign

where international law did not specifically create a cause of action, it was up to Congress to explicitly grant one and that the ATCA did not independently create such a cause of action. 726 F.2d at 799.

9. Moreover, as discussed below, for the same reasons the Ninth Circuit has held the act of state doctrine may be raised *sua sponte*, the potential implications for foreign relations additionally counsel in favor of permitting the court to inquire into the matter of sovereign immunity *sua sponte*. *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir.1989).

immunity.[10] *Tachiona v. Mugabe,* 169 F.Supp.2d 259, 271 (S.D.N.Y.2001); Restatement (Third) of Foreign Relations Law, Part IV, Chap. 5 Introductory Note, at 392 (1987). In practice, however, the State Department's immunity determinations often were not based on consistent or coherent standards. *Mugabe,* 169 F.Supp.2d at 272. These "suggestions of immunity" were frequently issued on the basis of the foreign government's political and diplomatic pressures on the Executive Branch, and often yielded inconsistent outcomes. *Id.* Moreover, the courts were left without objective rules of law to apply in cases where the foreign state did not request immunity, or the State Department chose not to intervene. *Id.;* Restatement, at 393.

This growing dissatisfaction with the Tate Letter motivated the passage of the Foreign Sovereign Immunities Act, which was intended to adopt "comprehensive rules governing sovereign immunity" bringing U.S. practice into conformity with many other nations who left sovereign immunity decisions exclusively to the courts. *Mugabe,* 169 F.Supp.2d at 272. Congress strictly limited foreign states' immunity to actions arising from public or governmental acts, removed the State Department's former exclusive and preemptive role in the foreign state immunity process, and transferred "the determination of the sovereign immunity from the executive branch to the judicial branch." *Id.*

■ Although the ATCA and TVPA confer jurisdiction and rights of action as discussed above, the FSIA provides that foreign sovereigns are immune from suit unless an enumerated exception applies. 28 U.S.C. §§ 1330, 1602–11 (2002). If the FSIA applies, it "trumps" the ATCA. *In re Estate of Ferdinand E. Marcos Human Rights Litig.* *("Trajano v. Marcos"),* 978 F.2d 493, 497 (9th Cir.1992). The Plaintiffs do not contend that any statutory exception applies here. Rather, they contend that the FSIA is inapplicable because the Act confers jurisdiction on sovereign entities and applies to *individual* officials of a foreign state only if they are performing official acts within their legal authority. They contend that the Defendants in the instant case, by engaging in international law violations, acted beyond their authority and are thus not entitled to immunity under the FSIA.[11] For the reasons stated

10. Under the "restrictive" theory of sovereign immunity, a foreign state is "restricted" to suits involving a foreign state's public acts, but not in cases based on commercial or private acts. S.Rep. No. 94–1310, at 9–10.

11. None of the parties have raised the issue of diplomatic immunity and it appears to be inapplicable to this case. *See* 22 U.S.C. § 254a-e (the Diplomatic Relations Act implementing the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes). Here the State Department did not certify the Defendants as diplomatic agents for the PRC, nor did the State Department indicate as such in its statement of interest letter to this Court. U.S. State Department Office of Protocol, Diplomatic List for Winter/Spring and Fall/Summer 2002, *available at* http:// www.state.gov/s/ cpr/rls/dpl/ 2002/11030.htm and http://www.state.gov/s/ cpr/ rls/dpl/2002/12733.htm (last visited March 27, 2003). Thus, Defendants fail to meet a threshold requirement for diplomatic immunity. *See United States v. Lumumba,* 741 F.2d 12, 15 (2d Cir.1984) (diplomatic immunity is premised upon recognition by the receiving state); *United States v. Foutanga Dit Babani Sissoko,* 995 F.Supp. 1469, 1470 (S.D.Fla.1997) (defendant's status as "special advisor" did not entitle him to diplomatic immunity because he has not been submitted to the United States Department of State for certification). Courts, however, have recognized diplomatic status by the State Department made when legal actions were already ongoing. *Republic of Philippines by Cent. Bank of Philippines v. Marcos,* 665 F.Supp. 793, 799 (N.D.Cal.1987) (diplomatic status conferred on Solicitor General of the Philippines after he was subpoenaed); *Abdulaziz v. Metro. Dade County,* 741 F.2d 1328, 1329

below, the Court concludes that the Defendants are not immune from suit under the FSIA.

## A. *Application of FSIA to Individual Officials*

■ The FSIA confers immunity upon foreign states. A "foreign state" under the Act includes "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). FSIA defines such "agency or instrumentality" as any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Although the FSIA does not on its face explicitly apply to individual officials, the Ninth Circuit has held that the Act applies to foreign officials acting in an official capacity for acts within the scope of their authority. *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103, 1106–07 (9th Cir.1990). Otherwise, "to allow unrestricted suits against individual foreign officials acting in their official capacities ... would amount to a

blanket abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what [FISA] barred them from doing directly." *Id.* at 1102.

Often the critical question is whether "the officer purports to act as an individual and not as an official." *Chuidian*, 912 F.2d at 1106. *See e.g., Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 1028 (D.C.Cir.1997) (personal action not immune); *Doe v. Bolkiah*, 74 F.Supp.2d 969, 974 (D.Haw.1998) (accord). To determine the answer, the Ninth Circuit considered whether an action against the foreign official is "merely a disguised action against the nation that he or she represents" and thus " 'the practical equivalent of a suit against the sovereign directly.' " *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir.2002) (quoting *Chuidian*, 912 F.2d at 1101). The Court must also ask "whether an action against the official would have the effect of interfering with the sovereignty of the foreign state that employs the official." *Park*, 313 F.3d at 1144 (citing *Hilao II*, 25 F.3d at 1472). Ordinarily, these factors would suggest Defendants Liu and Xia were acting in their official capacities since the Plaintiffs are in effect challenging "a government policy [of repression and mistreatment of Falun Gong] implemented by" the Defendants, not their personal decisions. *Park*, 313 F.3d at 1144. As discussed *infra* Part VI regarding the act of state doctrine, an adverse judgment might, depending on the

(11th Cir.1984) (Saudi Prince and his family obtained diplomatic status after the commencement of suit).

This Court is not aware of any cases that have granted diplomatic immunity to local officials from foreign governments that are not in the United States on diplomatic missions. *See United States v. Enger*, 472 F.Supp. 490, 506 (D.N.J.1978) ("full privileges and immunities of diplomatic status have traditionally been reserved to those of acknowledged diplomatic rank, performing diplomat-

ic functions"); *see also Tabion v. Faris Mufti*, 73 F.3d 535, 536 (4th Cir.1996) (diplomatic immunity given to First Secretary and later Counselor of the Jordanian Embassy); *Logan v. Dupuis*, 990 F.Supp. 26, 26 (D.D.C.1997) (diplomatic immunity given to the Alternative Representative of Canada at the Permanent Mission of Canada to the Organization of American States); *Fatimeh Ali Aidi v. Amos Yaron*, 672 F.Supp. 516, 516 (D.D.C.1987) (diplomatic immunity given to military attache of the Israeli Embassy).

scope of relief granted, "interfere with the sovereignty or policymaking power" of the PRC. *Id.*

 However, the cases at bar involve an additional layer of complexity not extant in *Park.* Even if it is assumed that Defendants Liu and Xia acted in their official, as opposed to personal, capacities in carrying out the challenged practices, there is a question whether their acts were validly authorized. *Chuidian* and *Hilao II* require an additional inquiry into whether the defendant official acted within or "outside the scope of his authority." *Hilao II,* 25 F.3d at 1472. If an official acts "completely outside his governmental authority," he or she loses his/her immunity. *Chuidian,* 912 F.2d at 1106 (citing *United States v. Yakima Tribal Court,* 806 F.2d 853, 859 (9th Cir.1986)). Moreover, "[w]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do." *Chuidian,* 912 F.2d at 1106 (citation omitted). The mere fact that acts were conducted under color of law or authority, which may form the basis of state liability by attribution, is not sufficient to clothe the official with sovereign immunity. *Cf. Phaneuf,* 106 F.3d at 308 (actual authority necessary to establish "commercial activity" exception to FSIA);

Restatement § 453. If the official does not act "within an *official* mandate," FSIA immunity does not apply. *Hilao II,* 25 F.3d at 1472 n. 8 (emphasis added).[12]

In *Chuidian,* a business owner sued an official of the Philippine government after the defendant official instructed the Philippine National Bank to dishonor a letter of credit issued to the plaintiff. The court held that the official was entitled to sovereign immunity under FSIA, because regardless of the propriety of his personal motivation, his action was within his "statutory mandate" as a member of the Presidential Commission on Good Government. *Chuidian,* 912 F.2d at 1106–07.

Applying *Chuidian,* the Ninth Circuit in *Trajano* held that President Marcos' daughter, Imee Marcos–Manotoc, who as National Chairman of the Kabataang Baranggay controlled the police and military intelligence, was not immune from suit brought by the mother of a victim who was allegedly tortured and murdered by police and military personnel. The court reasoned that Marcos–Manotoc admitted acting on her own authority, not on the authority of the Republic of the Philippines. Her acts were not within any official mandate and, not acts of an agent or instrumentality of a foreign state within the meaning of the FSIA. *Trajano,* 978 F.2d at 498.

---

12. The fact that the official at the time of suit is a sitting official does not render the official immune under the FSIA. *See Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1198 (S.D.N.Y.1996) (defendant was sitting Deputy Chief of National Security for Ghana). While, as noted below, that fact informs the applicability of the act of state doctrine, nothing in the express language of the ATCA, TVPA or FSIA renders such an official automatically immune. Indeed, the legislative history of the TVPA suggests that while the focus may have been on suits against former officials, the Senate and the House only expressed an intent to preserve diplomatic and head of state immunity for individuals. *See* S.Rep. No. 102–249, at 8–9 (1991) (TVPA not intended to override traditional immunity enjoyed by foreign diplomats and heads of state); H.R.Rep. No. 102–367, at 5 (1991) (TVPA does not override the doctrines of diplomatic and head of state immunity). No mention is made in either report to immunize all sitting officials. As noted in the Senate Report, the purpose of the TVPA "is to provide a Federal cause of action against *any* individual who, under actual or apparent authority or under color of law of any foreign nation, subjects any individual to torture or extrajudicial killing." S.Rep. No. 102–249, at 3 (emphasis added).

Similarly, in *Hilao II*, the Ninth Circuit held that President Marcos was not immune from suit charging him with arrests, torture and murders because his actions were "taken without official mandate pursuant to his own authority." 25 F.3d at 1471. According to the complaint, the alleged actions violated international law, the constitution, and law of the Philippines. *Id.* The Philippine government confirmed that Marcos' actions were "in violation of existing law." *Id.* at 1472 (quotations omitted). Since his acts "were not taken within any official mandate," they were not acts of an agency or instrumentality of a foreign state within the meaning of FSIA. *Id.* at 1472; *see also Phaneuf*, 106 F.3d at 306 (Ninth Circuit, citing *Trajano* and *Chuidian*, remanded case to district court to determine whether individual defendant's actions were "within the scope of his authority" and thus immune under FSIA).

The question here is whether Defendants Liu and Xia acted within their scope of authority such that they can be deemed to have acted as an agency or instrumentality of the People's Republic of China under the FSIA.

**B. *Whether Scope of Authority is Measured by International or Foreign Sovereign's Law***

██ Both the *Liu* and *Xia* Plaintiffs contend that FSIA does not apply to officials who violate international law as established by either *jus cogens* norms or customary international law since any such act would by definition be beyond the scope of the official's proper authority.

However, case law, including that of the Ninth Circuit, establishes that the official's scope of authority for the purposes of FSIA immunity analysis, is measured by the domestic law of the foreign state, not by international law.

In *Chuidian*, the issue was whether the individual defendant acted within his "statutory mandate" governing his powers as a member of the Presidential Commission on Good Government. 912 F.2d at 1107. The court noted that as a member of the Commission, under the Philippine Executive Order, he was entitled to investigate possible fraudulent transfers, had the power to prevent payment in aid of his investigation, and to seek an injunction if the bank refused to comply. *Id.* In *Hilao II*, Marcos was denied FSIA immunity because his actions were not "official acts pursuant to his authority as President of the Philippines." 25 F.3d at 1471. Quoting from its earlier decision in *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988) (*en banc*), the court noted that Marcos "was not the state, but the head of the state, bound by the laws that applied to him." *Id.* at 1471. In *Trajano*, the pivotal finding in denying Marcos–Manotoc immunity under the FSIA was that she admitted acting on her own authority, "not on the authority of the Republic of the Philippines." 978 F.2d at 498.[13]

In each of these cases, the question of whether the official acted within the scope of his authority and pursuant to an "official mandate" turned on an analysis of the official's powers under the domestic law of the foreign state, not international law.[14]

---

**13.** Indeed, Marcos–Manotoc claimed she was not a member of the government or the military at the time of Trajano's murder. 978 F.2d at 498 n. 10.

**14.** Other courts are in accord. *See Jungquist*, 115 F.3d at 1028 (Sheikh Sultan's act not in furtherance of the interests of the sovereign but a personal and private action); *El–Fadl*, 75 F.3d at 671 (official's activities not personal or private but undertaken only on behalf of governmental bank); *Bolkiah*, 74 F.Supp.2d 969 (Government of Brunei did not empower defendant to run alleged prostitution ring or harem).

Indeed, if the Plaintiffs herein were correct, there would have been no need for the courts in *Trajano* and *Hilao II* to address the scope of authority under Philippine law since the acts of torture and murder attributable to Marcos and his daughter clearly violated *jus cogens* norms of international law. According to the Plaintiffs' theory herein, the defendants should have been denied FSIA immunity *per se* without regard to Philippine law. But the Ninth Circuit did not so hold. Hence, the contention that the scope of authority determinative of FSIA immunity is measured by international law is not supported by current case law.[15]

Moreover, there are several reasons why Plaintiffs' theory would appear to be inconsistent with the FSIA and its underlying policies. First, one of the significant purposes of sovereign immunity is not only to prevent ultimate liability, but to afford immunity from suit. *See El–Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir. 1996). If an official's immunity turned on the ultimate determination of whether he or she violated international law—the basis for the substantive cause of action—immu-

nity could not be resolved without adjudicating the merits of the case. This would "frustrate the significance and benefit of entitlement to immunity from suit." *Id.* at 671 (quotations omitted).

Second, the Ninth Circuit has held that even violation of *jus cogens* norms of international human rights law do not vitiate FSIA immunity of a foreign sovereign. *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 717–718 (9th Cir.1992). Agencies and instrumentalities of the foreign sovereign are immune irrespective of the magnitude of the human rights violations unless one of the exceptions enumerated in FSIA, none of which apply here. Where an official acts in his official capacity within the scope of authority provided under the sovereign's law, a suit against the official is the "practical equivalent of a suit against the sovereign directly." *Chuidian*, 912 F.2d at 1101–02. Thus, permitting suit against such an official would amount to an "abrogation of foreign sovereign immunity by allowing litigants to accomplish indirectly what the Act barred them from doing directly" under *Siderman*.[16] *Id.* at 1102.

---

**15.** The cases cited by the *Liu* and *Xia* Plaintiffs are inapposite. For the reasons discussed above, neither *Hilao II* nor *Trajano* support the Plaintiffs' argument. In *Xuncax v. Gramajo*, 886 F.Supp. 162, 176 (D.Mass. 1995), cited by the Plaintiffs, the district court held that the former Minister of Defense of Guatemala was not immune under FSIA from suit alleging torture, arbitrary detentions and executions, because the alleged acts "exceed anything that might be considered to have been lawfully within the scope of Gramajo's official authority." The court noted that the government of Guatemala did not allege that the actions were "officially" authorized. *Id.* at 176 n. 10. In *Cabiri*, also cited by Plaintiffs, the district court held the commander in the Ghanian Navy and Deputy Chief of National Security was not immune from suit under FSIA for alleged torture, because defendant did not claim the alleged acts fell within the scope of his authority; he did "not argue that

such acts are not prohibited by the laws of Ghana." 921 F.Supp. at 1198. Since the alleged acts of torture fell "beyond the scope of his authority as the Deputy Director of National Security of Ghana," he was not immune under the FSIA. *Id. Granville Gold Trust–Switzerland v. Comm. Del Fallimento/Interchange Bank*, 928 F.Supp. 241, 243 (E.D.N.Y.1996) cited by Plaintiffs is also inapposite. The court in *Granville Trust* erroneously assumed that FSIA immunity has no application to claims under the ATCA and TVPA for human rights violations. It cites no convincing authority for this proposition. These case simply do not establish international law displaces the foreign sovereign's law in assessing the scope of the defendant official's authority for purposes of the FSIA.

**16.** This is not to suggest that a foreign sovereignty and its agencies and instrumentalities including officials acting within their official

### C. *Whether Defendants Acted Within the Scope of Their Authority Under Chinese Law*

 The issue then is whether Defendants Liu and Xia acted within the scope of their authority in carrying out and/or permitting the human rights violations alleged in the Complaints. The *Liu* Plaintiffs submit the Affidavit of Professor Robert C. Berring ("Berring Aff.") to establish that Chinese law prohibits the conduct alleged herein.[17] In particular, Professor Berring describes in his affidavit the provisions of the Chinese constitution and criminal procedure laws which specifically prohibit arbitrary detention, physical abuse and torture of detainees. Berring Aff. ¶¶ 3–8, 9–12. Moreover, the PRC's laws do not authorize physical abuse or detention without due process in implementing its crackdown on Falun Gong. *Id.* ¶¶ 22–24. Defendants' conduct is not authorized by the domestic law of China. *Id.* ¶ 25. Additionally, under Chinese law, those in Defendants' positions have responsibility to prevent police and other security forces under their authority from violating the rights of citizens and visitors. *Id.* ¶¶ 15–21; *Liu* Compl. ¶ 34.

The public pronouncement of the PRC is consistent with Professor Berring's conclusions. In its most recent report to the United Nations Committee Against Torture, the PRC stated that no form of physical violence is tolerated or condoned in the treatment of detained and arrested persons. *Third Periodic Reports of States Parties Due in 1997: China*, U.N. Comm. Against Torture, 24th Sess., at ¶ 155, U.N. Doc. CAT/C39/Add.2 (2000). The report also stated that torture and other cruel, inhuman or degrading treatment or punishment is strictly prohibited. *Id.* ¶ 158. Furthermore, as stated in the report, "[i]t is strictly forbidden to use torture in a prison. No one is ever permitted to torture prisoners under any circumstances or for whatever reason." *Id.* ¶ 29. In the PRC's letter to this Court, it likewise stated that "[p]rohibition of torture has always been a consistent position of the People's Republic of China." Statement of the Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 3.[18]

On the other hand, the Complaints and materials submitted in support of Plaintiffs' motions establish that the alleged conduct of Defendants Liu and Xia is part of a larger campaign by the national government to repress and punish members and supporters of the Falun Gong movement. As alleged in the *Liu* Complaint:

> The acts alleged herein against Plaintiffs were carried out in the context of a nationwide crackdown against Falun Gong practitioners. Police and other security forces in Beijing, and throughout

capacities may not be sued for international human rights violations. FSIA allows such suits *e.g.* where the injury occurs "within the United States." 28 U.S.C. § 1605; *see also Letelier v. Republic of Chile*, 488 F.Supp. 665, 672 (D.D.C.1980) (FSIA not bar to action against Chilean officials for assassination of Chilean dissident political leader in the United States).

17. Berring is Interim Dean, Professor of Law, and Head Librarian at Boalt Hall, and is a recognized authority on Chinese law. *See e.g.*, Robert C. Berring, *Chinese Law, Trade*

*and the New Century*, 20 Nw. J. Int'l L. & Bus. 425 (2000).

18. Such pronouncements are hardly surprising. As the Second Circuit observed in *Filartiga v. Pena–Irala*, virtually no government publicly asserts a right to torture its citizens. 630 F.2d 876, 884 (2d Cir.1980). Likewise, the Ninth Circuit noted in *Siderman* "that states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens." 965 F.2d at 717.

the People's Republic of China, have engaged in a widespread or systematic campaign against Falun Gong practitioners, marked by a pattern and practice of violations . . .

*Liu* Compl. ¶ 2. The *Xia* Complaint likewise alleges that the acts complained of were part of "the governmentally mandated policy of repression of Falun Gong practitioners that was adopted and imposed by the highest levels of the national government of China for implementation at all governmental levels." *Xia* Compl. ¶ 15. It alleges that the National Government commenced the national policy of repression in 1999. *Id.* ¶ 18. In its condemnation of the repression of the Falun Gong movement, the State Department has recognized the alleged human rights violations as part of the government of the PRC's national policy. *See* Letter to McCallum, at 2–3 ("The United States has repeatedly made these concerns known to the Government of the P.R.C. and has called upon it to respect the rights of all its citizens, including Falun Gong practitioners."). While the PRC may publicly deny allegations of human rights violations in regard to its effort to contain or repress the Falun Gong, Plaintiffs' allegations and evidence of widespread systemic abuse, which must be taken as true in the context of the defendants' default, evidences a national policy that belies the government's disclaimer.

The legal question presented is therefore whether acts by an official which violate the official laws of his or her nation but which are authorized by covert unofficial policy of the state may be deemed to be within the official's scope of authority under the FSIA. This appears to be an issue of first impression. A close examination of the Ninth Circuit's analysis in *Chuidian* and the policy considerations which underlie the ATCA and TVPA suggests that such acts are not immunized by the FSIA.

In holding that an official shares sovereign immunity with the foreign government when acting within the scope of his governmental authority, the court in *Chuidian* relied upon an analogy to principles in American law which draws a distinction between a suit against a sovereign's employee and a suit against the sovereign itself. 912 F.2d at 1106. *Chuidian* cited *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and *United States v. Yakima Tribal Court*, 806 F.2d 853 (9th Cir.1986), both of which involved the question of whether suits brought against federal officials to enjoin certain governmental actions could be deemed to be suits against the United States and thus barred by sovereign immunity. *Larson* held that even when the official acts under color of law, where the official's powers "are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." 337 U.S. at 689, 69 S.Ct. 1457. In that instance, his actions were *ultra vires* his authority. *Id.* Moreover, when a federal official commits an unconstitutional act, he or she also acts beyond his powers. Although "power has been conferred in form [ ] the grant is lacking in substance because of its constitutional invalidity." *Id.* at 690, 69 S.Ct. 1457. *Cf. Ex parte Young*, 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ("the use of the name of the state to enforce an unconstitutional act . . . is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."). Thus, an official enforcing an unconstitutional act is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.* at 160, 28 S.Ct. 441.

The Ninth Circuit subsequently refined *Larson's* analysis of statutory and regulatory violations in *Yakima Tribal Court.* The court reaffirmed, however, that *ultra vires* actions are not subject to sovereign immunity. Thus, the key in the line of cases relied upon in *Chuidian* in construing the FSIA is whether the official acted within his *legally valid* grant of authority. *Cf. Cabiri,* 921 F.Supp. at 1197 (FSIA does not apply to acts "which exceed the *lawful* boundaries of a defendant's authority") (emphasis added); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1546 (N.D.Cal.1987) ("since violations of the law of nations virtually all involve acts practiced, encouraged or condoned by states, defendant's argument would in effect preclude litigation under § 1350 for 'tort[s] . . . committed in violation of the law of nations'") (citation omitted).

This interpretation of the FSIA is consistent with Congressional policy embodied in the TVPA. The TVPA provides that an individual who "under actual or apparent authority, or color of law, of any foreign nation" subjects an individual to torture shall be liable for damages to that individual. 28 U.S.C. § 1350 note § 2(a). Under the plain wording of the TVPA, an official who engaged in torture may be subject to suit and damages liability even if he or she acted under authority of the foreign nation. 28 U.S.C. § 1350 note 2(a). The legislative history of the TVPA indicates that Congress intended to subject individual officials to liability regardless of whether their acts were secretly condemned by the state. Recognizing that "[d]espite universal condemnation of these abuses, many of the world's governments still engage in or tolerate torture of their citizens," the purpose of the TVPA is to provide a remedy for U.S. citizens and aliens for acts

"undertaken under color of official authority." H.R.Rep. No. 102–367, at 3–4 *reprinted in* 1992 U.S.C.C.A.N. 84, 85–86. TVPA specifically contemplates "some governmental involvement" in the prohibited acts in order for a claim to lie. *Id.* at 5. While TVPA was intended to preserve FSIA immunity for foreign state governmental agencies, it assumes that "sovereign immunity would not generally be an available defense" to a suit against individual officials. *Id.*[19] Moreover, the TVPA and ATCA were seen as consonant. *Id.* at 4 (the TVPA would "enhance the remedy already available under section 1350 . . . [C]laims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered by section 1350").

### D. *FSIA Sovereign Immunity Not Applicable to Defendants Liu and Xia*

Hence, under the FSIA as interpreted by *Chuidian* and consistent with Congressional policy, an official obtains sovereign immunity as an agency or instrumentality of the state only if he or she acts under a valid and constitutional grant of authority. Where, as here, the PRC appears to have covertly authorized but publicly disclaimed the alleged human rights violations caused or permitted by Defendants Liu and Xia and asserts that such violations are in fact prohibited by Chinese law, Defendants cannot claim to have acted under to a valid grant of authority for purposes of the FSIA. *Cf. Larson, supra* and *Yakima Tribal Court, supra.* The authorities presented by Plaintiffs establish that the alleged conduct for which the Defendants are responsible were inconsistent with Chinese law. Accordingly, their alleged acts are not acts of an agency or instrumentality of the People's Republic of China within

---

**19.** The Senate Report likewise states that the TVPA was not intended to override the FSIA, permitting suits only against individuals. S.Rep. No. 102–249, at 7.

**1288**

the meaning of the FSIA, and sovereign immunity thereunder does not lie.[20]

## VI. *ACT OF STATE DOCTRINE*

Having determined the Plaintiffs in both the *Liu* and *Xia* cases have established this Court's jurisdiction and that they are not statutorily barred under the FSIA from asserting claims against the Defendants Liu and Xia under the ATCA and TVPA, this Court must address whether these cases are justiciable in light of their potential implications for foreign relations and separation of powers. In this context, the justiciability concerns are examined under the act of state doctrine.

### A. *Background on the Act of State Doctrine*

The Court's classic statement of the act of state doctrine was articulated in *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). In *Underhill,* an American citizen filed a damages action alleging that a Venezuelan military commander—whose government was later recognized by the U.S.—unlawfully assaulted, coerced and detained him in Venezuela. *Id.* The *Underhill* Court refused to inquire into the deeds of this Venezuelan official, declaring:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to

be availed by sovereign powers as between themselves.

*Id.* at 252, 18 S.Ct. 83. *See also Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918) (after a Mexican general seized hides that were then sold to a Texas company, the Court declined to adjudicate a case brought by the assignee of the original owner, declaring, "To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.' ").

The leading modern case on the act of state doctrine is *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). In *Sabbatino,* the plaintiff challenged the taking of property under a controversial principle of customary international law after the Cuban government took property within its own territory. *Id.* In response to a U.S. reduction in Cuba's sugar quota, which Cuba characterized as an act of political aggression, Cuba nationalized property (sugar) in which America nationals had an interest. *Id.* at 402–403, 84 S.Ct. 923. In this context, the *Sabbatino* Court declined to adopt a broad and inflexible rule, but rather held:

> [W]e decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the Complaint alleges that the

**20.** The Senate Report also suggests an additional basis for establishing an individual official acts as an agency of a foreign state. The Report assumes that the FSIA immunity would extend to an individual if the state "admit[ted] some knowledge or authorization of relevant acts." S.Rep. No. 102–249, at 8. Presumably, such an admission would imply the official acted under a valid grant of authority. As noted above, however, the PRC has made no such admission.

taking violates customary international law.

*Id.* at 428, 84 S.Ct. 923.

 The Court noted that while the act of state doctrine was not mandated by the Constitution, the doctrine nonetheless had "constitutional underpinnings" arising from separation of powers concerns about the competency of the judiciary to make and implement certain decisions in the area of international relations. *Id.* at 423, 84 S.Ct. 923. The doctrine arises out of the basic relationships between branches of government enjoined by a separation of powers; it "concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." *Id.* It "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* The doctrine is neither jurisdictional nor constitutionally mandated. Rather, it constitutes a prudential limitation upon the exercise of the court's power to adjudicate the legality of the acts of a foreign state or its agents. The act of state doctrine has been referred to as the "foreign counter part" to the political question doctrine. *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1046 (9th Cir.1983).

While *Sabbatino* acknowledged the classic notion that '[t]he conduct of the foreign relations of our government is committed by the Constitution to the Executive and Legislative ... departments' (citing *Oetjen,* 38 S.Ct. at 311, 38 S.Ct. 309), the Court nonetheless observed that "it cannot of course be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance,'" and that "the act of state doctrine ... does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state." 376 U.S. at 423, 84 S.Ct. 923 (citing *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

In sum, the act of state doctrine encompasses two related concerns: respecting the sovereignty of foreign states and the separation of powers in administering foreign affairs of this nation. Balanced against those concerns, however, is the power and duty of the court to exercise its judicial functions. In assessing that balance, *Sabbatino* announced a three-part test for determining when to apply the act of state doctrine:

It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, as in the Bernstein case,[21] for the political interest of this

21. The *Bernstein* cases refer to *Bernstein v. Van Heyghen Freres Societe Anonyme,* 163 F.2d 246 (2d Cir.1947) and *Bernstein v. N.V. Nederlandsche–Amerikaansche Stoomvaart–Maatschappij,* 173 F.2d 71 (2d Cir.1949), which involved suits by a Jewish U.S. resident

country may, as a result, be measurably altered. 376 U.S. at 428, 84 S.Ct. 923. The Ninth Circuit has further held that the court must additionally consider "whether the foreign state was acting in the public interest." *Liu v. Republic of China,* 892 F.2d 1419, 1432 (9th Cir.1989).

In *Sabbatino,* the Court held that the act of state doctrine prohibited a challenge to the validity of a decree of the Government of Cuba expropriating certain property. The Court noted that there was no international consensus upon the limitations on the state's power to expropriate the property of aliens. 376 U.S. at 429–30, 84 S.Ct. 923. Although the State Department declined to make any statement one way or the other bearing on the litigation, the Court noted the danger of interfering and embarrassing the Executive Branch should the Court adjudicate the validity of the expropriation decree. *Id.* at 420, 431–33, 84 S.Ct. 923. The Court concluded, "[h]owever offensive to the public policy of this country and its constituent States an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application." *Id.* at 436, 84 S.Ct. 923.

 Normally, the burden of proving acts of state rests on the party asserting the applicability of the doctrine. *Liu,* 892 F.2d at 1432 (citing *Alfred Dunhill of London Inc. v. Republic of Cuba,* 425 U.S. 682, 694–95, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)). However, where there is a "potential for embarrassing the Executive Branch," the act of state doctrine may be raised *sua sponte. Liu,* 892 F.2d at 1432. Obviously, where, as here, the Defendants have defaulted, the issue is not raised by either party. Instead, it is raised *sua sponte* by this Court.

Plaintiffs contend that under *Sosa,* the act of state doctrine does not apply where the claims satisfy the standard of specificity and universality the Court required. The argue that where "a court is presented with a claim based on international norms of equal 'definite content and acceptance among civilized nations than the historical paradigms familiar when section 1350 was enacted' then it no longer is suitable or appropriate to weigh the proposed standard against potential political or foreign policy consequences." Plaintiffs' Responsive Brief of the United States' Statement of Interest regarding *Sosa,* p. 5.

The Plaintiffs misread *Sosa.* It is true that the Court cited as one of several reasons that counsel caution in finding a common law claim actionable under the ATCA the concern that permitting a private cause of action could have potential implications for the foreign relations of the United States and that the courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." 124 S.Ct. at 2763. This, along with other

and former German citizen to recover property seized by the Nazi government. The Second Circuit initially dismissed the cases under the act of state doctrine. The State Department's legal advisor then wrote a letter stating its was "the policy of the Executive ... to relieve Americans courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials."

The Second Circuit then reconsidered and ordered the trial court to make a full inquiry into the plaintiff's allegations. 210 F.2d 375 (2d Cir.1954). A so-called "Bernstein letter" refers to situations in which the State Department declares that the Executive Branch does not object to the adjudication of a particular controversy.

factors, led the Court to require a high degree of specificity and clarity in finding an enforceable common law claim under the ATCA. However, the Court in no way intimated that once that standard is met, that no consideration may be given to similar concerns in determining whether such a case may proceed.

■ Indeed, the Court specifically noted, "This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law ..." *Id.* at 2766, n. 21. As one example, the Court noted that consideration might be given to the need to exhaust remedies available in the domestic legal system. *Id.* Addressing the issue raised by plaintiffs herein, the Court went on to state, "Another possible limitation that we need not apply here is a policy of

case-specific deference to the political branches." *Id.* The Court cited as one example pending suits in federal district court seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. Noting that both the governments of South Africa and the United States believe that these cases interfere with the policy embodied by South Africa's Truth and Reconciliation Commission, the Court observed, "[i]n such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.* The act of state doctrine embodies these same concerns, and thus consideration may properly be given to it in the cases at bar.[22]

22. The Plaintiffs also argue that the act of state doctrine should not be applied to the TVPA where Congress has expressly spoken in creating a cause of action. However, nothing in *Sosa* suggests that case-specific considerations of deference to political branches should be limited only to common law claims under the ATCA. The basis for such deference, embodied in the act of state doctrine, is rooted in overarching considerations of separation of powers and the dangers of judicial interference with foreign relations committed to the political branches. *Cf. Sosa,* 124 S.Ct. at 2766, n. 21. These concerns obtain whether an international law claim is based on statute or common law premised on a clear norm of customary international law.

Even if Congress could, by express legislation, negate the application of the act of state doctrine (at the expense of the Executive Branch), such negation should not be lightly implied in light of the alteration of balance between Congress and the Executive Branch that would ensue. *See Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991) ("clear statement" of Congress required where statute significantly alters the balance between Congress and the President). *Cf. Franklin v. Massachusetts,* 505 U.S. 788, 800, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (in view of separation of powers and unique constitution-

al position of the President, silence in text of statute insufficient to subject President to provisions of the APA). Here, there is no clear indication in the TVPA that suggests Congress intended the TVPA to have such a far reaching effect. The principal aim of the TVPA was to codify the Second Circuit's decision in *Filartiga* by providing an explicit cause of action against individuals for torture and extrajudicial killings. Although, as noted above, it was contemplated that individuals would generally not be able to claim immunity under the FSIA, the TVPA does preserve immunity for foreign state governmental agencies. Where the particular circumstances, such as those in the case at bar, suggests that individual defendants may not claim immunity under the FSIA because their conduct is *ultra vires* under positive domestic law, but nonetheless their acts should be treated as acts of state because they were carried out pursuant to state policy and implicate current governmental policy, the considerations which afford foreign governments immunity under the TVPA also inform the potential applicability of the act of state doctrine. *Cf.* S.Rep. No. 102–249, at 8 ("To avoid liability by invoking the FSIA, a former official would have to prove an agency relationship to the state, which would require that the state admit some knowledge or authorization of relevant

## B. Whether Defendants' Conduct Constituted Acts of State

■ The act of state doctrine presupposes an "act of state." It arises only when the court is required to rule on the legality of an "official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405–406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ("Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign") (emphasis in original); *Alfred Dunhill of London*, 425 U.S. at 694, 96 S.Ct. 1854 (the question is whether "the conduct in question was the public act of those with authority to exercise sovereign powers"); *Liu*, 892 F.2d at 1432 (act of state doctrine implicated "when courts are asked to judge the legality or propriety of public acts committed within a foreign state's own borders"). Official action or a public act constitutes an act of state if it involves "the public and governmental acts of sovereign states," *i.e.*, the "governmental functions of a State." *Alfred Dunhill of London*, 425 U.S. at 695–96, 96 S.Ct. 1854; *see Liu*, 892 F.2d at 1432 (stating that party asserting act of state doctrine must offer evidence that "the government acted in its sovereign capacity"); *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360 (9th Cir.1981) ("When the state *qua* state acts in the public interest, its sovereignty is asserted."). Thus, were the suits at bar brought directly against the PRC, the act of state analysis would undoubtedly apply.

The instant cases, however, are brought against two officials—the Mayor of Beijing (now a high ranking member of the Chinese Communist Party) and the Deputy Provincial Governor of the Liao Ning Province. The question is whether the alleged conduct of these two individual officials constitutes an act of state.

■ The *Liu* and *Xia* Plaintiffs argue that because their conduct violated customary standards of international law and/or *jus cogens* norms, their acts cannot be deemed to be official acts of the state, and thus the act of state doctrine cannot be invoked. As with the parallel argument made with respect to the FSIA immunity of individual officials, however, this argument is not supported by case law. Whether the acts of individual officials are attributable to the foreign state so as to constitute acts of state turns not on international law, but on domestic law and policy of the foreign state.

■ As noted above, the act of state doctrine is not rendered inapposite simply because international law or *jus cogens* norms are violated. As the Court noted in *Sabbatino*, "the act of state doctrine is applicable even if international law has been violated." 376 U.S. at 431, 84 S.Ct. 923. The fact that the challenged action of the foreign state violates clear international consensus informs the doctrinal analysis (*i.e.* the first *Sabbatino* factor), not the threshold question of whether there is an act of state. *Id.* at 428, 84 S.Ct. 923. The *Sabbatino* analysis presupposes a violation of international law. The act of state doctrine is not compelled by international law.

acts.'") (internal quotation marks omitted). Absent a clearer indication from Congress, the Court concludes that the courts are not precluded from considering the act of state doctrine in adjudicating claims under the TVPA. To be sure, the fact that Congress has expressly codified a cause of action may inform the balance of factors the courts consider in applying the act of state doctrine (it informs the degree of international consensus and Congress' view of the importance of enforcement in the context of foreign relations), but it does not preclude its application entirely as plaintiffs suggest.

*Sabbatino,* 376 U.S. at 427, 84 S.Ct. 923. As a corollary, neither is it controlled by international law. Moreover, as previously discussed, *Sosa* made clear that specific deference to the political branches, as the act of state doctrine implies, may be warranted even where the alleged international law violations meets the clear definition test. 124 S.Ct. at 2766, n. 21.

The cases which have addressed whether conduct of individual officials constitutes an act of state have focused on whether the official acted consistent with the foreign state's laws or with approval by the national government, not on whether his or her acts violated international standards. *See Kadic,* 70 F.3d at 250 (doubting whether acts of state official "taken in violation of a nation's fundamental law and wholly unratified by that nation's government" could be properly characterized as an act of state); *Filartiga v. Pena–Irala,* 630 F.2d 876, 889 (2d Cir.1980) (doubting whether action by a state official "in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nations government" could properly be characterized as an act of state); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 544 (S.D.N.Y.1984) (acts of then General Sharon not alleged to have been authorized by the State of Israel, but in fact was alleged to have gone beyond his authority in the campaign in Lebanon and by intentionally misleading national government were not acts of state).

■ The question is whether, as measured by domestic laws and policies of the foreign state, the acts of the defendant officials in this case are sufficiently attributable to the government of China so as to constitute an act of state. The Ninth Cir-

cuit has not had an opportunity to address the parameters of this question. In *Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir.1988) (en banc), the court applied the *Sabbatino* analysis to a RICO suit against former President Marcos and his wife and held, after balancing various factors, including the fact that Marcos had been deposed and that the United States did not oppose adjudication of the suit, that the act of state defense did not bar the suit. *Id.* at 1360–61. Since the Marcoses had at that point in the litigation "offered no evidence whatsoever to support the classification of their acts as acts of state," the court had no occasion to address under what circumstances the acts of an official are sufficient to implicate the act of state doctrine. 862 F.2d at 1361.

In addressing the issue, the Second Circuit indicated that there is no requisite "act of state" where the official's conduct violated the foreign state's fundamental laws and was wholly unratified by the nation's government. *Kadic,* 70 F.3d at 250; *Filartiga,* 630 F.2d at 889. Unlike the facts in *Kadic* and *Filartiga,* Defendants' acts, though apparently violative of the state's domestic law, are not "wholly unratified by that nation's government." Indeed, as discussed above, the PRC's alleged repression of the Falun Gong movement and violation of the international human rights of Falun Gong practitioners appears to be consistent with and pursuant to the unofficial policy of the national government.[23] The question then is whether the analysis of the act of state doctrine applies to such conduct that is violative of domestic law but nonetheless ratified by the national government. This

---

**23.** The acts of the Defendants Liu and Xia in furtherance of national policy as alleged herein contrasts with conduct undertaken for purely private financial gain as in *e.g. Jimenez*

*v. Aristeguieta,* 311 F.2d 547, 558 (5th Cir. 1962) (dictator's embezzlement and fraud not protected by act of state doctrine).

appears to be a question of first impression in this circuit.

The language of the Second Circuit's decisions in *Kadic* and *Filartiga* suggest that such conduct may constitute acts of state. In both cases, the court indicated there is no act of state where *both* of two conditions are met: (1) the conduct violated the fundamental laws of the foreign sovereign and (2) the conduct was "wholly unratified" by the nation's government. *Kadic,* 70 F.3d at 250; *Filartiga,* 630 F.2d at 889. In the cases at bar, only the first condition is met. The Court concludes the second condition is essential to an act of state.

The policy considerations underlying the act of state doctrine are implicated where a public official engages in conduct in executing policy authorized or ratified by the government even if that policy is covert and inconsistent with official law. The doctrine's concern of affording respect and comity between and among sovereign nations is implicated whenever the official executes the policy of the sovereign. *Underhill,* 168 U.S. at 252, 18 S.Ct. 83. That the government's policy is covert or inconsistent with its domestic law does not gainsay the fact that conduct in execution of that policy is a "governmental act" and the "exercise [of] powers peculiar to sovereigns." *Alfred Dunhill of London,* 425 U.S. at 704, 96 S.Ct. 1854.[24] *Cf.* Restatement § 207(c) (1987) (state is responsible for violations of international law resulting from action or inaction by an official "acting within the scope of authority or under color of such authority"). Enactment or issuance of a "statute, decree, order, or resolution" by the government is one way in which the state exercises its sovereign power. *Alfred Dunhill of London,* 425 U.S. at 694–95, 96 S.Ct. 1854. Creation and implementation of policy, even if that policy is covert, is another. *Cf. Timberlane Lumber Co. v. Bank of Am.,* 549 F.2d 597, 607 (9th Cir.1976) (expressing hesitancy to "challenge the sovereignty of another nation, the wisdom of its policy, or the integrity or motivation of its action").

Moreover, the concerns of the act of state doctrine for the separation of powers, the desirability of having our government speak with one coherent voice on matters of foreign affairs, and the interest in avoiding conflict with and embarrassment of the Executive Branch are implicated where the conduct at issue is the subject of diplomacy. *Sabbatino,* 376 U.S. at 423, 431–433, 84 S.Ct. 923; *OPEC,* 649 F.2d at 1360. Despite the PRC's public disclaimer of human rights violations and wrongdoing in its treatment of the Falun Gong movement, the State Department has addressed the issue in its diplomatic communications with China. As the letter from the State Department filed herein states, "the United States has repeatedly made these concerns known to the Government of the PRC and has called upon it to respect the rights of all its citizens, including Falun Gong practitioners. Our critical views regarding the PRC Government's abuse and mistreatment of practitioners of the Falun Gong movement are a matter of public record . . . ." Letter from William H. Taft, IV to Assistant Attorney Gen. Robert D.

24. The situation is analogous to provisions of American law governing governmental liability for the acts of public officials. Under *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may be held liable in damages for acts of its individual officials if those acts are pursuant to a custom or policy of the government. That those acts violate *e.g.* federal statutes or the constitution does not negate the government's liability. Nor would the fact that those customs or policies were secret and publicly disavowed by the government immunize the government from liability.

McCallum of Sept. 25, 2002, at 2–3. The State Department also states that the "Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply those tools within the context of our broader foreign policy interests." *Id.* at 7. It urges that "U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy," and that "[s]uch litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy." *Id.* at 7–8 (emphasis in original). Where a foreign state's policy is the specific subject of foreign diplomacy by the State Department, the separation of powers considerations underpinning the act of state doctrine are implicated regardless of whether the subject policy is consistent with the foreign state's domestic laws.

The analysis of the act of state doctrine thus diverges from that of FSIA immunity. In holding the FSIA does not supersede the act of state doctrine, the Ninth Circuit noted that the act of state doctrine addresses different concerns than the doctrine of sovereign immunity. *Liu,* 892 F.2d at 1432; *OPEC,* 649 F.2d at 1359–60. The law of sovereign immunity goes to the jurisdiction of the court, whereas the act of state doctrine is prudential. Sovereign immunity is a principle of international law recognized by the United States by statute whereas the act of state doctrine is a domestic legal principle arising from the peculiar role of American courts. *OPEC,* 649 F.2d at 1359. The doctrine "recognizes not only the sovereignty of foreign states, but also the sphere of power of the co-equal branches of our government." *Id.* "The doctrine is meant to facilitate the foreign relations of the United States . . ." *Marcos,* 862 F.2d at 1361. The FSIA embodies the principle of sovereign immunity law under which a public official is stripped of his or her sovereign immunity defense if he or she exceeds the scope of a valid grant of authority (*e.g.* by committing an unconstitutional act or otherwise violating applicable law). However, the policy concerns embodied in the act of state doctrine obtain whenever the official acts pursuant to authority of or ratification by the national government *regardless* of whether those acts comply with official domestic law.

Accordingly, this Court finds that in the context of these default proceedings, the evidence establishes that the Defendants' alleged conduct was not "wholly unratified" by the PRC. It was pursuant to policy and therefore constituted acts of state. Hence, the *Sabbatino* analysis applies.

## C. The Sabbatino Analysis

▮▮▮ As discussed above, the Supreme Court in *Sabbatino* developed a three-factor balancing test to determine whether the act of state doctrine bars suit:

[1] [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it . . .

[2] [T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.

[3] The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence . . .

376 U.S. at 428, 84 S.Ct. 923. The Ninth Circuit has also held that the court should consider whether the foreign state was acting in the public interest. *Liu,* 892 F.2d at 1432.

### 1. Degree of International Consensus

█ It is well established that torture constitutes *jus cogens* violations. *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 714–15 (9th Cir.1992). As discussed below, the alleged acts of torture, cruel, inhuman or degrading treatment and arbitrary detention which the Court finds actionable violate the law of nations on which a broad degree of international consensus exists. Moreover, as noted below, the basis for commander responsibility for those acts are also consistent with well recognized international law standards. *See infra*, Part VIII.

Accordingly, the first *Sabbatino* factor weighs against the act of state defense.

### 2. Implications for Foreign Relations

The second *Sabbatino* factor reflects the "peculiar requirements of successful foreign relations"—that "the United States must speak with one voice and pursue a careful and deliberate foreign policy." *OPEC*, 649 F.2d at 1358. This is the central factor in the *Sabbatino* analysis and "[t]he 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." *Id.* at 1360 (citation omitted); *see also Alfred Dunhill of London*, 425 U.S. at 697, 96 S.Ct. 1854 (the "major underpinning of the act of state doctrine" is avoiding court rulings "that might embarrass the Executive Branch of our Government in the conduct of our foreign relations"); *Timberlane Lumber*, 549 F.2d at 607 ("The touchstone of *Sabbatino*-the potential for interference with our foreign relations-is the crucial element in determining whether deference should be accorded in any given case."); *Liu*, 892 F.2d at 1432 (accord).

█ In this regard, the views of the State Department, while not "conclusive," are entitled to respectful consideration. *Kadic*, 70 F.3d at 250; *Sharon*, 599 F.Supp. at 552. The reason is obvious. Primary responsibility for conducting foreign relations lies with the Executive Branch. The limited institutional competence of the judiciary to assess the impact upon its rulings upon foreign relations makes second guessing judgments made by the State Department hazardous. On the other hand, as previously noted, in enacting the FSIA, Congress intended to end to practice of affording total deference to the views of the Executive Branch on whether particular foreign states should be subject to suit on a case by case basis; Congress transferred ultimate responsibility from the executive branch to the judiciary. *See Chuidian, supra*, 912 F.2d at 1100; *Letelier v. Republic of Chile*, 488 F.Supp. 665, 670 (D.D.C.1980). Moreover, in enacting the TVPA, Congress indicated its desire that certain conduct—torture and extrajudicial killings—be amenable to adjudication by the federal courts.

As mentioned previously, this Court invited the views of the State Department on the cases at bar. The State Department urged against adjudication of the instant suits. In its letter, the Department expresses the view that:

> adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong], including the cases before Magistrate Chen, is not the best way for the United States to advance the cause of human rights in China....

> ... The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

We believe, however, that U.S. *courts* should be cautious when asked to sit in

judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy ...

... Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

... [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 7–8 (emphasis in original).

While the State Department does not describe with any more specificity how adjudication of the instant cases could interfere with the Executive Branch's foreign diplomacy in this matter, "the key inquiry for the court's purpose is whether there will be an impact on the United States' foreign relations, not whether the position adopted by the United States is well-founded or factually accurate." *Sarei v. Rio Tinto PLC.*, 221 F.Supp.2d 1116, 1192 (C.D.Cal.2002). *See also id.* at 1181–82 ("[T]he court must accept the statement of foreign policy provided by the executive branch as conclusive of its view of that subject; it may not assess whether the policy articulated is wise or unwise, or whether it is based on misinformation or faulty reasoning.").

The Plaintiffs contend that because the Executive Branch has already publicly condemned the PRC's repression of the Falun Gong, an adjudication by this Court

finding that government officials committed violations of international human rights and imposing sanctions in the form of relief sought herein (damages and equitable relief) would not interfere with the Executive Branch's foreign diplomacy efforts. While this fact may well mitigate the potential conflict between coordinate branches of government, it does not eliminate them for two reasons.

First, pronouncements or rulings from the different branches may have different implications. As the Court in *Sabbatino* highlighted,

Even if the State Department has proclaimed the impropriety of the expropriation, the stamp of approval of its view by a judicial tribunal, however, impartial, might increase any affront ... Considerably more serious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary.

376 U.S. at 432, 84 S.Ct. 923. Even though the cases at bar are proceeding by way of default, that is no guarantee that the Court, in examining the sufficiency of the Complaints and evidence presented, will in fact find an international law violation. If it does find such violations, as it does herein, the imprimatur of formal findings by a federal court might in some circumstances have foreign policy implications beyond that desired by the Executive Branch.[25]

---

**25.** The Court also notes that the fact that the two individual Defendants herein appear to have had little contact with the United States and that personal jurisdiction is based solely on service during their transitory physical presence in the United States and the fact that many of the Plaintiffs have little or not substantial ties to the United States could exacerbate tension arising out of these suits. This

assertion of the outer reaches of the jurisdiction of the federal judiciary in these cases might appear especially ironic in view of the government's resistance to submission to such international bodies as the International Criminal Court. *See* Felicity Barringer, *"U.S. Stance on War Crimes Court Reopens Rift with Allies,"* S.F. Chron., June 11, 2003, at A8.

Second and more importantly, although the conclusions of this Court coincide with the Executive Branch's condemnation of the PRC's human rights policy, there may be different approaches to diplomacy in regard thereto. As past debates over other foreign diplomatic efforts have demonstrated, there are a variety of approaches to changing a foreign state's policy, ranging from e.g. "constructive engagement" to economic isolation to threats of war.[26] Thus, for instance, an order imposing a significant damage award upon the two defendant officials or issuing an injunction could well conflict with the "tools" alluded to by the State Department which the Executive Branch chooses to apply "within the context of our broader foreign policy interests."

As noted above, while the views of the State Department are not dispositive, they are entitled to "respectful consideration," (Kadic, 70 F.3d at 250) and given "serious weight" (Sosa, supra, 124 S.Ct. at 2766, n. 21) in appropriate cases. The Restatement, after reviewing cases in which the State Department has stated a position on application of the act of state doctrine, concludes: "It seems that if the State Department issues a letter requesting that the courts not review the validity of particular act, such a letter will be highly persuasive if not binding." Restatement at § 443 n. 9.[27]

As an empirical matter, this Court notes that as observed by the court in Sarei, "plaintiffs have not cited, and the court has not found, a single case in which a court permitted a lawsuit to proceed in the face of an expression of concern such as that communicated by the State Department here." 221 F.Supp.2d at 1192.[28] The

---

**26.** For instance, while virtually all officials and policy makers condemned South Africa's system of apartheid, there was intense debate between those who advocated boycotting and isolating South Africa and those who advocated "constructive engagement" with its government. Overriding a presidential veto, Congress enacted the Comprehensive Anti-Apartheid Act ("CAAA") of 1986, 22 U.S.C. 5001 et seq., which established U.S. policy toward South Africa and imposed substantial sanctions against its white minority government, and instituted civil and criminal liability for violations of the Act. See e.g., United States v. van den Berg, 5 F.3d 439, 440 (9th Cir.1993) (discussing the CAAA and its termination by Executive Order in 1991 after South Africa took steps toward democracy).

**27.** Deference is due to the State Department on issues involving political, rather than legal judgments for the same reasons that courts are reluctant to second guess the Executive Branch on questions of foreign policy. Thus, the State Department's legal arguments that the court should refrain from exercising jurisdiction because the alleged acts occurred entirely outside the United States or because personal jurisdiction over the defendants were obtained only by alleged service of process during an official visit is entitled to less weight than its judgment that the assertion of jurisdiction over these cases could disrupt foreign relations. Indeed, the Court finds that contrary to the Department's legal arguments, it is clear that once personal jurisdiction is properly asserted, Filartiga, Kadic, Marcos, Hilao II, and their progeny establishes that claims may be brought under the ATCA or TVPA for violations of international human rights occurring entirely outside the United States.

**28.** After the hearing, the Liu Plaintiffs submitted a supplemental brief arguing that the district court in Sarei rejected application of the act of state doctrine despite the State Department's assertion that the case would interfere with foreign relations. Liu Plaintiffs' Post-Hearing Memorandum in Response to Court Inquiries, at 4–5. The Sarei court noted, "The Statement of Interest filed by the Department of State does not directly indicate whether it believes any of the act of state, political question or international comity doctrines applies. It does clearly express the view, however, that continued adjudication of this lawsuit will negatively impact United States foreign relations with Papua New Guinea." 221 F.Supp.2d at 1190. The court held that the act of state doctrine barred environmental

cases involving Cuban expropriations are instructive. When *Sabbatino* was before the Second Circuit, one of the State Department letters strongly suggested that the act of state doctrine not be applied, and the Second Circuit relied on this letter to affirm the district court's decision not to apply the act of state doctrine. 307 F.2d at 858–859. However, when *Sabbatino* reached the Supreme Court, the Executive Branch reversed course. The Solicitor General urged application of the act of state doctrine. The Court ultimately adopted the Solicitor General's position. 376 U.S. at 430–432, 84 S.Ct. 923.

Likewise, in *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), the Cuban government seized City Bank branches in Cuba. City Bank retaliated by selling collateral which secured a loan (which exceeded the value of the branches) it had made to the predecessor of the Banco Nacional de Cuba. Cuba sued to recover the excess proceeds and asserted the act of state doctrine as a defense to City Bank's counterclaims. The Second Circuit held that the act of state doctrine barred City

Bank's counterclaim. 431 F.2d 394 (2d Cir.1970). The Supreme Court subsequently remanded the case for reconsideration in light of the State Department's letter that the act of state doctrine should not apply, but the Second Circuit held that notwithstanding the State Department's change of position, *Sabbatino* barred the counterclaim. 442 F.2d 530, 532, 536–38 (2d Cir.1971). A majority of the Court reversed the Second Circuit, although it presented only fractured reasoning as to why the act of state doctrine should not apply. A three-justice plurality relied upon the State Department's letter and declared that the Court should automatically defer to the Executive's wishes and find the act of state doctrine not applicable. 406 U.S. at 769–70, 92 S.Ct. 1808.[29]

In *Alfred Dunhill of London*, 425 U.S. at 695–706, 96 S.Ct. 1854, an action brought by former owners of expropriated Cuban cigar companies against American importers to recover payments for cigar shipments, the court of appeals held that a judgment against the defendant importers was barred by the act of state doctrine.

---

tort and racial discrimination claims. *Id.* at 1185–93.

More importantly, in *Sarei*, the district court ultimately barred all claims under the political question doctrine. *Id.* at 1185–93. The court acknowledged that "the same separation of powers principles that inform the act of state doctrine underlie the political question doctrine" and it characterized the act of state doctrine as the foreign relations "equivalent" of the political question doctrine. *Id.* at 1196 (citations omitted). Under these circumstances, this Court does not read *Sarei's* holding as contrary to the recommendation presented here. Given that plaintiff's claims in *Sarei* were barred by the political question doctrine, and given the substantial overlap between that doctrine and the act of state doctrine, the *Liu* Plaintiffs' argument amounts to a distinction without a difference. Cf. *Northrop Corp. v. McDonnell Douglas Corp.*, *supra*, 705 F.2d at 1046 ("The act of state doctrine is essentially the foreign coun-

terpart to the political question doctrine. Both doctrines require courts to defer to the executive or legislative branches of government when those branches are better equipped to handle a politically sensitive issue ... Neither doctrine is susceptible to inflexible definition, and both must be applied on a case-by-case basis by balancing a variety of factors.") (citing *OPEC*, 649 F.2d at 1358–59).

**29.** This opinion was authored by Justice Rehnquist, joined by Burger and White. *Id.* at 765–70, 92 S.Ct. 1808. Justice Douglas concurred in the result but preferred to rely on equitable considerations. *Id.* at 772, 92 S.Ct. 1808. Justice Powell concurred in the result but objected to the *Bernstein* exception. *Id.* at 773, 92 S.Ct. 1808 ("I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction.").

The State Department proclaimed its position that the case did not raise an act of state question. The Supreme Court subsequently reversed, with a four-justice plurality stating that the State Department's argument was persuasive. *Id.* at 695–706, 96 S.Ct. 1854. *See also W.S Kirkpatrick & Co.,* 493 U.S. at 403–409, 110 S.Ct. 701 (RICO action involving allegations of construction company's bribery payments to Nigerian government, the State Department advised that this case would not interfere in foreign affairs, and Supreme Court held that act of state doctrine did not apply); *Marcos,* 862 F.2d 1355 (en banc) (State Department argues that act of state doctrine not a defense in RICO action against former president of Philippines, Ninth Circuit ruled that the act of state does not bar the suit); *Allied Bank v. Banco Credito Agricola de Cartago,* 757 F.2d 516 (2d Cir.1985) (Second Circuit reversed both its own earlier ruling and that of the district court after State Department filed brief recommending that the act of state doctrine did not bar suit); *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 884–85 (2d Cir.1981) (act of state doctrine held not to apply when Bernstein letter obtained); *Banco Nacional de Cuba v. Chemical Bank,* 658 F.2d 903, 911 (2d Cir.1981) (act of state doctrine defense recognized when Bernstein letter not obtained); *First Nat'l Bank of Boston (Int'l) v. Banco Nacional De Cuba,* 658 F.2d 895, 902 (2d Cir.1981) (act of state doctrine defense recognized when Bernstein letter not obtained); *Sarei,* 221 F.Supp.2d at 1181 (court affords respectful consideration to the State Department's view that a human rights suit would risk potentially serious adverse impact on foreign relations in applying the act of state doctrine and political question doctrine).

In addition, the PRC, through the United States Department of State, submitted a letter to this Court urging this Court not to assert jurisdiction over the instant cases. The PRC asserts in its letter that Falun Gong is not a religious belief or spiritual movement but an "evil cult that seriously endangers the Chinese society and people," and that is has "seriously disrupted the law and order," and endangered social stability by inciting lawless and disruptive acts including sabotage and suicide bombings. Statement of the Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 1–2 (translated). The letter denies allegations of torture and mistreatment and asserts that the U.S. Courts have no jurisdiction over such suits and that such lawsuits are detrimental to China–US relations. In particular the Government contends that

> If the U.S. courts should entertain the "Falun Gong" trumped-up lawsuits, they would send a wrong signal to the "Falun Gong" cult organization and embolden it to initiate more such false, unwarranted lawsuits. In that case, it would cause immeasurable interferences to the normal exchanges and cooperation between China and the United States in all fields, and severely undermine the common interests of the two countries.

*Id.* at 6.

This Court cannot assume the veracity of the factual assertions made by the PRC since it is not a party to the suit and because the assertions are not based on competent and admissible evidence (there is no declaration of a competent witness under oath). Accordingly, the Court cannot take judicial notice of the PRC's factual assertions contained in its submission. However, the Court can and does take judicial notice under Fed.R.Evid. 201(b)(2) of the *fact* that the PRC vigorously opposes the assertion of jurisdiction over the instant suits and views such suits as detrimental to the relations between China and

the United States. The fact that the foreign state whose policies are at issue objects to the suit informs the second *Sabbatino* factor—the significance to our foreign relations. *Cf. Sosa, supra,* 124 S.Ct. at 2766, n. 21 (consideration given to view of Government of South Africa). Given the PRC's position, the posture of the cases at bar stand in stark contrast to the situation in *Hilao II,* where the Philippine government expressly disclaimed any opposition to the suit against its former ruler. *In re Estate of Ferdinand Marcos, Human Rights Litig. ("Hilao II"),* 25 F.3d 1467, 1472 (9th Cir.1994).

 Accordingly, the second *Sabbatino* factor generally weighs against justiciability. However, the force of this factor may depend upon the nature of the relief sought. The more intrusive the remedy upon the sovereignty of the foreign state, the more the concerns of the act of state doctrine are implicated. *Cf. Credit Suisse v. U.S. Dist. Ct.,* 130 F.3d 1342, 1347 (9th Cir.1997) ("Any order from the district court compelling the Banks to transfer or otherwise convey Estate assets would be in direct contravention of the Swiss freeze orders"); *OPEC,* 649 F.2d at 1361 ("The possibility of insult to the OPEC states and of interference with the efforts of the political branches to seek favorable relations with them is apparent from the very nature of this action and the remedy sought"—injunctive relief and damages).

Any injunctive relief which would command the defendant officials to comply with this Court's order in contravention of PRC's practices or policies would obviously be disruptive. Such a direct intrusion into the sovereignty of the PRC risks enormous implications for our foreign relations. Accordingly, though the Complaint in the *Xia* case prays for injunctive relief (without specifying what that relief would be), counsel for the *Xia* Plaintiffs acknowledged at the hearing herein that the Plaintiffs do not seek any injunctive relief against Defendant Xia.

A monetary damages award based on the Defendant's acts of state (conduct attributable to the national government of the PRC), while not as intrusive into sovereignty as an injunction, nonetheless constitutes a significant invasion of sovereignty. *Cf. Sosa, supra,* 124 S.Ct. at 2766, n. 21 (noting view of South African government that award of damages would interfere with its avoidance of " 'victors' justice" approach). Its effect in this instance would be similar to the imposition of monetary sanctions against a foreign state's actions. The Court notes that the imposition of economic sanctions is one of the tools of foreign diplomacy that has often been controversial and the subject of debate and deliberation between the political branches of government. *See infra* footnote 25 (discussing South Africa); *van den Berg,* 5 F.3d at 440. That damages are imposed upon individual public officials, rather than directly against the state itself, does not obviate the impact on foreign relations if the basis of the monetary sanctions is the official's implementation of the foreign state's policy. Not only would such an award effectively impose a sanction against the state's policy, but the risk of personal exposure to monetary sanctions would subject the state's officials to conflicting commands-the official must either violate his or her state's policies or be subjected to damages liability imposed by a United States court. Such a dilemma risks a substantial degree of interference with the foreign state's administration of government [30] and is thus likely to have substantial implications for foreign diplomacy.

---

**30.** It is for similar reasons—the concern of

interfering with the administration of govern-

In contrast, the request for declaratory relief poses the least threat to foreign relations for several reasons. First, although the judicial act of declaring a foreign state's policy as violative of international law implicates the act of state doctrine inasmuch as it entails ruling on the legality of an "official act of a foreign sovereign performed within its own territory," it does not command the state or its officials to do anything. *W.S. Kirkpatrick & Co.*, 493 U.S. at 405, 110 S.Ct. 701.

Second, in the cases at bar, any such declaration would be generally consistent with the prior public pronouncements of the State Department condemning China's repressive policy toward Falun Gong practitioners. In its Statement of Interest, the State Department noted its "critical views regarding the PRC Government's abuse and mistreatment of practitioners of the Falun Gong movement are a matter of public record" and are set forth in the Department's annual human rights reports. Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 3. The most recent report states that "[f]or the past 3 years, the government has waged a severe political, propaganda, and police campaign against the FLG movement. . . . Directives to prevent FLG protests at all costs has resulted in many egregious abuses." Country Reports on Human Rights Practices 2001, China, United States Dept. of State,

March 4, 2002, at 17 (*available at* http://www.state.gov/g/drl/rls/hrrpt/2001/eap/8289pf.htm) The report goes on to state:

> The Government intensified its repression of groups that it determined to be "cults," and of the FLG in particular. Various sources report that thousands of FLG adherents have been arrested, detained, and imprisoned, and that approximately 200 or more FLG adherents have died detention since 1999; many of their bodies reportedly bore signs of severe beatings or torture or were cremated before relative could examine them.
>
> \* \* \*
>
> Police often used excessive force when detaining peaceful FLG protesters, including some who were elderly or who were accompanied by small children. During the year, there were numerous credible reports of abuse and even killings of FLG practitioners by the police and other security personnel, including police involvement in beatings, detention under extremely harsh conditions, and torture (including electric shock and by having hands and feet shackled and linked with crossed steel chains). Various sources report that since 1997 approximately 200 or more FLG adherents have died while in police custody.

*Id.* at 18, 22.[31] Given the Executive Branch's public and specific condemnation

---

ment—that individual public officials are afforded qualified immunity from suit under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (purpose of qualified immunity is to protect public officials from "undue interference with their duties and from potentially disabling threats of liability"); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (permitting damage suits against individual officials presents risk that fear of personal monetary liability will

"unduly inhibit officials in the discharge of their duties").

**31.** A State Department spokesperson has also publicly condemned China's repression of Falun Gong practitioners. *See* Statement of Phillip T. Reeker, Daily Press Briefing, U.S. Dept. of State (August 20, 2001) (*available at* http:// www.state.gov/r/pa/prs/dpb/2001.4576pf.htm) ("We have raised with China on many occasions our concerns about the crackdown on the Falun Gong and reports of torture and mistreatment of detained and im-

of the People's Republic of China's mistreatment of Falun Gong practitioners, a declaratory judgment would essentially affirm the views of the State Department, thus creating minimal risk of disrupting foreign relations conducted by the Executive Branch.

Moreover, a judgment declaring that certain alleged abuses violates international human rights would not directly challenge the legality of China's written law which, as previously discussed and as stated in the People's Republic of China's letter to this Court, already prohibits such mistreatment. *See* Statement of the Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 3 (translated) ("Prohibition of torture has always been a consistent position of the People's Republic of China. In 1986, China signed *The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*.").

Finally, a declaratory judgment in the instant cases would be based upon a default of two lower level individual officials and not the crucible of an adversarial fact-finding process of trial in which the government itself participated. While this may not lessen the legal effect of a final judgment, a declaratory judgment resulting from such a default may well have lesser implications politically than a judgment based upon formal findings after a contested trial.

Significantly, while the State Department has cautioned this Court against exercising jurisdiction of the cases at bar, it also urges that if this Court does not entirely dismiss the case that it "fashion its

final orders in a manner that would minimize the potential injury to the foreign relations of the United States." Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 8. For the reasons stated above, limiting relief to declaratory judgment would have such an effect.

### 3. Continued Existence of the Accused Government

The third *Sabbatino* factor clearly weighs in favor of applying the act of state doctrine. Not only does the PRC still exist, but the individual officials named as Defendants herein continue in their significant positions in the PRC, and as alleged, continue to implement the policies in question. The Ninth Circuit has noted the difference between suing a sitting official and one who has been deposed:

> [T]he classification of "act of state" is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scrutiny in our courts. No estoppel exists insulating a deposed dictator from accounting....
>
> The classification might, it may be supposed, be used to prevent judicial challenge in our courts to many deeds of a dictator in power, at least when it is apparent that sustaining such challenge would bring our country into a hostile confrontation with the dictator. Once deposed, the dictator will find it difficult to deploy the defense successfully. The "balance of considerations" is shifted.

*Marcos, supra,* 862 F.2d at 1360 (citing *Sabbatino,* 376 U.S. at 428, 84 S.Ct. 923).

---

prisoned practitioners, and we are going to continue to raise those issues"). So has the U.S. delegation to the U.N. Commission on Human Rights. *See* Statement of Ambassador Shirin Tahir–Kheli, U.N. Comm. on Human Rights, 57th Sess., March 30, 2001

(*available at* http:// www.state.gov/g/drl/rls/ rm/2001/1806pf.htm) ("[The U.S. government] should not be silent when the Chinese authorities ... brutally repress Falun Gong practitioners exercising rights of freedom of belief and expression").

Virtually every case permitting a suit to proceed over the act of state objection advanced by an individual defendant involve former dictators, rulers or officials no longer in power.[32] *Id.* at 1361; *Kadic*, 70 F.3d at 250; *Filartiga*, 630 F.2d at 889; *cf.* S.Rep. No. 102–249 ("the FSIA should normally provide no defense to an action taken under the TVPA against a former official"); *Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996) (affirming entry of judgment against defendant local government official who had personally supervised torture and interrogation during 1970s Ethiopian military dictatorship then later worked in Atlanta, and rejecting defense based on the political question doctrine). *But see Chiminya Tachiona v. Mugabe*, 216 F.Supp.2d 262 (S.D.N.Y.2002) (TVPA damages award), and 234 F.Supp.2d 401 (S.D.N.Y.2002) (ATCA damages award), in which individual defendants were dismissed based on head of state immunity, but *ruling political party of Zimbabwe held liable for multi-million dollar judgment under TVPA and ATCA for campaign of extrajudicial killing, torture and other human rights abuses.[33] The Plaintiffs have cited no case in which the court has refused to apply the act of state doctrine in a suit against a sitting official charged with implementing current state policy, the legality of which is at issue.

After the hearing on Plaintiffs' motions, the *Xia* Plaintiffs have submitted post-

---

**32.** The *Liu* Plaintiffs cite *Sharon*, 599 F.Supp. 538 (S.D.N.Y.1984), *Jungquist v. Nahyan*, 940 F.Supp. 312 (D.D.C.1996), *rev'd on other grounds*, 115 F.3d 1020 (D.C.Cir.1997); and *Letelier v. Rep. of Chile*, 488 F.Supp. 665 (D.D.C.1980) as cases in which the act of state doctrine was found not to bar suits against sitting officials. These cases are inapposite, however. In *Sharon*, at issue was Ariel Sharon's acts taken in his *former* capacity as Israeli defense minister. Sharon's position at the time of the suit (not described in the opinion), had nothing to do with the acts previously committed while defense minister. After Sharon resigned as Defense Minister he served as "Minister without Portfolio" in 1983–84, then as Minister of Trade and Industry in 1984–90. *See* Israeli Ministry of Foreign Affairs website, *available at* http://www.mfa.gov.il/mfa/go.asp?MFAH00ge0. Moreover, in that case it was Sharon who brought the libel suit and Time Magazine that asserted an act of state doctrine defense while also taking the contrary position that "Sharon went beyond his authority in the campaign in Lebanon and intentionally misled Prime Minister Begin and the Cabinet into expanding the war." 599 F.Supp. at 544. The district court rejected Time's act of state defense because it contradicted Time's theory of the case. *See id.* at 544 ("The actions of an official acting outside the scope of his authority as an agent of the state are simply not acts of state."). In summary, the posture of *Shar-on* is distinct from the instant cases. In *Jungquist*, the defendant Crown Prince's position was found to be unrelated to the conduct in question which was taken solely in his individual capacity. *Letelier* did not involve a suit against an individual official.

**33.** In *Mugabe*, where the defendants failed to answer, the United States government was permitted to intervene for the limited purpose of appealing the judgment. 186 F.Supp.2d 383 (S.D.N.Y.2002). In addition, the State Department submitted a suggestion of immunity based on three arguments: (1) head-of-state immunity; (2) diplomatic immunity; and (3) personal inviolability attaching to both defendants Mugabe and Mudenge, the president and foreign minister, respectively. 169 F.Supp.2d 259, 267–68 (S.D.N.Y.2001), *reconsideration denied* 186 F.Supp.2d 383 (S.D.N.Y.2002). While the State Department argued that permitting the action to proceed against the President and Foreign Minister "would be incompatible with the United States' foreign policy interests" (169 F.Supp.2d at 267) the act of state doctrine *per se* was not analyzed. The district court dismissed the three individual defendants (the information minister had not been properly served), but held that personal inviolability could not be extended through Mugabe and Mudenge to their political party as well. *Id.* at 318.

hearing supplemental memoranda indicating that Defendant Liu, subsequent to the filing of this suit, left his post as Mayor of Beijing to accept a promotion to the higher post of Secretary of the Communist Party for the City of Beijing's Municipal Party Committee, a post "more powerful" than the position of Mayor. *Xia* Pls.' Post–Hearing Supp. Mem., at 2. The *Liu* Plaintiffs' argue that Defendant Liu's new status substantially diminishes foreign policy implications of this suit. Notice of Change in Defendant's Status (Feb. 3.2003); Nathan Decl. Nonetheless, the newspaper article attached as an exhibit to the *Liu* Plaintiffs' Notice describes the Chinese Communist Party Politburo as "the second highest body of power in China." Exh. 1; *see also* Exh. 2 (Politburo is "second highest seat of power")

The Court is not convinced that this change materially alters the *Sabbatino* analysis. First, Defendant Liu was the Mayor at the time the suit was filed and for a substantial period during the pendency of this suit. The concern about the disruption of foreign relations stemming from subjecting a sitting official to suit obtains to a large extent even if the official leaves the post during the pendency of the suit. Second, Defendant Liu has left the position of Mayor for a "more powerful" position. While there is a distinction between Chinese Communist Party and the government, and Defendant Liu may no longer be a government official *per se,* Plaintiffs do not seriously dispute that the Chinese Communist Party wields considerable, virtually monopolistic, political power over the mechanisms of government in the PRC. *Cf.* Nathan Decl. ¶ 6 (acknowledging the Chinese Communist Party's "tight control over government ..."); Robert C. Berring, *Chinese Law, Trade and the New Century,* 20 Nw. J. Int'l L. & Bus. 425, 444 (2000) ("The CCP [Chinese Communist Party] still monopolizes power and refuses to accept challenges to its authority. The problems swirling around the Falun Gong sect illustrate this monopoly on power."). In fact, the State Department describes the PRC as "an authoritarian state in which the Chinese Communist Party (CCP) is the paramount source of power. At the national and regional levels, Party members hold almost all top government, police, and military positions. Ultimate authority rests with members of the Politburo." Country Reports on Human Rights Practices—2001, China, U.S. Dept. of State, March 4, 2001, at 1. Plaintiffs concede that Defendant Liu will assume a "more powerful" position as a high ranking official within the CCP and that "Defendant Liu will continue to exert considerable influence over policies and actions of government at both the local and national levels" *Xia* Pls.' Post–Hearing Supp. Mem., at 3–4. Presumably those policies and actions includes the national policy of repressing the Falun Gong. Plaintiffs do not contend otherwise. Thus, Defendant Liu's promotion contrasts sharply to Ferdinand Marcos' status as "deposed dictator." 862 F.2d at 1360.

Finally, and most importantly, the essence of the suit at bar is a challenge to the nationally directed policies of Falun Gong repression implemented by Defendants Liu and Xia. According to the Plaintiffs, these policies are ongoing and transcend the individual defendants. This is not a case where the existing national government has disavowed the conduct of a former official. *Cf. Hilao II,* 25 F.3d at 1472 (current Philippine government stated that Marcos' acts were "clearly in violation of existing law"). Given the policy concerns of the act of state doctrine, the risk of interfering with foreign sovereignty and disrupting foreign relations remain largely unaffected by Defendant Liu's change in position. As such, the third

Sabbatino factor weighs in favor of applying the act of state doctrine.

### 4. Whether the Foreign State Was Acting in the Public Interest

As noted above, the PRC contends in its letter submitted to this Court that its actions outlawing Falun Gong were taken because of the threat to public health and safety posed by the "cult." Even if the PRC's purpose in singling out the Falun Gong movement were demonstrated by competent evidence and thus found to be taken in the "public interest," it would be difficult to conclude that the more specific actions allegedly taken in violation of international human rights—*e.g.* torture, cruel, inhuman or degrading treatment and arbitrary detentions—were "in the public interest." The PRC does not attempt to justify the alleged violations of international human rights. Rather, it categorically denies that they occurred. Indeed, the PRC contends that any such violations would be contrary to Chinese law. Thus, this Court cannot conclude that if alleged violations are proven, they were done "in the public interest."

### 5. Summary

Although the first and fourth *Sabbatino* factor weigh in favor of exercising jurisdiction over the instant case, the second and third factors weigh strongly against it. As noted above, the touchstone of the act of state doctrine is, the risk of interfering with the conduct of foreign relations by coordinate branches of government. That this suit is brought against sitting officials aggravates that risk. Hence, the second and third factor coalesce to counsel strongly against assertion of jurisdiction. However, because the risk of interfering with the Executive Branch is minimal were this Court to enter declaratory judgment, particular if, as discussed below, that judgment is limited to the individual claims brought by the Plaintiffs, the Court concludes that the act of state doctrine bars plaintiffs' claim for damages and injunctive relief but not their claim for declaratory relief.

### VII. ANALYSIS OF PLAINTIFF'S HUMAN RIGHTS CLAIMS

 While the Plaintiffs in both the *Liu* and *Xia* cases have asserted claims of torture under the TVPA and numerous other human rights violations under the ATCA, as explained below, the Court concludes that only certain claims—torture under the TVPA, arbitrary detention under the ATCA, and cruel, inhuman, or degrading treatment under the ATCA are justiciable.

At the outset, it should be emphasized that only claims of the individual Plaintiffs in each case are before the Court. The *Liu* suit is brought by six individuals. The *Xia* suit is brought nominally as a class action by three individual lead plaintiffs (one of whom is suing on behalf of her mother who is incarcerated in a prison labor camp). However, the *Xia* Plaintiffs have never moved to certify the class. Hence, the human rights claims asserted must be assessed in the context of the nine individuals Plaintiffs before the Court.

Moreover, although the individual Defendant officials have not answered and defaulted, the PRC has filed, through the State Department, a statement in opposition to this court's adjudication of the *Liu* and *Xia* lawsuits. As noted above, in its opposition letter, the PRC contends, *inter alia*, that the Falun Gong was banned after the PRC concluded that it was a "cult" and an "unregistered and illegal organization," (Translation of China's Statement at ¶ 2), and that its founder, Li Hongzhi, and certain practitioners have

committed activities that pose a "serious threat to public security," such as:

- "[H]arassing and assaulting people who have different views with them,";
- Organizing "many illegal mass gatherings, disrupting and blocking the traffic and provoking and stirring up troubles[,]";
- "[S]tealing state secrets, sabotaging broadcasting, television and other public facilities, intentionally attacking the national satellite facilities and jamming the broadcasting of satellite programs[,]";
- Instigating "self-immolation for the sake of 'ascending to Heaven[,]'"; and
- Plotting and committing "train derailing or suicide bombings."

*Id.* ¶ 1. Thus, on July 29, 1999, the PRC issued an arrest order for Li Hongzhi. *Id.* ¶ 2. As such, the PRC contends that in outlawing the Falun Gong, it acted "in accordance with law." *Id.* Viewed in this context, the Plaintiffs' claims can be divided into two categories. First, there are claims which allege human rights abuses suffered directly by the individual Plaintiffs while detained by Chinese authorities-torture, cruel, inhuman and degrading treatment, and arbitrary detention. These claims are not dependent upon the legality of the PRC's decision to outlaw the Falun Gong or the bona fides of the PRC's asserted justification for the arrest and detentions of FLG supporters and practitioners. Nor do they depend on facts beyond the individual circumstances of the detention of each individual Plaintiff. As the Plaintiffs assert in their reply to the PRC's filing, at least with respect to these claims, "the lawfulness of Falun Gong is not an issue that needs to be addressed by

the Court ... since the sole question posed by the complaints is whether Defendant officials carried out acts of torture [ ] and other gross human rights violations against the Plaintiffs ... If they did, the reason they committed the atrocities is irrelevant." Plaintiffs' Motion to Strike the Government of China's Statement, at 2. As explained below, if the Defendants herein committed or are legally responsible for the commission of the acts complained of, such as torture, while the Plaintiffs were detained, any asserted justification for their arrest is legally irrelevant.

Second, there are the broader claims asserted by the Plaintiffs which do require assessment of the government's action in outlawing of Falun Gong and the bona fides of the government's purpose. These claims also require determination of facts that extend beyond their circumstances of the individual Plaintiffs.

Thus, for instance, the claim of genocide asserted by the *Xia* Plaintiffs requires a factual showing of either large scale or widespread systematic practices on the part of the defendant. Genocide, as defined by the Restatement, is an act committed with the intent to destroy a whole or a part of a national, ethnical, racial, or religious group. Restatement § 702, cmt. d. The International Criminal Tribunal for Yugoslavia ("ICTY") held that genocidal intent lies only when "a reasonably substantial number relative to the total population of the group" within a geographic area has been physically destroyed. *Prosecutor v. Sikirica,* Judgement Case No. IT–95–8–T, ¶ 65 (Int'l Crim. Trib. Yugoslavia, Trial Chambers, Sept. 3, 2001) *available at* http://www.un.org/icty/sikirica/judgement/010903r98bis-e.pdf.[34] Before

---

34. Thus, for instance the ITCY in *Sikirica* held that two percent of a population in a certain geographical area "would hardly qualify as a 'reasonably substantial' part of the ... population." *Sikirica,* 72.

ratifying the Genocide Convention, the United States Senate made a similar declaration. The Senate declared that genocidal intent lies only when a "substantial number" of victims have been killed. S. Exec. Rep. No. 94–23, at 1–2, 6, 18 (1976); see also David Alonzo–Maizlish, Note, In Whole or in Part: Group Rights, the Intent Element of Genocide and the "Quantitative Criterion," 77 N.Y.U.L.Rev. 1369, 1374 n. 16, 1385 (2002) (quoting the "substantial number" language in S. Exec. Rep. No. 94–23).[35]

The claim of crimes against humanity asserted by the *Liu* Plaintiffs likewise requires finding of facts beyond the circumstances of the individual plaintiffs. The scope of a defendant's actions is probative of the *actus reus* element of the crime. *Prosecutor v. Akayesu,* Judgment, Case No. ICTR–96–4–T, 568–581 (Int'l Crim. Trib. Rwanda, Trial Chamber I, Sept. 2, 1998) 1998 WL 1782077 (UN ICT (Trial)(Rwa)). A crime against humanity is specifically defined, in part, as an act committed as part of a "widespread or systematic" attack against a civilian population. I.C.C. Statute, art. 7, 37 I.L.M. 999, 1004 (1998). The terms widespread and systematic have been defined as follows:

> The concept "widespread" may be defined as massive, frequent, large scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims. The concept of "systematic" may be defined as thoroughly organized and following a regular pattern on the basis of a common policy involving substantial public or private resources. There is no requirement that this policy must be adopted formally as the policy of a state. There must, however, be some kind of preconceived plan or policy.

*Akayesu,* 580 (cited the Report on the International Law Commission to the General Assembly, 51 U.N. GAOR Supp. (No 10) at 94, U.N.Doc. A/51/10 (1996)).[36]

Moreover, the claims alleging genocide and interference with freedom of religion and belief require an assessment of the government's justification for actions taken against the Falun Gong, including the arrest and detention of their practitioners' and supporters' freedoms. The right to freedom of religion and belief protected under the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights ("ICCPR") is subject to restrictions that are "necessary to protect public safety, order, health or morals, or the fundamental rights and freedoms of others." General Comment

---

**35.** Genocide is a "specific intent offense." *Beanal v. Freeport–McMoRan, Inc.,* 969 F.Supp. 362, 373 (E.D.La.1997), *aff'd* 197 F.3d 161 (5th Cir.1999); *Kadic,* 70 F.3d at 244; *see also Xuncax v. Gramajo,* 886 F.Supp. 162, 176, 188 (D.Mass.1995); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1354–55 (N.D.Ga.2002); *Sarei,* 221 F.Supp.2d at 1151; *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 316 (S.D.N.Y. 2003). Thus, the nature and scope of the practice is probative of the defendant's *mens rea. Prosecutor v. Akayesu,* Judgment, Case No. ICTR–96–4–T, 568 (Int'l Crim. Trib. Rwanda, Trial Chamber I, Sept. 2, 1998) 1998 WL 1782077 (UN ICT (Trial)(Rwa)). That intent may be inferred from, *inter alia,* the number of victims (*Prosecutor v. Sikirica,* Judgment, Case No. IT–95–8–T, 76–90 (Int'l Crim. Trib. Yugoslavia, Trial Chamber, Sept. 3, 2001) *available at* http://www.un.org/icty/sikirica/ judgement/010903r98bis-e.pdf) and the scale of atrocities committed. *Akayesu,* 523.

**36.** *See also Prosecutor v. Rutaganda,* 39 I.L.M. 557, 571 (Case No. ICTR–96–3–T, May 2000); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *10 (S.D.N.Y. Feb.28, 2002) (citing *Rutaganda* ); Darryl Robinson, *Defining "Crimes Against Humanity" at the Rome Conference,* 93 Am. J. Int'l L. 43, 47–52 (1999).

22 under Article 18 of the ICCPR, ¶ 8.[37] As noted above, the PRC asserts such justification in defense of its official actions outlawing the Falun Gong. *See generally* Translation of China's Statement. Genocide likewise requires a finding that rather than attempting to pursue a legitimate social goal, its perpetrators engage in acts "committed with intent to destroy" the targeted group and causing their physical destruction. Restatement § 702 cmt. d; *Kadic,* 70 F.3d at 244; *see also Beanal,* 969 F.Supp. at 373; *Xuncax,* 886 F.Supp. at 188; *Mehinovic,* 198 F.Supp.2d at 1354–55; *Sarei,* 221 F.Supp.2d at 1151; *Talisman,* 244 F.Supp.2d at 327.

The Court concludes only the first set of narrower claims pertaining to the individual Plaintiffs are appropriate for judgment by default in the instant cases. It does so for several reasons.

First, in contrast to claims which require the resolution of specific facts particular to the individual Plaintiffs before the Court, the broader claims which entail findings of systemic and widespread practices greatly enlarges the scope of the factual inquiry that must properly be undertaken; that inquiry would involve facts beyond that to which individual Plaintiffs may competently testify. Moreover, claims which require a determination into the bona fides, legitimacy and substantiation of the government's purpose in suppressing the Falun Gong would require the Court to delve into what is akin to legislative facts. It would entail a judicial inquiry well beyond the

concrete factual allegations pertaining to the individual claims.

While broad factual determinations are not inherently beyond the competence of the Court to adjudicate, the reliability of the process of determining such facts are severely compromised in the cases at bar. The instant cases are proceeding as default judgments against two mid-level officials who serve at local levels of government. That these cases are not formally brought against the national government of China, but against two local officials is significant in the context of the default judgment at issue herein. As previously noted, once a default is entered, the allegations of the complaint together with competent admissible evidence submitted by the moving party are usually treated as true. *TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917–18 (9th Cir.1987); *Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir.1978). While there normally is good reason for assuming that allegations directed against a defendant are admitted and true if left unanswered and unopposed, there is less reason to do so when the allegations are broad and implicate conduct and policies of others beyond the defendant's control, including in this case those of the national government. Judgment by default is not a reliable process for determining facts where the defaulting defendants are not in a position to admit facts pertaining to conduct and policy (*e.g.* that of the national government) beyond their control and who have less incentive to defend and controvert allegations directed at others.[38]

---

**37.** *See also Tachiona v. Mugabe,* 234 F.Supp.2d 401, 428–29 (S.D.N.Y.2002); Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion and Belief, art. 1(3), G.A. Res. 55, 35 U.N. GAOR Supp. No. 51; European Convention on Human Rights, Nov. 4, 1950, art. 15(1), 213 U.N.T.S. 221; American Convention on Human Rights, Jan. 7, 1970, art.

12(3), 1144 U.N.T.S. 123; African Charter of Human and Peoples' Rights, June 27, 1981, art. 8, OAU Doc. CAB/LEG/67/3/Rev. 5 (1981).

**38.** For instance, in numerous cases cited by the *Xia* Plaintiffs as evidence of abuses suffered by potential class members, the arrests and detentions took place in jurisdictions out-

Moreover, default judgment is a less reliable process for finding facts where the

scope of the facts are beyond that to which the individual plaintiffs are competent to allege and testify.[39] The possibility of dis-

side Beijing and the Liao Ning Province. In particular, at least eight alleged torture victims listed in the *Xia* unsworn affidavit may have been arrested and detained outside Liao Ning. The affidavit provides: (1) Wang Youji was arrested and detained in Gonji before being transferred to a Liao Ning facility, (2) Song Jinying was arrested in Paotai and detained at Wafangdian, (3) Case 15 was arrested by Heshijiao police, (4) Liu Shan's and Li Zhi's whereabouts are unknown, and (5) Miao Junjie's and Zheng Yuyine's places of arrest were undisclosed. The *Xia* Plaintiffs also rely on the State Department's report on human rights violations in China as evidence of the defendants' wrongdoings. However, the report merely lists the regions in China where human rights have been violated and does not focus specifically on the conduct of government officials in Beijing and Liao Ning. In addition to describing the conditions in Liao Ning, the report also highlights conditions in Heilongjian, Tianjin, Inner Mongolia, Zhejiang, Hebei, Shaanxi, Sichuan, Wuhan, Shanghai, Xinjiang, Guangxi, and Chongqing. In fact, the report makes no mention of human rights violations in Beijing.

**39.** In this respect, the evidence of specific abuses suffered by other individuals is not nearly as reliable as that pertaining to the named Plaintiffs. The *Xia* Plaintiffs have submitted a document entitle "Additional Un–Notarized Information Compiled by Falun Gong on Persecution, Torture and Execution of Practitioners in Liaoning Province" cataloging human rights violations suffered by others. It appears to be a summary compiled by unidentified persons through some undefined process, the evidentiary basis of which is unclear. Indeed, it is not accompanied by any sworn statement as to its authenticity, accuracy, or the other factors which would inform its admissibility as evidence. As such, it is not competent admissible evidence to prove the conduct described therein. Fed. R.Evid. 602–603. Furthermore, the statement contains inadmissible hearsay statements because they are unsworn out-of-court statements taken for the purposes of substantiating the *Xia* Plaintiffs' various claims of human rights violations. They do not fall within any hearsay exception categories provided under Fed.R.Evid. 803–804. *See Webb*

*v. Lewis*, 44 F.3d 1387, 1390–93 (9th Cir. 1994) (amended opinion) (statement taken by social worker trained to elicit descriptions of sexual abuse was inadmissible hearsay lacking guarantees of trustworthiness), *cert. denied*, 514 U.S. 1128, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995); *see also Idaho v. Wright*, 497 U.S. 805, 826–27, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Padilla v. Terhune*, 309 F.3d 614, 620 (9th Cir.2002); *United States v. Valdez–Soto*, 31 F.3d 1467, 1471 (9th Cir.1994), *cert. denied*, 514 U.S. 1113, 115 S.Ct. 1969, 131 L.Ed.2d 859 (1995); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 n. 6 (9th Cir.1991) (uncorroborated unsworn statement); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1552 (9th Cir.1989); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir.1985) (the court did not abuse its discretionary power by excluding unsworn affidavits prepared specifically to support a party's case by individuals who arguably have an interest in the outcome); *United States v. Satterfield*, 572 F.2d 687, 691 (9th Cir.1978); *Jackson v. Bache & Co., Inc.*, 381 F.Supp. 71, 100 n. 1 (N.D.Cal.1974).

The Plaintiffs also rely on reports such as an annual human rights report issued by the U.S. State Department which finds human rights violations by the government of China directed *inter alia* at the Falun Gong practitioners. The State Department's annual human rights reports have been held to fall within the public records exception to the hearsay rule under Fed.R.Evid. 803(8), and is thus admissible. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143–44 (2d Cir.2000); *see also Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1411 (9th Cir.1995) (relying on the annual reports in granting summary judgment on the issue of the fairness of Iranian courts), *cert. denied*, 516 U.S. 989, 116 S.Ct. 519, 133 L.Ed.2d 427 (1995); *Canales Martinez v. Dow Chem. Co.*, 219 F.Supp.2d 719, 735, 737, 740 (E.D.La.2002) (relying on annual reports on the fairness of the courts in Costa Rica, Honduras, and the Republic of Philippines in deciding whether those courts can provide an adequate form for the plaintiff's claims). The annual human rights reports have also been found to be trustworthy. *See Bridgeway*, 201 F.3d at 144. While the reports may be admissible evidence, they do not provide the same

putes concerning material facts, a factor informing the court's discretion in deciding whether to enter a default judgment (*Eitel, supra,* 782 F.2d at 1471–72) is magnified under these circumstances. And given the potential unreliability of making broad factual findings by default in these peculiar circumstances, the strong policy favoring a decision on the merits (*Eitel,* 782 F.2d at 1471–72) also counsels against entering default judgment on the broader claims.

Furthermore, to the extent adjudication of the broader human rights claims requires an assessment of the PRC's official decision to outlaw the Falun Gong, it implies a direct challenge to official governmental policy of the PRC. As discussed above (*see* Section V, *supra* ), such a challenge would, in substance, constitute the practical equivalent of a suit against the government of China, even though the suits are brought nominally against individual officials. *See Park v. Shin,* 313 F.3d at 1144. As such, these claims fall more squarely within the bar of the FSIA than suits challenging conduct unauthorized by official law of the foreign sovereignty.

Finally, to the extent the Court is required to pass on the legality and propriety of actions officially sanctioned and justified by the government of the PRC, such an adjudication implicates core concerns underpinning the act of state doctrine. As discussed above (*see* Section VI, *supra* ), although the Court concludes that even unofficial and publicly disclaimed policy (*e.g.* of torture) of the foreign state constitutes an "act of state" raising justiciability problems, the act of state doctrine is even more squarely implicated were the court required to rule on the legality of an "*offi-*

*cial* act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 405–06, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (emphasis added). *See Liu v. Republic. of China,* 892 F.2d 1419, 1432 (9th Cir.1989) (act of state doctrine implicated "when courts are asked to judge the legality or propriety of public acts committed within a foreign state's own borders"). *Cf. Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161, 167 (5th Cir.1999) ("the argument to abstain from interfering in a sovereign's environmental practices [alleged to inflict human rights violations and genocide] carries persuasive force especially when the alleged environmental torts and abuses occur within the sovereign's borders and do not affect neighboring countries").

Plaintiffs appear to implicitly acknowledge the difficulties that would inhere in the Court's adjudication of the lawfulness of PRC's decision to outlaw Falun Gong and the reasons for the alleged commission of human rights violations. As noted above, the Plaintiffs have stated that "the lawfulness of the Falun Gong spiritual movement and the activities of its practitioners and supporters in China need not be a matter of concern to this Court, and is not a valid basis for challenging this litigation." Plaintiffs' Motion to Strike the Government of China's Statements, at 2; *see also Liu* Plaintiffs' Response to Statements by United States Department of State and Government of the People's Republic of China, at 1–2, 13; *Xia* Plaintiffs' Reply to the State Department's Statement of Interest and Statement by the Government of China in Response to Questions Posed by the Court, at 5 (hereinafter "*Xia* Plaintiffs' Reply to State Depart-

---

quality of evidence as the specific and direct evidence substantiating the particular abuses allegedly suffered by the individual Plaintiffs.

The report has greater probative value in establishing as a general matter the scope and nature of human rights violations in China.

ment's Statement"). Moreover, Plaintiffs posit that "[t]he justifications for the Chinese government's prohibition of Falun Gong provided in China's Statements are immaterial to the case." *Liu* Plaintiff's Response to China's Statements, at 13. They also state that "the reason they committed the atrocities is irrelevant, and need not be considered as material to adjudication of the causes of action that have been presented." Plaintiffs' Motion to Strike, at 2. The Court agrees with these statements insofar as they relate to claims of torture, arbitrary detention, and cruel and inhuman treatment. The Court does not agree, however, that the other broader human rights claims would not require such an adjudication.

The above concerns counsel in favor of adjudicating only the individualized human rights claims of torture, cruel, inhuman, and degrading treatment, and arbitrary detention of the individual Plaintiffs. Accordingly, the Court below analyzes these three claims.

### A. *The Torture Claims (TVPA)*

The *Xia* Plaintiffs and two of the *Liu* Plaintiffs allege they were subject to torture and thus assert claims under the TVPA. Plaintiffs' allegations are sufficient to state claims of torture within the meaning of these laws. The TVPA defines torture as follows:

> (1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individu-

al for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

> (C) the threat of imminent death; or

> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality."

28 U.S.C. § 1350 note § 3(b). The TVPA's definition of torture mirrors that of the United Nations Convention Against Torture, etc. ("CAT"), previously mentioned in Part IV, *supra.* The Convention, which has been ratified by the United States,[40] defines torture as follows:

> For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information

---

**40.** *Li v. Ashcroft,* 312 F.3d 1094, 1102 (9th Cir.2002) ("The United States signed the Convention on April 18, 1988, and the Senate ratified it on October 27, 1990.... The Con-

vention became binding on the United States in November of 1994 after President Clinton delivered the ratifying documents to the United Nations ....") (citations omitted).

or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

*Available at* http://193.194.138.190/ html/menu3/b/h_cat39.htm. *See also* Restatement § 702 cmt. g (1987) (quoting the same definition of torture).

A threshold issue of standing must be addressed with respect to one Plaintiff. *Xia* Plaintiff B does not allege that she is a victim of torture herself. Rather, she seeks relief for the harm that has been inflicted on her parent, who is currently incarcerated in the Masanjia Labor Camp in Liao Ning Province. As such, she must establish her standing to sue under the TVPA.

### B. Standing for Plaintiff B

▉▉▉▉ There are two bases for standing under the TVPA: (1) where the plaintiff is a direct victim of the alleged torture and (2) where the plaintiff brings a claim on behalf of a deceased tortured victim. H.R.Rep. No. 102–367(III) *reprinted* in *1992 U.S.C.C.A.N.* 84, 87; S. Rep. 102–249(IV)(C). The House Report provides that the TVPA "authorizes the Federal courts to hear cases brought by or on behalf of a victim of any individual who subjects a person to torture or extrajudicial killing." H.R.Rep. No. 102–367(III)

*reprinted* in *1992 U.S.C.C.A.N.* at 87. Similarly, the Senate Report provides that the TVPA "permits suit by the victim or the victim's legal representative or a beneficiary in a wrongful death action." S. Rep. 102–249(IV)(C).

The Ninth Circuit has not ruled on the second basis for standing, *i.e.* to sue on behalf of tortured victims.[41] Regarding suits brought on behalf of others, two district court cases—*Cabello v. Fernandez Larios* and *Xuncax v. Gramajo*—suggest that the TVPA allows only claims brought on behalf of deceased torture victims. The court in *Cabello* provided that "[the legislature] intended to allow the surviving legal representative of a *deceased* torture victim to recover on behalf of the victim's estate." *Cabello v. Fernandez Larios,* 205 F.Supp.2d 1325, 1334–1335 (S.D.Fla.2002) (emphasis added). Similarly, in *Xuncax,* the court provided that "under either federal or state law, [the] plaintiffs cannot recover on behalf of their relatives for . . . torture." *Xuncax,* 886 F.Supp. at 192. Plaintiffs herein have not cited any persuasive authority to the contrary.

Accordingly, the Court concludes that absent a ruling from the Ninth Circuit holding to the contrary, *Xia* Plaintiff B has no standing to bring an action for torture on behalf of her parent. Her parent was not subject to an extrajudicial killing, and Plaintiff B herself does not allege she is a torture victim.

### C. Legal Sufficiency of the Plaintiffs' Claims of Torture

▉▉▉ The facts offered by the remaining plaintiffs who assert torture claims— Does I and II and Plaintiffs A and C— sufficiently support their claims of torture

**41.** In *Doe v. Unocal Corp.*, the Ninth Circuit held that where the action is not a class action, the plaintiff cannot recover damages based on injury to another (2002 WL 31063976 at *16), but as discussed *infra* footnote 7, *en banc* review is now pending in that case so the earlier ruling was withdrawn. 2003 WL 359787.

under the TVPA. To establish a cause of action for torture under the TVPA, each plaintiff must show the following: (1) that the defendant acted "under actual or apparent authority, or color of law," (2) that the defendant subjected the plaintiff to torture, (3) that the plaintiff has exhausted "adequate and available remedies," and (4) that the ten-year statute of limitations has not run. 28 U.S.C. § 1350 note § 2.

### 1. Color of Law or Authority

 Each plaintiff must first establish that governmental actors carried out the alleged torture. 28 U.S.C. § 1350 note § 2. With regards to the phrase "under actual or apparent authority, or color of law," the House Report provides that "the plaintiff must establish some governmental involvement in the torture to prove a claim." H.R. Rep No. 102–367(III) *reprinted* in *1992 U.S.C.C.A.N.* at 87. The TVPA bars suits brought against "purely private groups." *Id.*

Both complaints provide that PRC police and security forces conducted the torture. *Liu* Compl. ¶¶ 13–24 & *Xia* Compl. ¶¶ 9, 11. The acts were committed under color of authority. Furthermore, as discussed under Section VIII on Commander Responsibility, both Defendants Liu and Xia can be held responsible for their subordinates' conduct under both American and international law principles on commander responsibility. As such, the facts pleaded properly support a finding of governmental involvement in each plaintiff's alleged torture.

### 2. *Acts Rising to the Level of Torture*

After establishing the state actor requirement, the plaintiffs must show that they were subjected to acts rising to the level of torture. As noted above, the TVPA defines torture as:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severed pain or suffering . . ., is intentionally inflicted on that individual for such purposes as obtaining . . . information or a confession, punishing that individual . . ., intimidating or coercing that individual or a third person, or for . . . discrimination of any kind.

28 U.S.C. § 1350 note § 3(b)(1).

Does I and II and Plaintiffs A and C have each offered facts sufficient to support a finding of acts rising to the level of torture.

### a. Subjected to Torture While Under the Actor's Custody or Physical Control

For an act to constitute torture, it must first be conducted while the plaintiff was under "the offender's custody or physical control." 28 U.S.C. § 1350 note § 3(b)(1). Both complaints herein provide that PRC police and security forces conducted the alleged torture during the plaintiffs' arrests and detentions. *Liu* Compl. ¶¶ 13–25 & *Xia* Compl. ¶¶ 9–11, 25–27. Therefore, the first element of torture is met.

### b. Severe Pain or Suffering

 In order to constitute "torture" under the TVPA, the alleged acts must inflict "severe" pain or suffering. 28 U.S.C. § 1350, note § 3(b)(1). The TVPA definition borrows extensively from the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *supra* ("CAT"). *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 92 (D.C.Cir.2002). "The severity requirement is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemna-

tion that the term 'torture' both connotes and invokes." *Id.* " '[O]nly acts of a certain gravity shall be considered to constitute torture.' " *Id.* (citation omitted). Accordingly, "[n]ot all police brutality, not every instance of excessive force used against prisoners, is torture" under the TVPA. *Id.* at 93 (emphasis in original). Rather the term is " 'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.' " *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C.Cir.2003) (*quoting Price*, 294 F.3d at 92–93). The crucial issues is the degree of pain and suffering the torturer intended to and actually did inflict—"[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Price*, 294 F.3d at 92.

▇▇ The Ninth Circuit has not yet addressed the contours of the definition of torture under the TVPA. It has, however, in the context of persons seeking relief from deportation, interpreted the "torture" under the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA") which implements CAT. *See Li v. Ashcroft*, 312 F.3d 1094, 1103 (9th Cir.2002); *Al–Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir.2001). *See also Wang v. Ashcroft*, 320 F.3d 130, 133 (2d Cir.2003). FARRA prohibits deportation or extradition of an individual where there are substantial grounds for believing the individual would be in danger of being subjected to torture. 8 U.S.C. § 1231. Because the TVPA definition of torture borrows extensively from CAT and

thus the two statutes may be read *in pari materia*, the courts' interpretation and application of torture under CAT informs the interpretation of torture under the TVPA.[42]

In *Al–Saher*, the Ninth Circuit found that the petitioner, a native and citizen of Iraq seeking asylum in the United States, had been subject to torture in Iraq where he had been subjected to sustained beatings for a month during his first arrest, during which time he was tied and blindfolded and beaten by attackers' hands, feet and a thick electrical cable. 268 F.3d at 1145, 1147. During a second arrest, he was subjected to severe beatings and burned with cigarettes over an 8 to 10 day period. *Id.* The court concluded "[t]hese actions were specifically intended by officials to inflict severe physical pain on Al–Saher." Id. at 1147.

In contrast, in *Li v. Ashcroft*, the Ninth Circuit held that a petitioner seeking asylum had not established torture when she was forced to endure a pregnancy examination which lasted half an hour at the village birth control department. 312 F.3d at 1103. The court found the examination was not an "extreme form of cruel, inhuman treatment." *Id.*

In *Wang*, the Second Circuit held that the petitioner, who deserted the Chinese military, had not proven a likelihood that he would be subject to torture if returned based on a previous escape attempt in which he was captured, beaten, kicked and punched unconscious. *Wang*, 320 F.3d at 136, 144. Although the decision was based primarily on the lack of systemic evidence suggesting likelihood of torture, the court characterized the beating as "a deviant

---

**42.** Justice Department regulations interpreting the Foreign Affairs Reform and Restructuring Act of 1988 defines torture similarly to the TVPA. It requires, *inter alia*, the intentional infliction of "severe pain or suffering, whether physical or mental." 8 C.F.R. § 208.18(a)(1). It is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 208.18(a)(5).

practice carried out by one rogue military official."

In *Abebe–Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir.1996), the Eleventh Circuit held that detaining the victim, forcing her to undress, binding her legs and arms, and whipping her on the legs and back with wire and threatening her with death constituted torture.

In order to establish torture, the plaintiff must establish facts and details specific enough to permit the court to assess the severity of the mistreatment. In *Price*, the D.C. Circuit ruled the plaintiff's general allegations that prison guards "kick[ed], club[bed], and beat" the plaintiff was sufficiently detailed to determine whether the severity requirements for torture had been met. *Price*, 294 F.3d at 93. There was no information about the frequency, duration and parts of the body at which the beatings were aimed. *Id.* Nor was there information about weapons used to carry them out. *Id.* The court remanded the case to permit the plaintiff to amend the complaint. *Id.* at 94. *See Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 166 (5th Cir.1999) (plaintiffs asserting torture claims to provide "adequate factual specificity as to what had happened.").

A number of lower court cases have addressed the contours of torture actionable under the TVPA. The district court in *Daliberti v. Republic of Iraq* found that "direct attacks on a person and ... deprivation of basic human necessities [alleged by the victim] are *more than* enough to meet the definition of 'torture' in the Torture Victims Protection Act." 97 F.Supp.2d 38, 45 (D.D.C.2000) (emphasis added). The plaintiff in *Daliberti* alleged that he was confined for up to eleven days without lights, windows, water, a toilet, and a bed. *Id.* On one occasion, prison guards also stripped him naked, blindfolded him, and threatened him with electrocution by placing wires on his testicles. *Id.*

Two years later, the same district court found that being "held for fourteen months in cruel, inhuman conditions, denied sufficient food and water, subjected to constant and deliberate demoralization, physically beaten, possibly subjected to gruesome physical torture, and denied essential medical treatment" was torture. *Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 264 (D.D.C.2002).

In *Mehinovic v. Vuckovic*, the court found that the plaintiff's allegations sufficiently support a finding of physical and mental torture under the TVPA. 198 F.Supp.2d 1322, 1346 (N.D.Ga.2002). The plaintiffs in *Mehinovic* alleged that Bosnian Serb police officers subjected them to repeated "kicks and blows to the face, genitals, and other areas" until they almost lose consciousness. *Id.* at 1345. During the course of the physical beating, each plaintiff sustained either broken ribs or broken fingers. *Id.* at 1346. One plaintiff was also forced to play a "game of horse" in which a soldier rode on the plaintiff's back while hitting the plaintiff on the head with a baton. *Id.* Another plaintiff was hung upside until he almost lost consciousness. *Id.*

In *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222 (D.D.C.2002), the plaintiff was tortured for purposes of FSIA where terrorists inflicted severe pain on plaintiff over a four-day period in order to force him to confess to being an Israeli spy. *Id.* at 233–34 (citing TVPA). Plaintiff, who was already being treated for a painful bowel obstruction when he was kidnapped from a hospital, was gashed in the head by a rifle butt, was repeatedly kicked and punched severely, and was forced to witness others being savagely beaten. *Id.* at 226–28. The beatings compounded his medical condition so that he could not

stand, sit or even drink water, causing him to be near death from dehydration. *Id.*

In order to establish mental (in contrast to physical) torture, the TVPA requires a showing of "prolonged" mental harm that is caused by the threat that either the victim or another will be imminently subjected to death or severe physical pain or suffering. 28 U.S.C. § 1350 note § 3(b)(2). The TVPA does not define the length of time required for a finding of "prolonged" mental harm. The *Mehinovic* complaint alleged that the plaintiffs "feared that they would be killed by [the defendant] during the beatings he inflicted or during games of 'Russian roulette' " and that "each plaintiff continues to suffer long-term psychological harm as a result of the ordeals they suffered at the hands of the defendant and others." 198 F.Supp.2d at 1346.

■ While the precise contours of "torture" under the TVPA may be ill-defined, the statutory and regulatory definitions expressed in the TVPA, CAT and FARRA, together with the interpretive case law discussed above, make clear that while a single instance of "garden variety" excessive force may not constitute torture, sustained systematic beatings or use of particularly heinous acts such as electrical shock or other weapons or methods designed to inflict agony does constitute torture. As the court in *Price* noted, the court must assess the intensity, duration and heinousness of the agony inflicted. *Price,* 294 F.3d at 93.

■ Applied to the cases at bar, Does I and II and Plaintiffs A and C have all provided specific descriptions of acts that exceed "garden variety" excessive force. They each have alleged facts showing sustained beatings over a lengthy period. Some have alleged, in addition, heinous methods of inflicting agony.

In particular, both Does I and II specifically allege that severe mental and physical harm resulted from their brutal treatment by Beijing police forces and prison guards. *Liu* Compl. ¶¶ 13–25. Doe I sustained at least 20 days of physical beatings during which she was also subjected to "electric shocks through needles placed in her body." *Id.* ¶ 13–15. Each session lasted at least three hours. *Id.* ¶¶ 13–15. During one of the brutal sessions, she sustained head injuries so severe that the guards had to drag her out of the interrogation room to her cell. *Id.* ¶ 14. The severe beating caused her to lose the ability to eat. *Id.* ¶ 15.

Beijing security forces subjected Doe II to a similar course of brutality during her 32–day detention. *Liu* Compl. ¶¶ 17–25. When Doe II was arrested at a peaceful demonstration, "[p]olice officers repeatedly slapped her in the face and on her ears, causing her to temporarily lose her hearing." *Id.* ¶ 18. They also kicked her with their boots as they transported her to the detention center. *Id.* At the detention center, she was physically beaten and kicked in the head and chest until she lost consciousness. *Id.* ¶ 20. At one point, "four female officers pulled her hair and hit her head against the floor." *Id.* While she was unconscious, she was stripped naked. *Id.* Upon regaining her consciousness, she was subjected to more physical beating. "Several guards took her into another room, tied her down to a bed, and began interrogating her." *Id.* ¶ 21. She further alleges that when she refused to answer, they "pumped liquid" into a tube that was inserted through her nose, causing her "severe pain." *Id.* On one occasion, a guard allowed one of her cellmates to beat her severely in exchange for a reduced sentence. *Id.* ¶ 24. Her injuries from that beating was so severe that the guard had to stop the beating after twenty minutes and even felt "obliged to remove her from

**1318**

the cell." *Id.* ¶ 24. The severe physical beatings left her body marred with "purple and black bruises." *Id.* ¶ 22. In addition to the physical brutality, Beijing prison officials also subjected her to mental torture. She was forced to witness the guards' severe mistreatment of a close friend. *Id.* ¶ 20. Her "friend was sexually assaulted in her friend's vaginal area, causing the friend to hemorrhage" and deprived of medical treatment. *Id.*

Like the *Liu* Plaintiffs, *Xia* Plaintiffs A and C have also alleged facts that are legally sufficient to support a finding of severe pain and suffering. In fact, Plaintiffs A and C's ordeal spanned over a longer period of time than the ordeal of Does I and II. Like the plaintiff in *Daliberti*, the *Xia* Plaintiffs sustained direct attacks and were deprived of basic necessities for long periods of time. *Xia* Plaintiff A alleges that she was arrested twice and detained for a total of 104 days following the arrests. Confidential Affidavits of *Xia* Plaintiffs. During her detention, she was handcuffed back-to-back with other prisoners, and physically beaten. On one occasion, she was deprived of food, water, sleep, and the use of toilet facilities for three days and two nights. *Id.* As a result, she was forced to defecate on herself and "endure[d] the filth" on her body. *Id.* She was also placed on a torture device called "Di Lao," which is "a torture device for capital criminals that had not been use[d] since the Cultural Revolution." *Id.* Plaintiff A further states that the "rusted torture instruments" were used to grind the detainees' wrists and ankles until the detainees bled. *Id.* The guards also sealed her mouth with adhesive tape to prevent her from reciting Falun Gong beliefs while she was on the Di Lao. *Id.*

Like Plaintiff A, Plaintiff C was also physically beaten by the Liao Ning Province police during two periods of detention totaling 78 days. Confidential Affidavits of *Xia* Plaintiffs. On at least one occasion, prison guards brutally beat him with an electric baton, a leather belt, and iron chains until he bled and until he lost consciousness. Confidential Affidavits of *Xia* Plaintiffs & *Xia* Compl. ¶ 11. On other occasions, he was "hung from water pipes for three days, handcuffed to other prisoners and not allowed to sleep." *Xia* Compl. ¶ 27. The beatings left his foot badly mangled. *Id.* ¶ 11. After his release, Plaintiff C was continuously harassed by local police officers who threatened to send him to a labor camp. Confidential Affidavits of *Xia* Plaintiffs. Thus, he was forced to leave his home and go into hiding. *Id.*

In sum, all four plaintiffs have sufficiently alleged facts establishing the severe pain or suffering requirement for torture.

**c. Requisite Intent**

The last element that each plaintiff must establish is intent. 28 U.S.C. § 1350 note § 3(b)(1). The TVPA requires that the offender acted for such purposes as obtaining information, intimidation, punishment or discrimination. 28 U.S.C. § 1350 note § 3(b). The D.C. Circuit in *Price* explained that the list of purposes was included to illustrate "the common motivations that cause individuals to engage in torture." 294 F.3d at 93. The purpose of the intent requirement is to eliminate claims based on "haphazard" acts. *Id.*

In both cases, the arresting officers and prison guards are alleged to have acted, at the very least, for such purposes as obtaining information, intimidation, punishment, or discrimination. In the *Liu* case, Does I and II were arrested and detained *because* of their support of the Falun Gong practice. *Liu* Compl. ¶¶ 13–25. In the *Xia* case, Defendant Xia issued directives and orders calling for the targeting, intimidation and punishment of Falun Gong

practitioners as "hateful group acting against the best interests of Chinese society." *Xia* Compl. ¶ 23. According to the complaint, Plaintiff A was arrested, detained, and tortured for "her participation in the Falun Gong spiritual movement, and her belief and practice in Falun Gong related associations, observances and activities." *Id.* ¶ 9. Plaintiff C was arrested and detained because the Liao Ning Province police suspected that he was a Falun Gong practitioner. The *Xia* Complaint also alleges that "[p]olice questioned him as to whether he practiced Falun Gong and brutally beat him with an electric baton" when he refused to answer. *Xia* Compl. ¶ 27. When he refused to denounce the practice of Falun Gong, he was "hung from water pipes for three day, handcuffed to other prisoners and not allowed to sleep." *Id.* ¶ 27. As such, the facts as plead support a finding that the government officials in both cases acted with the requisite intent to intimidate, punish and discriminate against these individuals as the basis of their practice or support of Falun Gong. At the very least, the allegations establish these were not merely haphazard acts.

In sum, the facts offered by Does I and II and Plaintiffs A and C sufficiently support a finding that they have been subjected to acts rising to the level of torture.

### 3. *Exhaustion of Local Remedies and Statutes of Limitations*

■ In addition to requiring that the alleged acts come within the definition for torture, the TVPA also has two procedural requirements: (1) exhaustion of local remedies, and (2) commencement of an action within the statute of limitations period. 28 U.S.C. § 1350 note 2(b-c). Regarding exhaustion of remedies, the TVPA provides that the court "shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 note 2(b). However, this requirement is not jurisdictional. The responding party "has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use." *Hilao v. Estate of Marcos ("Hilao III")*, 103 F.3d 767, 778, n. 5 (9th Cir.1996) (quoting S.Rep. No. 102–249, at 9–10). By defaulting, neither defendant in the cases at bar has raised the affirmative defense of non-exhaustion. Moreover, even had the defense been properly raised, exhaustion may be excused where the plaintiff demonstrates that the local remedies are "ineffective, . . . inadequate, or obviously futile." *Id.; see Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1347, n. 30 (N.D.Ga.2002) (accord). As to the second procedural requirement, the TVPA provides: "No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose." 28 U.S.C. § 1350(c).

■ The facts offered in both complaints are sufficient to establish their compliance with both procedural requirements. First as to exhaustion of local remedies, the *Liu* Plaintiffs allege that "[i]n light of the repressive actions and policies of the People's Republic of China described above, and the control exerted over the Chinese judiciary by its executive authorities, there are no adequate and available remedies for Plaintiffs' claims in the People's Republic of China," and that the government has issued an ordinance prohibiting attorneys from engaging in legal advocacy on behalf of petitioners and that those making allegations against the government could suffer "serious reprisals." *Liu* Compl. ¶ 38. Specifically, Does I and II allege that they were arrested after they tried to appeal to the Beijing

Government on behalf of Falun Gong practitioners who have been arrested, detained and tortured. *Liu* Compl. ¶¶ 13, 17. Both of the Does have fled the PRC to escape further persecution. *Liu* Compl. ¶¶ 16, 25.

As for the *Xia* Plaintiffs, they allege that they cannot exhaust local remedies because of the risk of further persecution. Their complaint notes:

> [A]lphabetic designations have been used to substitute for the specific identities of the individually named plaintiffs in order to protect them and their families, some of whom remain within the jurisdiction of China, from reprisal, as a very real and substantial risk exists that the Government of China would seek to inflict punishment or coercion on the [p]laintiffs and/or their families as a result of their filing this lawsuit and bringing public exposure and criticism to the government's policies and practices regarding the intimidation of Falun Gong practitioners and the government's efforts to terminate the Falun Gong movement.

*Xia* Compl. ¶ 8. Exhaustion of remedies would have been ineffective and futile.

Regarding the statute of limitations, both actions are brought well within the statute of limitations period. The acts of torture alleged by the plaintiffs in both cases first took place in 1999. *Liu* Compl. ¶¶ 9–11 & *Xia* Compl. ¶¶ 13, 14. As such, the ten-year limitations period does not run until 2009. Thus, both actions are not time-barred.

In sum, the facts offered by Does I and II in the *Liu* action and Plaintiffs A and C in the *Xia* action sufficiently support their claims of torture under the TVPA. *Xia* Plaintiff B, however, has failed to state a claim on behalf of both herself and her parent.

### D. *Cruel, Inhuman or Degrading Treatment (ATCA)*

Does I and II and the four non-Chinese *Liu* Plaintiffs contend that their treatment constitutes cruel, inhuman, or degrading treatment in violation of the ATCA. Because torture is at the extreme end of the continuum of conduct which is cruel, inhuman or degrading *(Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1348 & n. 33 (N.D.Ga. 2002), (quoting Restatement § 702, Reporters' Note 5)), this Court's finding that Does I and II were subject to torture obviates their ATCA claims in this regard. The Court therefore addresses the claims of the other four *Liu* Plaintiffs.

The Ninth Circuit has held that to determine whether a tort in violation of the law of nations has been committed under the ATCA, the court must decide " [1] whether there is an applicable norm of international law [proscribing such a tort] ... recognized by the United States ... and [2] whether [that tort] was violated in [this] particular case.' " *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1383 (9th Cir.1998), (quoting *Trajano v. Marcos,* 978 F.2d 493, 502 (9th Cir.1992)). The applicable norm of international law must be " 'specific, universal, and obligatory.' " *Id.* at 1383 (quoting *Hilao II,* 25 F.3d at 1467). If the alleged conduct violates "well-established, universally recognized norms of international law" a claim may be stated under the ATCA. *Filartiga,* 630 F.2d at 888. As previously noted, the requisite clarity of definition under international law and specificity of the conduct violative of that definition, as expressed by the circuit courts in *Filartiga, Tel–Oren,* and *In re Estate of Marcos Human Rights Litigation,* was affirmed by the Supreme Court in *Sosa.* In determining norms of international law, the court may look to court decisions, the work of jurists and the

usage of nations. *Martinez*, 141 F.3d at 1383–84.[43]

"Cruel, inhuman, or degrading treatment" has been condemned by numerous sources of international law. *See* Restatement § 702(d). *See also* Universal Declaration of Human Rights, Dec. 10, 1948, art. 5, G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948); United Nations Convention Against Torture, etc., art. 16, S. Treaty Doc. No. 100–20, 23 I.L.M. 1027 (1984); International Covenant on Civil and Political Rights, March 23, 1976, art. 7, 999 U.N.T.S. 171 [hereinafter "ICCPR"]; *Forti v. Suarez–Mason,* 694 F.Supp. 707, 712 (N.D.Cal.1988); *Xuncax v. Gramajo,* 886 F.Supp. 162, 187 (D.Mass.1995); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *8 (S.D.N.Y.2002); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1348 (N.D.Ga.2002). The courts have thus held there is a clear international prohibition against cruel, inhuman or degrading treatment. *See Tachiona v. Mugabe,* 216 F.Supp.2d 262, 281 (S.D.N.Y.2002); *Mehinovic,* 198 F.Supp.2d at 1348; *Estate of Cabello,* 157 F.Supp.2d at 1360–61; *Jama v. U.S. I.N.S.,* 22 F.Supp.2d 353, 363 (D.N.J.1998); *Xuncax v. Gramajo,* 886 F.Supp. 162, 187 (D.Mass. 1995); *Forti,* 694 F.Supp. at 711.

The question is whether the prohibition on cruel, inhuman and degrading treatment "possesses the requisite elements of universality and specificity to constitute a recognized proscription under the customary law of nations." *Tachiona v. Mugabe,* 234 F.Supp.2d 401, 435 (S.D.N.Y.2002). There does not appear to be a specific standard for determining what constitutes such treatment. International law merely provides that "cruel, inhumane, or degrading treatment" encompasses acts falling short of torture. *See Mehinovic,* 198 F.Supp.2d at 1348 (cruel, inhuman or degrading treatment defined as including "acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of 'torture' or do not have the same purposes as 'torture.'"), *see also* Restatement § 702, Reporters' Note 5. In fact, the authorities provided by the Plaintiffs in their supplemental briefs merely illustrate the array of acts that courts around the world have found to be cruel, inhuman or degrading. *See* Aff. of International Law Scholars on the Status of Torture, Cruel, Inhuman or Degrading Treatment, Crimes Against Humanity, and Arbitrary Detention under International Law ["IL Aff."], 18–29. None of the international decisions cited by the Plaintiffs provides a specific standard for parsing out acts that are cruel, inhuman or degrading from acts that are not.

The courts have diverged in their approach to the question as to whether the prohibition on cruel, inhuman, or degrading treatment is sufficiently specific to be actionable under the ATCA. In *Forti,* the court held that there was no clear universally accepted guidance as to what constitutes such treatment. 694 F.Supp. at 712. The *Forti* court explained, "Absent some definition of what constitutes 'cruel, inhuman or degrading treatment' this Court has no way of determining what alleged treatment is actionable, and what is not." *Id.* at 712.

In contrast, the court in *Xuncax,* while acknowledging the complex definitional problem of this tort, reasoned that "[i]t is not necessary for every aspect of what

---

**43.** Within the Ninth Circuit TVPA and ATCA have the same ten-year statute of limitations. *Deutsch v. Turner Corp.,* 324 F.3d 692, 717 (9th Cir.2003); *Papa,* 281 F.3d at 1013.

Plaintiffs' claims are well within the statute of limitations since none of the alleged wrongdoing occurred prior to 1999.

might comprise a standard ... be fully defined and universally agreed before a given action meriting the label is clearly proscribed under international law ..." 886 F.Supp. at 187. The focus, under *Xuncax*, is on the specific conduct at issue, and the question under the ATCA is whether that conduct is universally condemned as cruel, inhuman, or degrading. *See Eastman Kodak Co. v. Kavlin*, 978 F.Supp. 1078, 1093 (S.D.Fla.1997) (issue is whether "the international community would ... agree that *that specific conduct* amounted to" a violation of customary international law) (emphasis in original).

This Court is persuaded that the *Xuncax* approach is correct. As the authorities cited above demonstrate, nearly every case addressing the question subsequent to *Forti* has held that conduct sufficiently egregious may be found to constitute cruel, inhuman or degrading treatment under the ATCA. Moreover, subsequent to *Forti*, the United States ratified the International Covenant of Civil and Political Rights which prohibits, *inter alia*, "cruel, inhuman or degrading treatment or punishment." *Estate of Cabello*, 157 F.Supp.2d at 1361. The fact that there may be doubt at the margins—a fact that inheres in any definition—does not negate the essence and application of that definition in clear cases.

This approach is entirely consistent with *Sosa*. The Court in *Sosa* acknowledged that the prohibition under international law of prolonged and arbitrary detention entailed a gray area at which it may be "hard [ ] to say which policies cross that line with the certainty" sufficient to state a common law claim under the ATCA; yet there are "some policies of prolonged arbitrary detentions [which] are so bad that those who enforce them become enemies of the human race." 124 S.Ct. at 2769. The inquiry turns on the specific facts of each

case and is not precluded simply because there are questions at the margins.

■ The Court therefore examines the allegations of each of the four non-Chinese plaintiffs in *Liu* to determine whether their alleged treatment is sufficiently severe so as to violate universally accepted norms prohibiting cruel, inhuman or degrading treatment. As previously noted, Plaintiffs Larsson, Lemish, and Odar allege that they were subjected to one day of incarceration and interrogation during which they were pushed, shoved, hit, and placed in a chokehold. *Liu* Compl., ¶¶ 26–29. Plaintiff Petit alleges that a police office attempted to force his hand into her vagina while several other officers pinned her down. *Id.* ¶ 26.

The allegations of specific conduct must be compared with existing authorities on international law to determine whether the specific conduct alleged violated universally established norms. Plaintiffs submit an affidavit of international scholars to establish such norms were violated here. However, none of the international decisions referenced in the Plaintiffs' affidavit supports a finding of cruel, inhuman or degrading treatment here. Affidavit of Int'l Scholars No. 1. The international cases before the United Nations Human Rights Commission, the Inter–American Commission on Human Rights, the European Court of Human Rights, and the African Commission on Human and Peoples' Rights cited therein described detention conditions and abuses far more severe than those alleged here.

For example, the United Nations Human Rights Committee has deemed the following conditions cruel, inhuman or degrading treatment: (1) a ex-convict abducted after serving his two-year prison term and his whereabouts cannot be ascertained, *see e.g. Tshishimbi v. Zaire*, Communication No. 542/1993, U.N. Doc.

CCPR/C/53/D/542/1993 ¶¶ 1–2.1 (1996); (2) a pre-trial detainee developed bronchitis after being confined for at least six days in a 25 square meter cell with up to 30 other detainees, deprived of food and sanitary facilities, and forced to sleep on the concrete floor without any covering or clothing, *Mukong v. Cameroon,* Communication No. 458/1991, U.N. Doc. CCPR/C/51/D/458/1991 ¶¶ 2.2–2.3 (1994); (3) a death row inmate confined in a cell that was filthy and infested with roaches, flies, and rats, and often, he was confined without natural lighting and ventilation for up to 24 hours at a time, deprived of necessary medical treatment, forced to sleep on the concrete floor, and physically beaten to the point that he required stitches, *Henry v. Trinidad and Tobago,* Communication No. 752/1997, U.N. Doc. CCPR/C/64/D/752/1997, ¶¶ 1.1–2.4 (1999); (4) a death row inmate subjected to at least two weeks of confinement with only one or two meals a day and sometimes without water, as well as beatings that resulted in serious physical injuries, such as fractured bones, *Hylton v. Jamaica,* Communication No. 407/1990, U.N. Doc. CCPR/C/51/D/407/1990, ¶¶ 2.6–2.7 (1994); and (5) a death row inmate subjected to regular physical beatings with clubs, batons, and electric wires that resulted in serious injuries and loss of consciousness, *Linton v. Jamaica,* Communication No. 255/1987, U.N. Doc. CCPR/C/46/D/255/1987, ¶¶ 2.1, 2.4 (1992).

The Inter–American Commission on Human Rights has deemed the following to constitute cruel, inhuman or degrading treatment: (1) a pre-trial detainee confined for 23 hours in a cell infested with flies and maggots that was pervaded by foul odor, and who was deprived of food, lighting, and ventilation and was left to bleed from serious injuries that resulted from being beaten with batons, *McKenzie v. Jamaica,* Case No. 12.023, ¶¶ 85–90 (2000), 1999 IACHR 918; and (2) a mentally ill prisoner subjected to regular physical beatings that on one occasion result in a visible head wound, *Congo v. Ecuador,* Case No. 11.427, ¶ 9 (1998), 1998 IACHR 475.

Cases before the European Court of Human Rights and Fundamental Freedoms involved similarly severe conditions: (1) a pre-trial detainee confined for approximately four days in sub-zero temperatures without bed or blankets and who was fed only bread and water and subjected to electric shocks and physical beatings, *Tekin v. Turkey,* 31 E.H.R.R. 95, ¶ 9 (2001); (2) a pre-trial detainee confined for up to two days and subjected to punches and kicks on the head, to the kidneys, right arm and upper leg, *Ribitsch v. Austria,* 21 E.H.R.R. 573, 575, ¶ 12 (1996); and (3) a pre-trial detainee subjected to beatings with batons and abuses that resulted in bruises all over his body that are up to 5 cm in diameter, *Assenov v. Bulgaria,* 28 E.H.R.R. 652, 663, ¶¶ 10–11 (1998).

Cases examined by the African Commission on Human and Peoples' Rights also involved such conditions as: (1) a pre-trial detainee confined for 147 days during which he was chained to the floor, not allowed to bathe, and fed only twice a day, *Media Rights Agenda v. Nigeria,* Comm. No. 224/98, ¶ 40 (2000); and (2) a pre-trial detainee confined for approximately two weeks during which he was subjected to unsanitary conditions, denied necessary medical attention, and physically beaten, *Huri–Laws v. Nigeria,* Comm. No. 225/98, ¶¶ 5–9 (2000).

United States courts have likewise found cruel, inhuman, or degrading treatment where severe mistreatment has been involved. *See Xuncax,* 886 F.Supp. at 187 (victims ·forced to witness the torture or severe mistreatment of an immediate rela-

tive, watch soldiers ransack one's home and threatening one's family, be subjected to bombings and grenade attacks); *Jama,* 22 F.Supp.2d at 358 (detainees not permitted to sleep under bright lights 24 hours a day, lived in filth and constant smell of human waste, being packed in rooms with twenty to forty detainees, beaten, deprived of privacy, subjected to degrading comments from guards and sexual abuse); *Mugabe,* 216 F.Supp.2d at 281–82 (victims subjected to being repeatedly hit on the head with the butt of a gun, set on fire, being repeatedly attacked and threatened with death); *Mehinovic,* 198 F.Supp.2d at 1348–49 (victims beaten and humiliated in front of others by *e.g.* having a crescent carved into the forehead, forced to lick own blood off police station walls); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *8 (S.D.N.Y.2002) (victims were forced into exile due to credible threat of physical harm, had to bribe defendant to gain a relative's freedom, were beaten, and had property destroyed in the course of a village ransacking).

Without diminishing the mistreatment allegedly suffered by Plaintiffs Larsson, Lemish, and Odar, their treatment pales in comparison to the acts which have been found by various courts and international authorities to constituted cruel, inhuman or degrading treatment.[44] Simply put, a

44. The Plaintiffs urge that finding cruel, inhuman or degrading treatment could be consistent with the Senate's ratifications of both the CAT and the ICCPR which reflects its intent to incorporate the constitutional test for cruel and unusual treatment or punishment prohibited by the Firth, Eighth, or Fourteenth Amendment. *See Cabello,* 157 F.Supp.2d at 1361. *See* CAT, 136 Cong. Rec. S10091, S10093 (July 19, 1990) (Text of Resolution Ratification); *see also* 138 Cong. Rec. S4781, S4783 (identical reservation amended to the ICCPR). As such, the Plaintiffs assert that the actions of the PRC security forces should be evaluated according to Constitutional standards for cruel and unusual punishment. Supp. MPA in Support of Motion for Default Judgment, at 29 (September 4, 2002). The conduct alleged by Plaintiffs Larsson, Lemish, and Odar, would appear to establish a *prima facie* due process violation applicable to pre-trial detainees. *See Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (whether force applied to detainee is unconstitutional turns on " 'whether the measure taken inflicted unnecessary and wanton pain and suffering' and whether 'force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm' ") (quoting *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)); *LeMaire v. Maass,* 12 F.3d 1444, 1454 (9th Cir.1993) (court must examine need for application of force, relationship between need and amount of force used, threat to officials, efforts to temper severity of force, and extent of injuries to detainee).

However, in ratifying the ICCPR, the Senate's expressed reservation states that "Art. 7 [prohibiting cruel, inhuman, or degrading treatment] shall not extend beyond protections of the 5th, 8th and 14th Amendments of the U.S. Constitution." *Mugabe,* 234 F.Supp.2d at 439 n. 151. Thus, it would appear that the Senate intended that U.S. constitutional standards set the outermost limit to the interpretation of the ICCRP and not necessarily state its equivalent.

In any event, irrespective of the Senate's interpretation, the constitutional standards of one nation is not necessarily determinative of standards to be followed by the international community as a whole. *See Cohen v. Hartman,* 634 F.2d 318, 319 (5th Cir.1981); *see also United States v. Smith,* 18 U.S. (5 Wheat) 153, 160–61, 5 L.Ed. 57 (1820); *Carmichael v. United Techs. Corp.,* 835 F.2d 109, 113 (5th Cir.1988); *Beanal,* 197 F.3d at 165. While one nation's practices may inform the question as to the existence of an internationally accepted standard, only those domestic standards rising to the level of customary usage and practice of the international community can constitute "the law of nations" under the ATCA. *Beanal,* 197 F.3d at 165. The instant case represents the converse of the dissents' position in *Alvarez–Machain* that the challenged conduct, transborder kidnapping of a Mexican national at the behest of the DEA, was authorized by the United States and thus could not violate the ATCA irrespective of

review of the authorities discussed above does not establish that the specific conduct alleged by these plaintiffs is universally prohibited by the international community as a whole.

On the other hand, the sexual abuse suffered by Plaintiff Petit is different. The United Nations Committee Against Torture's Initial Report specifically lists sexual abuse as a cruel act. *See* IL Aff. # 1, Para. 29. *See Jama*, 22 F.Supp.2d at 358–59 (sexual favors sought of female plaintiffs, including some being forced to submit to sexual assault as a precondition for contacting their lawyers by telephone, and male and female detainees subject to inappropriate touching).

Accordingly, Plaintiff Petit has stated a claim for cruel, inhuman or degrading treatment in violation of the ATCA. Plaintiffs Larsson, Lemish, and Odar have not.

## E. *Arbitrary Detention (ATCA)*

Each of the Plaintiffs in the *Liu* and *Xia* cases assert claims that they were subject to arbitrary arrests and detention in violation of the ATCA. The Ninth Circuit has held as a general proposition that the required norm of international law applicable under the ATCA be "specific, universal, and obligatory" (*Hilao II*, 25 F.3d at 1475) is satisfied with respect to the right to be free of arbitrary arrest and detention. In *Sosa*, the Supreme Court acknowledged that under some circumstances, prolonged arbitrary detention violates customary international law clearly enough to support a claim under the ATCA. 124 S.Ct. at 2769. *See Martinez v. City of Los Angeles*, 141 F.3d 1373, 1384 (9th Cir.1998) ("there is a clear international prohibition against arbitrary arrest and detention.") (citing the Universal Declaration of Human Rights ("Universal Declaration"), art. 9, the Inter-

national Covenant on Civil and Political Rights ("ICCPR"), art. 9, and the fact that at least 119 national constitutions recognize the right to be free from arbitrary detention) (other citations omitted).

The Supreme Court cited with apparent approval the definition of arbitrary detention contained in the Restatement § 702. 124 S.Ct. at 2768. The Restatement states that a "state violates international law if as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention." *Id.* at 2766, *quoting* Restatement § 702. *See Martinez*, 141 F.3d at 1384 (quoting the Restatement § 702 cmt. h). The Restatement further provides that detention is arbitrary if "it is not accompanied by notice of charges; if the person detained is not given early opportunity to communicate with family or to consult counsel; or is not brought to trial within a reasonable time." Restatement at § 702 cmt. h. *See also Mehinovic*, 198 F.Supp.2d at 1349 (plaintiffs were detained without ever being advised of any charges, were not brought before any court or tried for any offense, and detentions were not made pursuant to any law); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 at *7 (detention is arbitrary when person is detained without warrant or articulable suspicion, is not apprised of charges, and is not brought to trial).

In *Sosa*, the Court emphasized that to be actionable as a common law claim under the ATCA, the detention must be "prolonged;" "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment is insufficient to state such a claim." 124 S.Ct. at 2769. A number of lower courts have likewise given substantial weight to the length of the detention in assessing its arbitrariness. As Judge Jensen noted in *Forti v. Suarez–Mason* ("*For-*

international legal norms. 331 F.3d at 652– 53 (O'Scannlain dissenting).

*ti I* "), the international consensus is especially clear on the illegality of "prolonged" arbitrary detentions, noting that the Restatement makes express reference to "prolonged arbitrary detention." 672 F.Supp. 1531, 1541 (N.D.Cal.1987), *see also Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322 1349 (N.D. Ga.2002) and cases cited in *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1094 (S.D.Fla.1997). Logically, the fact that a detention is prolonged may determine whether the detention is "incompatible with the principles of justice or with the dignity of the human person" or whether the detainee was given a sufficiently "early opportunity to communicate with family or to consult counsel." Restatement § 702 cmt. h. Accordingly, under the Restatement as interpreted by *Sosa* and *Martinez,* the first step in the analysis is to determine whether the detention was prolonged.

Second, the court should examine whether the detention was arbitrary in that it was "incompatible with the principles of justice or with the dignity of the human person." *Martinez,* 141 F.3d at 1384 (*quoting* the Restatement § 702 cmt. h). In this regard, along with the factors referred to in the Restatement § 702 cmt. h (*e.g.* failure to notify detainee of charges, permit an early opportunity to communicate with family or consult with counsel), the conditions of confinement may be a factor. Where the detainee is subject to torture, courts have found the detention arbitrary. *See. e.g. Xuncax,* 886 F.Supp. at 169–70; *Paul v. Avril,* 901 F.Supp. 330, 335 (S.D.Fla.1994). Even if the conduct is short of torture, at least one court has found that inhuman conditions beyond the "run-of-the-mill due process violations," such as when the conditions of confinement are "horrendous by any contemporary standard of human decency," support a finding of arbitrary detention. *Eastman Kodak Co.,* 978 F.Supp. at 1094 (detainee

forced to share filthy cell with murderers, drug dealers and AIDS patients, and left without food, blanket or protection from inmates committing murder in his presence).

 Applying these standards to the cases at bar, the Court finds that the majority of the individual Plaintiffs have stated claims for prolonged arbitrary detention. Many suffered prolonged detention without being charged and without an opportunity to see family or obtain counsel. They were also detained under cruel or tortuous conditions.

### 1. *Doe v. Liu*

In the *Liu* case, Doe I was held to twenty days without being charged or being given an opportunity to see a family member or lawyer. *Liu* Compl., ¶ 13. *Cf. County of Riverside v. McLaughlin,* 500 U.S. 44, 56–58, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (under U.S. law, persons arrested without a warrant must be brought before a judicial officer for a probable cause hearing within 48 hours). As previously noted, she was subject to torture. Her confinement was prolonged under these circumstances. *Cf. Sosa, supra,* 124 S.Ct. at 2769 (detention of less than one day); *Eastman Kodak Co.,* 978 F.Supp. at 1094 (detention of eight or ten days can be sufficiently "substantial" so as to be constitute prolonged detention under adverse conditions of detention); *Mehinovic, supra,* 198 F.Supp.2d at 1349 (detention of plaintiff for one month during which he was subject to repeated beatings constituted arbitrary detention). Doe I's detention was arbitrary and prolonged.

Doe II was detained in 1999 for three days without being advised of any charges and was refused any opportunity to contact family or legal counsel. *Liu* Compl. ¶ 17. In 2000, she was detained in Beijing

for eleven days without charge or being tried for any offense. *Id.* ¶¶ 18–23. Her request to see any attorney was refused (and she was taunted for making the request) (*Id.* ¶ 23) and, as noted above, was subjected to torture as well as made to witness the beatings and sexual assault of others. *Id.* ¶ 20. She was then returned to her home town where she was detained for another fifteen day period. *Id.* ¶ 24. Her confinement of nearly a month without charge or opportunity to see an attorney and under condition of torture was prolonged. Her detention was also arbitrary.

Plaintiff Petit was detained for approximately 24 hours. *Liu* Compl. ¶ 26. She was not advised of any charges, nor was she permitted to contact her embassy or consult with legal counsel. *Id.* As noted above, she was made to suffer cruel, inhuman and degrading treatment during the confinement. *Id.* While the conditions of confinement were degrading and exceeded the bounds of decency, her detention of 24 hours was not sufficiently prolonged and arbitrary as to violate a well defined norm of customary international law required by *Sosa*.

Plaintiff Larsson was held for a day without being informed of charges or being permitted access to legal counsel or to contact his Embassy. He was struck and pushed several times but did not suffer any serious injury. *Liu* Compl. ¶ 27. His detention was not prolonged under *Sosa* as noted above. Nor does there appear to be a universal norm requiring the bringing charges within 24 hours or mandating that not being able to consult with counsel within 24 hours constitutes deprivation of "an early opportunity" to consult with counsel. *Cf. Martinez,* 141 F.3d at 1384 (fact that plaintiff was brought before a judge within 72 hours militating against finding of arbitrary detention). Nor was

Plaintiff Larsson subject to inhuman conditions that exceed the "run-of-the-mill due process violations," (*Eastman Kodak Co.,* 978 F.Supp. at 1094) sufficient to render his confinement violative of a universally accepted norm of international law. He has not established a prolonged arbitrary detention in violation of the ATCA.

Plaintiffs Lemish and Odar were detained for similar periods of time and under similar conditions as that suffered by Plaintiff Larsson. *Liu* Compl. ¶¶ 28–29. They therefore also fail to establish a claim under the ATCA for prolonged arbitrary detention.

### 2. *Plaintiff A v. Xia*

Plaintiff A was detained in 1999 for 49 days. She was charged with "disrupting social order." *Liu* Compl. ¶ 33. As discussed above, she was subject to torture and inhuman treatment during her detention. In 2000, she was detained for an additional 55 days and charged of being "suspected of converting back the converted Falun Gong practitioners." Confidential Affidavit. It appears she was never brought to trial. Although her arrest was arguably pursuant to color of law, her detentions were prolonged and at least the first was under inhuman conditions inconsistent with human dignity. She was therefore subjected to prolonged arbitrary detention. *Cf. Sosa, supra,* 124 S.Ct. at 2768, n. 27 (discussing claims for relief in connection with U.S. hostages in Iran which lasted "many months") (internal quotation omitted).

Plaintiff C was arrested in 1999 and detained for 13 days during which he was subject to torture including being subjected to an electric baton, leather belt and iron chains. Confidential Affidavit. In 2000, he was detained for more than fifteen days and again was tortured by being beaten with an electric baton, forced to

hang by handcuffs from a water pipe for three days, and deprived of sleep. It does not appear that he was ever brought to trial. The length and tortuous conditions of confinement establish he was subjected to prolonged arbitrary detention.

### 3. Conclusion

Doe I and Doe II in the *Liu* case and Plaintiff A and Plaintiff C in the *Xia* case have established claims for prolonged arbitrary detention under the ATCA. The other individual plaintiffs have not.[45]

## VIII. COMMANDER RESPONSIBILITY

The Plaintiffs in both the *Liu* and *Xia* cases do not contend that the Defendants in each case—the then Mayor of Beijing and the Deputy Provincial Governor of Liao Ning Province—directly engaged in the alleged conduct. Instead, both sets of Plaintiffs allege that the Defendants were legally responsible for the actions taken by security forces under their control.

The *Liu* Plaintiffs allege that Beijing police and other security forces under Defendant Liu's management, command, and supervisory authority engaged in widespread detention and torture of Falun Gong practitioners. *Liu* Compl. ¶¶ 32–34. The Plaintiffs allege that Defendant Liu as Mayor "planned, instigated, ordered, authorized, or incited police and other security forces to commit the abuses suffered by Plaintiffs, and had command or superior responsibility over, controlled, or aided and abetted such forces in their commission of such abuses." *Id.* ¶ 37. The *Liu* Complaint alleges that: (1) the city of Beijing has been a focal point of the repression and persecution of Falun Gong practitioners since 1999; (2) the police and other security forces have repeatedly detained and tortured practitioners participating in assemblies and demonstrations; and (3) such abuses have been widely reported. *Id.* ¶ 32. Importantly, the *Liu* Complaint alleges that "Defendant Liu knew or reasonably should have known that Beijing police and other security forces were engaged in a pattern or practice of severe human rights abuses against Falun Gong practitioners." *Id.* ¶ 33.

In *Xia*, Plaintiffs allege that Defendant Xia, as Deputy Mayor, Deputy Mayor of General Affairs and Member of the City Council of Da Lain City, exercised general supervisory authority over the operation of the law enforcement and correctional systems and the carrying out of the government's policy of repression of Falun Gong

---

**45.** The *Xia* Plaintiffs have also failed to establish two other claims: (1) that Defendant Xia violated their right to life, as defined by Article 6 of the ICCPR; and (2) that Defendant Xia violated their protected rights under customary international law of human rights. First, the plaintiffs lack standing to assert a right to life claim. Claims of deprivation of the right to life are predicated on actions resulting in the taking of human life. General Comment 14 under Article 6 of the ICCPR. The plaintiffs initially asserted this claim as part of a class action on behalf of over 100 Falun Gong practitioners who have alleged died from torture. *See Xia* Compl. ¶ 32. However, the class was never certified. Because all of the individual plaintiffs are still living, they have no cause of action for deprivation of the right to life. Second, the plaintiffs allege that in addition to having causes of action under the ATCA for violations of treaty-based law of nations on torture, genocide, arbitrary detention, religious persecution, and deprivation of the right to life, they also have causes of action under customary international law of human rights for the same atrocities. *See Xia* Compl. ¶ 35. The plaintiffs, however, provide no additional authorities to support their customary international law claims independent of the argument that the allegations violate the law of nations under the ATCA. As such, the claims are redundant with the more specific ATCA claims.

practitioners. *Xia* Compl. ¶ 15. Plaintiffs also allege that as Deputy Provincial Governor of Liao Ning Province, where there has been widespread crack down upon the Falun Gong, Defendant Xia played a "key part of the general governance body made up of the highest level officials" that exercises supervision and authority over law enforcement and prison management. *Id.* ¶ 17. The *Xia* Complaint alleges that the Liao Ning Province: (1) is known to be one of the most repressive and abusive jurisdictions in China as regards to its arrest and treatment of Falun Gong practitioners; (2) has one of the highest death tolls of Falun Gong detainees (27 since July 20, 1999); (3) and is the site of the most notorious prison labor camps in the country used to incarcerate and torture Falun Gong practitioners—470 practitioners were alleged to have been detained in June of 2000. *Id.* ¶ 20. According to the *Xia* Complaint, Defendant Xia actively participated in the general governing councils of Da Lian City and Liao Ning Province which actively carried out the policy of repression. *Id.* ¶ 23. Plaintiff's injuries are alleged to have been the direct result of the actions of the Defendant and those with whom he acted in concert. *Id.* ¶ 28. Although the *Xia* Complaint alludes to Defendant Xia's acting in concert with and conspiring with others, the only operative facts alleged pertain to his role in the governance of subordinates who conducted the claimed abuses. In this regard, the Complaint against Defendant Xia differs from that against Defendant Liu in that Liu is alleged to have acted essentially as a chief or sole commander of the subordinate forces and Xia is alleged to have acted only as part of a governing council or group under which subordinates carried out repressive policies.

Thus, the gist of the assertion of Defendants' liability in both cases is their exercise of superior or command authority over police and security forces who carried out the alleged abuses. The Ninth Circuit, in *Hilao III*, addressed similar claims against President Marcos, and held:

> The principle of command responsibility that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law in connection with acts committed in wartime, as the Supreme Court's opinion in *In re Yamashita*, 327 U.S. 1, 14–16, 66 S.Ct. 340, 90 L.Ed. 499 (1946), indicates . . .

103 F.3d at 777. In *In re Yamashita*, the Court held that the military governor of the Philippines and commander of the Japanese forces had an affirmative duty to take such measures within his power to protect prisoners of war and the civilian population. 327 U.S. at 14–16, 66 S.Ct. 340. In *Hilao III*, the Ninth Circuit cited the Protocol to the Geneva Conventions of August 12, 1949 (hereinafter referred to as the "Geneva Convention Protocol") and the Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia (hereinafter referred to as the "Former Yugoslavia Statute") as additional evidence of international law principles. In Article 86(2), the Geneva Convention Protocol states that "the fact that a breach of the Conventions or of this Protocol was committed by a subordinate does not absolve his superiors from penal [or] disciplinary responsibility . . . if they knew, or had information which should have enabled them to conclude in the circumstances at the time, that he was committing or was going to commit such a breach, and if they did not take all feasible measures within their power to prevent or repress the breach." *Hilao III*, 103 F.3d at 777 (citing the Geneva Convention Protocol, 16 I.L.M. 1391, 1429 (1977)). The

Ninth Circuit cited the Former Yugoslavia Statute as stating that the fact that a human rights violation was committed "by a subordinate does not relieve ... [the] superior of criminal responsibility if he knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof." *Hilao III*, 103 F.3d at 777 (citing the Former Yugoslavia Statute, art. 7(3), 32 I.L.M. 1159, 1192–94 (1993)). The Ninth Circuit also cited with approval *Paul v. Avril*, which held the former military ruler of Haiti responsible for arbitrary detention and torture committed by those "acting under his instructions, authority, and control and acting within the scope of authority granted by him." 901 F.Supp. 330, 335 (S.D.Fla.1994).[46]

Similarly, in a suit against the Director of the Salvadoran National Guard and El Salvador's Minister of Defense brought by survivors of churchwomen tortured and murdered by the Salvador National Guardsmen, the Eleventh Circuit endorsed the command responsibility doctrine. *Ford v. Garcia*, 289 F.3d 1283, 1288–89 (11th Cir.2002). The court held that the essential elements of such responsibility are: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." 289 F.3d at 1288. *See*

*also* Statute of the International Tribunal for Rwanda, U.N. SCOR, 49th Sess., art. 6(3), U.N. Doc. S/Res/955 (1994) (superior criminally responsible "if he or she knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof.").

While these cases and statutes have involved war or war-like contexts, the Ninth Circuit noted that the "United States has moved toward recognizing similar 'command responsibility' for torture that occurs in peacetime, perhaps because the goal of international law regarding the treatment of non-combatants in wartime—to protect civilian populations and prisoners ... from brutality, is similar to the goal of international human-rights law." *Hilao III*, 103 F.3d at 777 (quoting *In re Yamashita*, 327 U.S. at 15, 66 S.Ct. 340). The *Hilao III* court noted that the legislative history of the TVPA supports application of the doctrine, as the Senate expressly recognized responsibility for "anyone with higher authority who authorized, tolerated or knowingly ignored those acts ..." *Id.* (quoting S.Rep. No. 102–249, at 9). The Senate Report specifically refers to *In Re Yamashita* in which the Court held the commander responsible for war crimes which "he knew or should have known they were going on but failed to prevent or punish them." The Senate thus implicitly endorsed the application of command responsibility to acts of torture and extrajudicial killings whether committed by military or civilian forces. S.Rep. No. 102–249 at 9. Notably, the text of the TVPA does not

---

46. The evolution of the doctrine of command responsibility as an international principle after WWI is described in detail by the International Court in *Prosecutor v. Delalic*, No. IT– 96–21–T, 1998 WL 2013972, ¶¶ 333–43 (U.N.I.C.T.(Yug.)), *available at* http://www.un.org/icty/celebici/trialc21judgement/cel-tj981116e.pdf.

limit its applicability to acts of military officials or the context of war. *Id.*

Similarly, the statutes of the International Criminal Tribunal for Former Yugoslavia and Rwanda applied the doctrine of commander responsibility to civilian superiors as well as military commanders. In interpreting the Statute of the International Tribunal for Rwanda, the International Court in *Prosecutor v. Kayishema & Ruzindana,* after noting that the principle of command responsibility is "firmly established in international law" and constitutes a "principle of customary international law," held that the doctrine of superior responsibility embodied in the authorizing statute extends beyond military commanders to "encompass political leaders and other civilian superiors in positions of authority." No. 95–1, 1999 WL 33268309 ¶¶ 209, 213–16 (U.N. I.C.T (Trial)(Rwanda)) (citation omitted) *available at* http://www.ictr.org. "The crucial question [is] not the civilian status of the accused, but of the degree of authority he exercised over his subordinates." *Id.* ¶ 216. The International Court reached the same conclusion in interpreting the statute applicable to human rights violations in the former Yugoslavia. *Delalic,* 1998 WL 2013972, ¶ 363 (principle of superior responsibility "extends not only to military commanders but also to individuals in non-military positions of superior authority").

 Defendants Liu and Xia meet the standard for commander responsibility. The *Liu* Plaintiffs clearly allege a superior-subordinate relationship between Defendant Liu and the police and other security forces which allegedly committed the human rights violations claimed herein. As Mayor of Beijing, the *Liu* Plaintiffs allege that Defendant Liu held the "power not only to formulate all important provincial policies and policy decision, but also to supervise, direct and lead the executive branch of the city government, which includes the operation of the Public Security Bureau of Beijing, under which the police operate, and other security forces." *Liu* Compl. ¶ 35. He had the authority to appoint, remove, and punish staff members in the state administrative organs and to manage public security and supervision within his administrative area. *Id.* According to the *Liu* Complaint, the Beijing police and jail security forces acted under his management, command, and supervisory authority. The doctrine of command responsibility applies to a superior who "exercised effective control, whether that control be *de jure* or *de facto.*" *Kayishema & Ruzindana,* 1999 WL 33268309, ¶ 222. What is required is "the material ability to prevent and punish the commission of these offences." *Delalic,* 1999 WL 2013972, ¶ 378. Defendant Liu was a "superior" or "commander" within the meaning of the doctrine.

The circumstances of Defendant Xia's authority is more complicated. The essence of the allegations in the *Xia* Complaint is that Xia, Deputy Mayor and Member of the City Council of Da Lian City and Deputy Provincial Governor for Liao Ning Province, served on general governance bodies that supervised the policies and allegedly illegal practices. *Xia* Compl. ¶¶ 15–17. The *Xia* Plaintiffs contend that they suffered injuries as a result of the actions of the Defendant and other municipal, provincial and national government officials "with whom he acted in concert" and "with whom he conspired." *Id.* ¶¶ 24, 28. Thus, the *Xia* Complaint does not appear to allege that Defendant Xia had lone authority to authorize the conduct at issue; rather, his authority was shared collectively with others through governing bodies. While international law does not appear to be as well established on this point, the recent decisions of the Interna-

tional Tribunals in Rwanda and Former Yugoslavia have held, based on precedent dating back to the Second World War, that the degree of "effective control" needed to apply the doctrine of command responsibility is flexible. Not only does it encompass *de facto* as well as *de jure* powers, it extends to situations where the commander has less than absolute power. It applies where the commander has a degree of "influence" not amounting to "formal powers of command." *Delalic*, 1998 WL 2013972, ¶ 375; *Kayishema & Ruzindana*, 1999 WL 33268306, ¶ 220. For instance, the International Tribunal in *Delalic* pointed to precedent in which commanders have been held responsible for war crimes committed by troops not formally under their command and where the Defendant played an integral part of the command structure by meeting with concentration camp commanders or the governing cabinet. *Id.* ¶¶ 372, 374, 376. As the Tribunal noted, the Tokyo Tribunal convicted Foreign Minister Koki Hirota on the basis of command responsibility for war crimes although he lacked the domestic legal authority to repress the crimes in question because the tribunal found "Hirota derelict in his duty in not 'insisting' before the cabinet that immediate action be taken to put an end to the crimes." *Id.* at 376. The tribunal found powers of persuasion rather than formal authority to order sufficient to establish commander responsibility. *Id.*[47] In this case, it is alleged that Defendant Xia possessed similar authority as a high ranking municipal and provincial official who "actively participated" in the governing bodies that supervised the acts of repression and "played a major policy-making and supervisory role in the policies

and practices that were carried out in Da Lian City." *Xia* Compl. ¶ 15.

The doctrine of aiding and abetting applicable under the ATCA, and presumably under the TVPA which was intended to supplement and enhance remedies under the ATCA, reinforces this conclusion. *Mehinovic*, 198 F.Supp.2d at 1355 ("United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law."); *see also* S.Rep. No. 249–102, at 8–9 and n. 16 (TVPA Senate report states that statute is intended to apply to those who "ordered, abetted, or assisted" in the violation); *Wiwa*, 2002 WL 319887 at *16 ("[T]he Court finds that the language and legislative history of the TVPA supports liability for aiders and abettors of torture and extrajudicial killings."). As noted above, the *Xia* Complaint in effect alleges that Defendant Xia actively encouraged repressive acts directed at Falun Gong practitioners and "played a major policy-making and supervisory role in the policies and practices that were carried out in Da Lian City." *Xia* Compl. ¶¶ 15, 16, 23.

The facts alleged also establish that Defendants Liu and Xia knew or should have known of the human rights violations committed by the police and security forces. Both complaints allege that the patterns of repression and abuse were widespread, pervasive, and widely reported, and that both Defendants actively encouraged and incited the crackdown on Falun Gong supporters. *See Liu* Compl. ¶¶ 32–37; *Xia* Compl. ¶¶ 14–24, 28. Under these circumstances, it may be inferred that both defendants either "knew or should have

---

**47.** To hold otherwise would make little sense. The fact that command is shared by more than one official should not obviate the doctrine of command responsibility *per se,* lest responsibility could never be imputed to members of a governing body which authorized human rights violations.

known" of the human rights violations committed by their subordinate police and security forces. *Ford,* 289 F.3d at 1288; *see* S.Rep. No. 102–249, at 9 ("'command responsibility' is shown by evidence of a pervasive pattern and practice of torture ..."); *cf. Xuncax v. Gramajo,* 886 F.Supp. 162, 171–73, 174–75 (D.Mass.1995) (defendant was aware of and supported widespread acts of brutality committed by personnel under his command).[48]

Finally, the allegations of both complaints, taken as a whole, establish that Defendants Liu and Xia failed to take "all feasible measures within their power" to prevent the alleged abuses. *Hilao III,* 103 F.3d at 777 (*quoting* Protocol to the Geneva Conventions of August 12, 1949, 16 I.L.M. 1391); *see* Rome Statute of the International Criminal Court, art 28(1)(b) and (2)(c), July 12, 1999, U.N. Doc. A/CONF. 183/9th (failure to take "all necessary and reasonable measures" within their powers to prevent violations); Statute of International Tribunal for Former Yugoslavia, U.N. SCOR, 48th Sess., at art. 7(3), U.N. Doc. S/RES/827 (1993)(accord) *available at* http:// www.un.org/icty/legal-doc/index.htm; Statute of International Tribunal for Rwanda, U.N. SCOR, 49th Sess., at art. 6(3), U.N. Doc. S/RES/955 (1994)(accord) *available at* http://

---

**48.** It should be noted that in *Hilao III,* the court rejected defendant's challenge to the jury instruction which permitted a finding liability if, *inter alia,* "Marcos knew of such conduct by the military and failed to use his power to prevent it." 103 F.3d at 776. While the Ninth Circuit therefore did not have occasion to rule on whether commander liability could be predicated on the more expansive "should have known" standard, as discussed above, the court's reasoning and the sources upon which it relied—Protocol to the Geneva Conventions, Statute of the International Tribunal re Former Yugoslavia, and *In Re Yamashita*—establish the broader basis for liability. Significantly, it does so in the context of establishing *criminal* liability. A *fortiorari,* at least as broad a standard should apply in the context of establishing *civil* liability. Such a result would be in accord with the Eleventh Circuit's decision in *Ford. See* 289 F.3d at 1288.

To be sure, at least one source of international law—the Rome Statute of the International Criminal Court (as amended on Nov. 10, 1998 and July 12, 1999)—draws a distinction between the imposition of criminal liability upon a "military commander or person effectively acting as military commander" and all other "superior and subordinate relationships." As to military commanders, liability may be established where the commander or person "either knew or, owing to the circumstances at the time, should have known that the forces were committing or about to commit such crimes." Art. 28(a), July 17, 1998, U.N. Doc A/Conf. 183/9th, 17 I.L.M. 999, 1017. As to others, liability requires that the "superior either knew, or consciously disregarded information which clearly indicated, that the subordinates were committing or about to commit such crimes" and that the concerned activities "were within the effective responsibility and control of the superior." *Id.* at art. 28(2)(a-b). Again, even if a distinction is drawn between military commanders and civilian superiors in the context of criminal liability, logic suggests that the imposition of civil liability may proceed on a broader theory of responsibility. In any event, the distinction between "should have known" and "conscious disregard" in the context of the instant cases is immaterial given the breadth of the allegations made against the two defendants herein; either standard is met. Furthermore, since the police and security forces involved in the alleged repression and abuses are arguably paramilitary-like organizations, defendants could well be deemed to be person "effectively acting as a military commander" under Article 28(a).

Finally, although the Senate Report on the TVPA refers to command liability for those who "authorized, tolerated or knowingly ignored" abuses—language which might suggest a higher standard of liability, it also endorses the *In re Yamashita* standard of command responsibility where the commander "knew or should have known" of the abuses. S.Rep. No. 102–249, at 9. It appears that Senate did not intend any difference in its use of varying descriptions of the standard for command responsibility.

www.ictr.org; *see also Ford,* 289 F.3d at 1288–89 (failure to prevent commission of crimes or punish subordinates after commission). The Plaintiffs allege that Defendants Liu and Xia, rather than taking steps to prevent the repressive acts, actively encourage and incited the repression of Falun Gong supporters.

Accordingly, command responsibility under both American and international law principles, may be imposed upon Defendants Liu and Xia.

## IX. *CONCLUSION & RECOMMENDATION*

Considering all the factors established in *Eitel v. McCool, supra,* which inform the Court's discretion in deciding whether to enter default judgments, particularly the analysis of the merits, consideration of justiciability concerns and the unusual posture of these cases, this Court recommends that default judgments be entered declaring that Defendants Liu and Xia are responsible respectively for violations of the rights of (1) Doe I and Doe II in *Liu* and Plaintiff A and Plaintiff C in *Xia* to be free from torture; (2) Ms. Petit in *Liu* to be free from cruel, inhuman, or degrading treatment; and (3) Doe I and Doe II in *Liu* and Plaintiff A and Plaintiff C in *Xia* to be free from arbitrary detention. In all other respects, the Plaintiffs' motions for entry of default judgment should be **DENIED** and the remaining claims be dismissed.

October 28, 2004.